IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ETP RIO RANCHO PARK, LLC; FAC-ABQ,
LLC; JUNGLE JAM, LLC and DUKE CITY
JUMP, LLC,

              Plaintiffs,

vs.                                                                            No. CIV 21-0092 JB/KK

MICHELLE LUJAN GRISHAM; TRACIE C.
COLLINS and TIM Q. JOHNSON,

              Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Application for Temporary

Restraining Order and Preliminary Injunction, filed February 4, 2021 (Doc. 4)("Motion").  The

Court held a hearing on the Plaintiffs' Motion for a Temporary Restraining Order ("TRO") on

February 5, 2021.  The primary issues are whether: (i) Governor Michelle Lujan Grisham, New

Mexico Department of Health Secretary-Designate Tracie C. Collins, and New Mexico

Department of Public Safety Acting Secretary Tim Q. Johnson ("the Defendants"), have violated

ETP Rio Rancho Park, LLC ("Elevate"), FAC-ABQ, LLC ("Cool Springz"), Jungle Jam, LLC

("Jungle Jam"), and Duke City Jump, LLC ("Duke City"), (collectively, "the Plaintiffs"),

substantive due process rights under the Constitution of the United States of America; (ii)

N.M.S.A. § 24-1-3(E) and New Mexico Department of Health ("NMDOH") Public Health Orders

("PHOs") are void for vagueness and unconstitutionally overbroad; (iii) NMAC 7.1.30 has

violated procedural due process both on its face and as applied to Elevate; (iv) the Defendants have

violated the Plaintiffs' equal protection rights; (v) the Court should abstain from hearing this case

with respect to Elevate under the abstention doctrine articulated in <u>Younger v. Harris</u>, 401 U.S. 37 (1971); and (vi) the Plaintiffs are entitled to a TRO.  The Court concludes that: (i) the Plaintiffs' substantive due process claims are unlikely to succeed on the merits because the Defendants' policies are rationally related to a legitimate state interest; (ii) the Plaintiffs' vagueness and over-broadness claims are unlikely to succeed on the merits because the Supreme Court has held consistently that the the phrase public health does not provide an undefined or unrestricted grant of authority; (iii) the Plaintiffs' procedural due claims are unlikely to succeed on the merits because the Defendants likely provided adequate post-deprivation process; (iv) the Plaintiffs' equal protection claims are unlikely to succeed on the merits because the Defendants' policies are rationally related to a legitimate state interest; (v) the Court will likely need to abstain from this case with respect to Elevate under <u>Younger v. Harris</u>, 401 U.S. 37, because there are ongoing state administrative proceedings that involve important state interests and provide an adequate forum for Elevate's claims; and (vi) the Plaintiffs are not entitled to a TRO because their claims are unlikely to succeed on the merits.  The Court, therefore, denies the TRO.

## FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success."  <u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.).  Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp. 2d at 1179 (quoting <u>Attorney Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d 769, 776 (10th Cir. 2009))(alteration in <u>Herrera v. Santa Fe Public Schools</u> only).  <u>See</u>

Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).

The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d at 1188.  Thus, while the Court does the best it can to make good findings from the record that it has and in the short time that it has to make findings, these findings of fact are relevant only for the purpose of  determining whether to issue a TRO and do not bind the Court or the parties at trial.  Accordingly, the Court finds as follows:

1.    **The Parties.**

1.    Elevate is an Arizona limited liability company duly registered with the New Mexico Secretary of State and authorized to conduct business in New Mexico.   See Verified Complaint for Violation of Constitutional Rights to Due Process and Equal Protection and Request for Preliminary and Permanent Injunctive Relief ¶ 1, at 1, filed February 4, 2021 (Doc. 1-1)("Complaint").

2.    Elevate operates a trampoline facility as Elevate Park in Rio Rancho, New Mexico. See Complaint ¶ 1, 13, at 1, 3.

3.    Cool Springz is a New Mexico limited liability company duly registered with the New Mexico Secretary of State and in good standing.   See Complaint ¶ 2, at 2.

4.    Cool Springz operates a trampoline facility in Albuquerque, New Mexico.  See

Complaint ¶ 2, 14, at 2, 3.

5.      Jungle Jam is a New Mexico limited liability  company duly registered with the New Mexico Secretary of State and in good standing.  See Complaint ¶ 3, at 2.

6.      Jungle Jam built a trampoline facility located at 9227 Coors Boulevard, NW in Albuquerque, New Mexico.  See Complaint ¶ 3, at 2.

7.      Jungle Jam completed construction of its trampoline facility on April 22, 2020, but has not been able to do business since construction was completed.  See Complaint ¶ 15, at 4.

8.      Duke City is a New Mexico limited liability company duly registered with the New Mexico Secretary of State and in good standing.   See Complaint ¶ 4, at 2.

9.      Duke City owns a trampoline facility and does business as Fallout Trampoline Arena.  See Complaint ¶ 4, 16 at 2, 4.

10.      Duke City's principal place of business is located in the Cottonwood Mall at 10000 Coors Bypass NW, Albuquerque, New Mexico.  See Complaint ¶ 4, at 2.

11.      Duke City's business is closed even though other business at the Cottonwood Mall remain open for business.  See Complaint ¶ 16, at 4.

12.      Michelle Lujan Grisham is Governor of the State of New Mexico.  See Complaint ¶ 5, at 2.

13.      Tracie C. Collins, M.D., is Secretary-Designate of NMDOH.  See Complaint ¶ 6, at 2.

14.      Tim Q. Johnson is the Acting Cabinet Secretary for the New Mexico Department of Public Safety.  See Complaint ¶ 7, at 2.

**2.      The Pandemic.**

12.      "The coronavirus disease 2019 ("COVID-19") is a pandemic that has spread around

- 4 -

the world, within the United States of America, and in New Mexico.  See <u>Coronavirus disease</u>

<u>2019 (COVID-19)</u>, Mayo Clinic, https://www.mayoclinic.org/diseases-

conditions/coronavirus/symptoms-causes/syc-20479963 (last visited February 6, 2021)("Mayo

Clinic").

13.     As of February 8, 2021, there have been 26,654,965 cases of COVID-19 in the

United States, and 458,544.  See <u>WHO Coronavirus Disease (COVID-19) Dashboard</u>, World

Health Organization, https://covid19.who.int/ (last visited February 8, 2021).

14.     As of February 8, 2021, New Mexico has had 177,556 cases and 3,399 deaths.  See

<u>2019 Novel Coronavirus Disease (COVID-19)</u>, New Mexico Department of Health (DOH),

https://cv.nmhealth.org/ (last visited February 8, 2021).

15.     COVID-19 is a contagious disease that is spread through respiratory droplets that

are released when infected individuals cough, sneeze, or talk.  See Mayo Clinic.

16.     Risk factors for COVID-19 include close contact --  typically defined as within six

feet  -- with someone who has COVID-19, or when a person infected with COVID-19 coughs or

sneezes around others.  See Mayo Clinic; <u>COVID-19 Basics: Symptoms, Spread and Other</u>

<u>Essential Information About the New Coronavirus and COVID-19</u>, Harvard Medical School

(March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

17.     Common signs and symptoms can include fever, cough, and tiredness.  See Mayo

Clinic.

18.     Other symptoms can include a loss of taste or smell, shortness of breath or difficulty

breathing, muscle aches, chills, sore throat, runny nose, headache, and chest pain.  See Mayo

Clinic.

19.     Although COVID-19 may cause only mild symptoms for some people, for others,

COVID-19 can cause severe complications, including pneumonia in both lungs, organ failure, and death.  See COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus   and   COVID-19,   Harvard   Medical   School   (March   2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

20.     COVID-19 symptoms can persist for months.  See COVID-19 (coronavirus): Long-term effects, the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351#:~:text=COVID%2D19%20symptoms%20can,within%20a%20few%20weeks     (last visited February 6, 2021).

21.     COVID-19 can damage the lungs, heart, and brain, which increases the risk of long-term health problems.   See COVID-19 (Coronavirus): Long-Term Effects, the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351#:~:text=COVID%2D19%20symptoms%20can,within%20a%20few%20weeks     (last visited February 6, 2021).

22.      Signs and symptoms of COVID-19 typically appear two to fourteen days after exposure.  See Mayo Clinic.

23.     The time after exposure and before the appearance of symptoms is called the incubation period.  See Mayo Clinic.

24.     Many COVID-19 cases result in mild symptoms or no symptoms.  See Nathan W. Furukawa et al., Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article ("Furukawa COVID-

19 Transmission Paper").

25.     When cases are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms appearing as long as thirteen days after infection.  See Furukawa COVID-19 Transmission Paper.

26.     Individuals who have been infected, therefore, usually do not know that they are infected for at least several days, and they may never know, if the infection remain asymptomatic. See Furukawa COVID-19 Transmission Paper.

27.     Because many people who have COVID-19 do not know it have been infected, healthcare officials recommend that all people limit person-to-person contact, stay six feet apart, wash hands frequently, wear masks, cover coughs and sneezes, and avoid large gatherings.  See How to Protect Yourself & Others, The Centers for Disease Control and Protection, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html  (last  visited February 6, 2021); Furukawa COVID-19 Transmission Paper.

28.     The risk of transmission is heightened in indoor environments, where infectious droplets may linger for longer periods of time.  See Nathan W. Furukawa et al., Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

**3.     New Mexico's Response to the Pandemic.**

29.     On March 11, 2020, Governor Grisham declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015)(the "PHERA"), and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007)(the "AHEMA"), by directing all

cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the NMDOH.  See Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited Oct. 12, 2020)("Emergency Declaration").

30.     After Governor Grisham declared a public health emergency, Former NMDOH Secretary Kathyleen M. Kunkel entered a series of PHOs encouraging New Mexicans to stay in their homes as much as possible and requiring them to practice precautions when entering public spaces as well as restricting mass gatherings and business operations.  See, e.g., Kathyleen M Kunkel, Public Health Emergency Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19, New Mexico Department of Health (March 16, 2020), www.governor.state.nm.us%2Fwp-content%2Fuploads%2F2020%2F03%2FAMENDED-PUBLIC-HEALTH-ORDER.pdf.  See also Chris McKee, Supreme Court Rules Governor Has Authority To Restrict, Ban Indoor Dining (Aug. 26, 2020), https://www.krqe.com/health/coronavirus-new-mexico/supreme-court-to-hold-hearing-on-public-health-order-business-restrictions/ (reporting that "[t]he New Mexico Supreme Court ruled . . . that the state does have the power to enact a Public Health Order and restrict or close indoor dining at restaurants").

31.     On April 6, 2020, after declaring a public health emergency, Secretary Kunkel ordered:

>   All businesses, except those entities identified as "essential businesses", are hereby directed to reduce the in-person workforce at each business or business location by 100%. "Essential businesses" may remain open provided it minimize their operations and staff to the greatest extent possible. Further, all essential

businesses shall adhere to social distancing protocol and maintain at least six-foot social distancing from other individuals, avoid person-to-person contact, and direct employees to wash their hands frequently. All essential businesses shall ensure that all surfaces are cleaned routinely.

Public Health Order at 5-6, New Mexico Department of Health (April 6, 2020)("April 6 PHO),

available                                                                                     at

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved

=2ahUKEwiDzaHZ_NXuAhUKGVkFHclaAicQFjABegQIAxAC&url=http%3A%2F%2Fwww.

rld.state.nm.us%2Fuploads%2Ffiles%2FAlcohol%2520and%2520Gaming%2FApril%25206%2

520DOH%2520PHO.pdf&usg=AOvVaw37JOPfG51m2uJIGcF6OpzN.

32.    The April 6 PHO, defines "Essential Business" as any business or non-profit

entity falling within one or more of the following categories:

a.    Health care operations including hospitals, walk-in-care health facilities, veterinary and livestock services necessary to assist in an emergency or to avoid an emergency (such as vaccinations), pharmacies, medical wholesale and distribution, home health care workers or aides for the elderly, emergency dental facilities, nursing homes, residential health care facilities, research facilities, congregate care facilities, intermediate care facilities for those with intellectual or developmental disabilities, supportive living homes, home health care providers, and medical supplies and equipment manufacturers and providers;

b.    Homeless shelters, food banks, and other services providing care to indigent or needy populations;

c.    Childcare facilities necessary to provide services to those workers employed by essential businesses and essential non-profit entities;

d.    Grocery stores, supermarkets, food banks, farmers' markets and vendors who sell food, convenience stores, and other businesses that generate the majority of their revenue from the sale of canned food, dry goods, fresh fruits and vegetables, pet food, feed, and other animal supply stores, fresh meats, fish, and poultry, and any other household consumer products;

e.    Farms, ranches, and other food cultivation, processing, or packaging operations;

f.  All facilities routinely used by law enforcement personnel, first responders, firefighters, emergency management personnel, and dispatch operators;

g.  Infrastructure operations including, but not limited to, public works construction, commercial and residential construction and maintenance, airport operations, public transportation, airlines, taxis, private transportation providers, transportation network companies, water, gas, electrical, oil drilling, oil refining, natural resources extraction or mining operations, nuclear material research and enrichment, those attendant to the repair and construction of roads and highways, gas stations, solid waste collection and removal, trash and recycling collection, processing and disposal, sewer, data and internet providers, data centers, technology support operations, and telecommunications systems;

h.  Manufacturing operations involved in food processing, manufacturing agents, chemicals, fertilizer, pharmaceuticals, sanitary products, household paper products, microelectronics/semi-conductor, primary metals manufacturers, electrical equipment, appliance, and component manufacturers, and transportation equipment manufacturers;

i.  Services necessary to maintain the safety and sanitation of residences or essential businesses including security services, towing services, custodial services, plumbers, electricians, and other skilled trades;

j.  Media services including television, radio, and newspaper operations;

k.  Automobile repair facilities, bike repair facilities, and retailers who generate the majority of their revenue from the sale of automobile or bike repair products;

l.  New and used automobile dealers may sell cars through internet or other audiovisual means but it may not allow customers in showrooms;

m.  Hardware stores;

n.  Laundromats and dry cleaner services;

o.  Utilities, including their contractors, suppliers, and supportive operations, engaged in power generation, fuel supply and transmission, water and wastewater supply;

p.  Funeral homes, crematoriums and cemeteries;

q.  Banks, credit unions, insurance providers, payroll services, brokerage services, and investment management firms;

r.  Real estate services including brokers, title companies, and related services;

s.   Businesses providing mailing and shipping services, including post office boxes;

t.   Laboratories and defense and national security-related operations supporting the United States government, a contractor to the United States government, or any federal entity;

u.   Restaurants, but only for delivery or carry out and local breweries or distillers but only for carry out;

v.   Professional services, such as legal or accounting services, but only where necessary to assist in compliance with legally mandated activities; and

w.   Logistics, and also businesses that store, transport, or deliver groceries, food, materials, goods or services directly to residences, retailers, government institutions, or essential businesses. Businesses falling under this category are not permitted to provide curbside pickup services to the general public for online or telephonic orders.

April 6 PHO at 3-5.

33.   The April 6 PHO further orders:

(1)   All Mass Gatherings are hereby prohibited under the powers and authority set forth in the New Mexico Public Health Act, and all regulations promulgated pursuant thereto.
. . .

(2)   This Order requires the closure of physical office spaces, retail spaces, or other public spaces of a business and does not otherwise restrict the conduct of business operations through telecommuting or otherwise working from home in which an employee only interacts with clients or customers remotely. This prohibition does not apply to necessary operations of essential businesses.

(3)   The maximum number of customers allowed in a "retail space" at any given time shall be equal to 20% of the maximum occupancy of the retail space, as determined by the relevant fire marshal or fire department. If customers are waiting outside of a "retail space", it must to do so in compliance with social distancing protocols including the requirement that it maintain a distance of at least six-feet from other individuals, avoid person-to-person contact.

(4)   All casinos and horse racing facilities shall close during the pendency of this Order. This directive excludes those casinos operating on Tribal lands.

(5)   Hotels, motels, RV parks, and other places of lodging shall not operate at

more than twenty-five percent of maximum occupancy. Health care workers who are engaged in the provision of care to New Mexico residents or individuals utilizing lodging facilities for extended stays, as temporary housing, or for purposes of a quarantine or isolation period shall not be counted for purposes of determining maximum occupancy. Short-term vacation rentals, apartments, and houses are not permitted to operate except to provide housing to health care workers who reside out of state but are engaged in the provision of care to New Mexico residents.

(6)    All call centers situated in New Mexico are directed to reduce their in-person workforce by 100%. This includes any call center that is part of or supports an essential business.

(7)    Self-storage facilities should reduce operations to the minimum number of employees necessary to ensure public access to storage units and adequate security for storage units, including a 100% reduction in permanent on-site workforce whenever possible.

(8)    This Order does not limit animal shelters, zoos, and other facilities with animal care operations from performing tasks that ensure the health and welfare of animals. Those tasks should be performed with the minimum number of employees necessary, for the minimum amount of time necessary, and with strict adherence to all social distancing protocols.

April 6 PHO at 5-6.

34.    Following the April 6 PHO, NMDOH issued several other PHOs amending the April 6 PHO. See Public Health Orders and Executive Orders, New Mexico Department of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited February 6, 2021)(issuing PHOs on April 11, April 30, May 5, May 15, May 27, 2020).

35.    On June 1, 2020, NMDOH issued another PHO. See Public Health Order at 1, filed February 4, 2021 (Doc. 1-5)("June 1 PHO").

36.    The June 1 PHO kept in place several previous PHOs and amended others, including the April 6 PHO. See June 1 PHO.

37.    The June 1 PHO includes definitions for "close contact businesses," "recreational facilities," "bars," "COVID-Safe Practices ('CSPs')," "places of lodging," and "retail space":

- 12 -

1.      "Close-contact business" includes barbershops, hair salons, tattoo parlors, nail salons, spas, massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, gyms, and personal training services for up to two trainees.

2.      "Recreational facilities" include indoor movie theaters, museums, bowling alleys, miniature golf, arcades, amusement parks, concert venues, event venues, performance venues, go-kart courses, adult entertainment venues, and other places of indoor recreation or indoor entertainment.

3.      "Bars" are defined as food and beverage service establishments that derived more than 50% of their revenue in the prior calendar year from the sale of alcoholic beverages. Bars must remain closed during the pendency of this Public Health Order.

(8)     "COVID-Safe Practices" ("CSPs") are those directives, guidelines, and recommendations for businesses and other public operations that are set out and memorialized in the document titled "All Together New Mexico: COVID-Safe Practices for Individuals and Employers". That document may be obtained at the following link https://cv.mnhealth.org/covid- safe-practices/.

(9)     "Places of lodging" means all hotels, motels, RV parks, co-located short-term condominium rentals with a central check-in desk, and short-term vacation rentals.

(10)    "Retail space" means any essential business that sells goods or services directly to consumers or end-users such as grocery stores or hardware stores and includes the essential businesses identified in the categories above: l(d), 1(1), l(m), l(p), and l(s).

June 1 PHO at 6 (including two bullets for (8)).

38.     The June 1 PHO orders:

(3)     "Essential businesses" may open but must operate in accordance with the pertinent "COVID-Safe Practices (CSPs)" section(s) of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers and also any identified occupancy restrictions.

(4)     "Recreational facilities" must remain closed.

(5)     Any business that is not identified as an "essential business" or a "recreational facility" may open provided that the total number of

- 13 -

persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.

(6)     Businesses identified as a "retail space" may operate provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department. Any business opening pursuant to this provision must comply with the pertinent CSP's set out in the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers".

(7)     Indoor shopping malls are permitted to operate provided that the total number of persons within the mall at any given time does not exceed 25% of the maximum occupancy of the premises, as determined by the relevant fire marshal or fire department. Further, loitering within the indoor shopping mall is not permitted and food courts must remain closed.

(8)     Gyms and similar exercise facilities may operate at up to 50% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department, but may not conduct group fitness classes.

(9)     Public swimming pools may open but such facilities are limited to lane-swimming and lessons with up to two students only. Play and splash areas shall be closed. Public swimming pools may not exceed 50% of their maximum occupancy.

(10)    If customers are waiting outside of a business, the business must take reasonable measures to ensure that customers maintain a distance of at least six-feet from other individuals and avoid person-to-person contact.

(11)    Bars are not permitted to operate other than for take-out and delivery if otherwise permitted under their applicable licenses.

(12)    "Places of lodging" shall not operate at more than 50% percent of maximum occupancy. Health care workers who are engaged in the provision of care to New Mexico residents or individuals utilizing lodging facilities for extended stays, as temporary housing, or for purposes of a quarantine or isolation period shall not be counted for purposes of determining maximum occupancy. All places of lodging should comply with the "COVID-Safe Practices (CSPs) for Hotels, Resorts, & Lodging" section of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers". In the case of vacation rentals, occupancy shall be determined based upon the number properties managed by a property manager.

. . . .

- 14 -

June 1 PHO at 6-7

39.     On September 3, 2020, the NMDOH issued another PHO.  See Public Health

Order, New Mexico Department of Health (September 3, 2020) available at

https://cv.nmhealth.org/public-health-orders-and-executive-orders/ ("Sept. 3 PHO").

40.     The Sept. 3 PHO adds and amends definitions of establishments subject to various

restrictions:

(1)     "Essential business" means any business or non-profit entity falling within
        one or more of the following categories:

a.      Health care operations . . . ;

b.      Homeless shelters, food banks, and other services providing care to
        indigent or needy populations;

c.      Childcare facilities;

d.      Grocery stores, supermarkets, food banks, farmers' markets and
        vendors . . . ;

e.      Farms, ranches, and other food cultivation, processing, or packaging
        operations;

f.      Infrastructure operations . . .,

g.      Manufacturing operations . . .;

h.      Services necessary to maintain the safety and sanitation of
        residences or essential businesses including security services,
        towing services, custodial services, plumbers, electricians, and other
        skilled trades;

i.      Veterinary and livestock services, animal shelters and facilities
        providing pet adoption, grooming, daycare, or boarding services;

j.      Media services;

k.      Automobile repair facilities, bike repair facilities, and retailers who
        generate the majority of their revenue from the sale of automobile
        or bike repair products;

- 15 -

l.      Utilities, . . .;

m.      Hardware stores;

n.      Laundromats and dry cleaner services;

o.      Funeral homes, crematoriums and cemeteries;

p.      Banks, credit unions, insurance providers, payroll services, brokerage services, and investment management firms;

q.      Businesses providing mailing and shipping services;

r.      Laboratories and defense and national security-related operations supporting the United States government, a contractor to the United States government, or any federal entity;

s.      Professional services, such as legal or accounting services, but only where necessary to assist in compliance with legally mandated activities; and

t.      Logistics, and also businesses that store, transport, or deliver groceries, food, materials, goods or services directly to residences, retailers, government institutions, or essential businesses.

(2)      "Close-contact business" includes barbershops, hair salons, gyms, group fitness classes, tattoo parlors, nail salons, spas, massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, and personal training services.

(3)      "Food and drink establishments" include restaurants, breweries, wineries, distillers, cafes, coffee shops, or other similar establishments that offer food or drink. . . .

(3)      "Houses of worship" means any church, synagogue, mosque, or other gathering space where persons congregate to exercise their religious beliefs.

(4)      "Close-contact recreational facilities" include indoor movie theaters, indoor museums with interactive displays or exhibits and other similar venues, bowling alleys, miniature golf, arcades, amusement parks, aquariums, casinos, concert venues, professional sports venues, event venues, bars, dance clubs, performance venues, go-kart courses, automobile racetracks, adult entertainment venues, and other places of recreation or entertainment. For purposes of this section, a "bar" is defined as any business that

generated more than half of its revenue from the sale of alcohol during the preceding fiscal year.

(5)     "Outdoor recreational facilities" include outdoor golf courses, public swimming pools, outdoor tennis courts, summer youth programs, youth livestock shows, horseracing tracks, botanical gardens, outdoor zoos, and New Mexico state parks.

(6)     "Places of lodging" means all hotels, motels, RV parks, and short-term vacation rentals.

(7)     "Retail space" means any business that sells goods or services directly to consumers or end-users and includes the following "essential businesses" identified in the categories above: l(d), (l)k, (l)m, and (l)n.

(8)     "Mass gathering" means any public gathering, private gathering, organized event, ceremony, parade, organized amateur contact sport, or other grouping that brings together more than ten (I 0) individuals in a single room or connected space, confined outdoor space or an open outdoor space. "Mass gathering" does not include the presence more than ten (10) individuals where those individuals regularly reside. "Mass gathering" does not include individuals who are public officials or public employees in the course and scope of their employment.

(9)     "COVID-Safe Practices" ("CSPs") are those directives, guidelines, and recommendations for businesses and other public operations that are set out and memorialized in the document titled "All Together New Mexico: COVID-Safe Practices for Individuals and Employers". That document may be obtained at the following link https://cv.nmhealth.org/covid- safe-practices/.

June 1 PHO at 6-8.

41.     The Sept. 3 PHO orders:

(2)     "Essential businesses" may open but must comply with the pertinent "COVID-Safe Practices (CSPs)" . . . . "Essential businesses" identified as a "retail space" may not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department. Either, an "essential business" identified as a "retail space" may not allow a person who is without a mask or multilayer cloth face covering to enter the premises except where that person in in possession of a written exemption from a healthcare provider.

(3)     "Close contact businesses" may operate at up to 25% of the maximin occupancy of any enclosed space on the business's premises, as determined

- 17 -

by the relevant fire marshal or fire department.

(4)     "Close-contact recreational facilities" must remain closed

(5)     "Food and drink establishments" may provide dine-in service, but it may not exceed more than 25% occupancy of the maximum occupancy in any enclosed space on the premises, as determined by the relevant fire marshal or fire department. . . . .

(6)     "Houses of worship" . . . .

(7)     "Outdoor recreational facilities" may operate provided it comply with the pertinent "All Together New Mexico: COVID-Safe Practices for Individuals and Businesses." Further, state parks shall only be open to New Mexico residents and may open for day use only. Camping areas, visitor centers, and any other large enclosed indoor spaces at state parks shall remain closed. As a condition of entering a state park, all visitors must demonstrate proof of residency through one of the following means: a New Mexico license plate on their vehicle; a New Mexico driver's license or ID card; a valid New Mexico vehicle registration; a federal document attesting to residency; or a military identification. In addition, public swimming pools are limited to lane-swimming and lessons only. Play and splash areas shall be closed. Horseracing tracks may not allow  spectators.
        . . .

(9)     Any business that is not identified as an "essential business", "close contact business", "food and drink establishment", "house of worship", "close-contact recreational facility", "outdoor recreational facility", or "place of lodging" may open provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.

(10)    Any entity, including businesses and houses of worship, operating pursuant to this public health order must comply with the pertinent "COVID-Safe Practices (CSPs)" section(s) of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers" and also any identified occupancy restrictions.

        . . .

Sept. 3 PHO at 5-7.

        42.     On September 18, 2020, the NMDOH issued another PHO.  See Public Health

Order,   New   Mexico   Department   of   Health   (September   18,   2020)   available   at

https://cv.nmhealth.org/public-health-orders-and-executive-orders/ ("Sept. 18 PHO").

43.     The Sept. 18 PHO updated the definition for "close contact business" to "include[] barbershops, hair salons, gyms, group fitness classes, tattoo parlors, nail salons, spas, massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, bowling alleys, ice skating rinks, and personal training services."  Sept. 18 PHO ¶ 2, at 5.

44.     The Sept. 18 PHO provides that "[c]lose-contact businesses may operate at up to 25% of the maximum capacity on the business's premises, as determined by the relevant fire marshal or fire department." Bowling alleys were allowed to open for league play only and ice skating rinks were allowed to operate for athletic training and practice by reservation only.  See Sept. 18 PHO at 6.

45.     In the Sept. 18 PHO, bowling alleys are redefined as a "Close-contact business" and are allowed to open, but are restricted to "league play" only, see Sept. 18 PHO, whereas it had previously been defined "recreational facilities, "  June 1 PHO at 6, and, later as "Close-contact recreational facilities," Sept. 3 PHO at 5, 14**.**

46.     Ice skating rinks, included for the first time in the Sept. 18 PHO, are allowed to operate for athletic training and practice by reservation only.  See Sept. 3 PHO at 5, 14**.**

47.     Subsequently, the NMDOH has issued PHOs on October 16, October 22, November 5, November 13, November 30, December 2, December 15, December 30, 2020, and January 29, 2021.   See Public Health Orders, New Mexico Department of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited February 8, 2021).

48.     Since March 19, 2020, the Department of Health has issued twenty-five PHOs.  See Public Health Orders, New Mexico Department of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited February 8, 2021).

49.     On February 5, 2021, Governor Grisham issued Executive Order 2021-004, which

states:

> 4.      In consultation with NMDOH, I have determined that the statewide public
> health emergency proclaimed in Executive Order 2020-004, and renewed
> in Executive Orders 2020-022, 2020-026, 2020-030, 2020-036, 2020-053,
> 2020-55, 2020-059, 2020- 064, 2020-073, 2020-080, 2020-085, and 2021-
> 001 shall be renewed and extended through March 5, 2021.
>
> 5.      All other powers, directives, and orders invoked in Executive Order 2020-
> 004 remain in effect.
>
> 6.      All other Executive Orders with a duration that was tied to the COVID-19
> public health emergency or that was not explicitly stated shall continue
> with the same effect, including any orders appropriating emergency
> funding as well as Executive Orders 2020-016, 2020-020, 2020-021, 2020-
> 025, 2020-037, 2020-039, 2020-056, 2020-063, 2020-072, and 2020-075.
>
> 7.      This Order supersedes any previous orders, proclamations, or directives in
> conflict. This Executive Order shall take effect February 5, 2021 and shall
> remain in effect until March 5, 2021 unless renewed , modified, or until
> the Governor rescinds it.

Executive Order 2021-004, New Mexico Department of Health (February 5, 2021), available at

https://cv.nmhealth.org/wp-content/uploads/2021/02/Executive-Order-2021-004.pdf.

**4.      Elevate's Violations of the Public Health Orders.**

35.     On June 5, 2020, the Department of Public Safety ("DPS") issued a notice to

Elevate, stating that Elevate "is operating in violation of Executive Order 2020-004."  See

Notice at 1, filed February 4, 2021 (Doc. 1-1)("Elevate First Violation Notice").

36.     The Elevate First Violation Notice is signed by a DPS official and the

"Manager/Owner" of Elevate, stating:

> I, manager or owner of the below named business, acknowledge receipt of this
> notice of a First Violation of Executive Order 2020-004, New Mexico
> Department of Health Public Orders.  I understand that additional violations are
> subject to citation and fines as described below.  Today you will be provided a
> copy of this notice and a cease and desist order.

- 20 -

Elevate First Violation Notice at 1 (emphasis in the original).

37.     The Elevate First Violation Notice states the second violation will result in a petty misdemeanor and is punishable by a fine of up to $100.  See Elevate First Violation Notice  at 1 (emphasis in the original).

38.     The Elevate First Violation Notice states the third violation, and each following violation, is punishable by a civil administrative penalty of up to $100.  See Elevate First Violation Notice  at 1.

39.     On June 5, 2020, DPS also issued a cease and desist letter to Elevate, stating that Elevate is in violation of the April 6 PHO and stating that Elevate is "hereby ordered to immediately **cease and desist** from open public operation."   Elevate First Violation Notice at 2 (emphasis in the original).

40.     On September 16, 2020, a New Mexico State Police Officer issued a citation to an Elevate employees in Rio Rancho, New Mexico, because "the business was open and operating for the public in violation of the public health order issued on 8/28/2020, recreational facilities were required to remain closed."  State of New Mexico New Mexico Uniform Traffic Citation, filed February 4, 2021 (Doc. 1-7)("Sept. 16 Citation")(citing "Statute 24-01-21").

41.     On October 8, 2020, NMDOH issued Elevate a "Notice of Contemplated Action for Assessment of Civil Administrative Monetary Penalties Pursuant to PHERA for Violation of Public Health Order."  See Notice at 1, filed February 4, 2021 (Doc. 1-9)("Elevate's Notice of Civil Action").

42.     The Elevate's Notice of Civil Action states that NMDOH "has been notified that EPT Rio Rancho LLC, doing business as Elevate Park, has operated in violation of the

Public Health Order dated September 18, 2020 . . . , which prohibits mass gatherings, and which requires the closure of close contact recreational facilities." Elevate's Notice of Civil Action at 1.

43.     The Elevate's Notice of Civil Action, states:

By this letter the Department gives notice that, pursuant to the Public Health Emergency Response Act ("PHERA") at NMSA 1978, § 12-10A-19, the Department intends to impose on EPT Rio Rancho LLC doing business as Elevate Park, a civil administrative penalty of $5,000 per day that the business has continued (and continues) to operating in violation of the Public Health Order.

Elevate's Notice of Civil Action at 1-2.

44.     The Elevate's Notice of Civil Action states that Elevate has operated "for at least three business days" and that the NMDOH would, "therefore, assess a combined civil administrative penalty of $15,000." Elevate's Notice of Civil Action at 2.

45.     The Elevate's Notice of Civil Action states that "[i]n accordance with 7.1.30 NMAC," Elevate "may request an administrative evidentiary hearing to contest the proposed action." Elevate's Notice of Civil Action at 2.

46.     Elevate requested an evidentiary hearing on the Elevate's Notice of Civil Action.  See Complaint ¶ 68, at 11.

47.     On January 5, 2021, the NMDOH issued an Amended Notice of Contemplated Action.  See Amended Notice of Contemplated Action at 1, filed February 4, 2021 (Doc. 1-11)("Elevate's Amended Notice of Civil Action").

48.     The Elevate's Amended Notice of Civil Action states that Elevate "has operated in violation of the Public Health Order for at least 143 days," and that the NMDOH is assessing a "combined civil administrative penalty of seven-hundred-and-fifteen-thousand dollars ($715,000.00)." Elevate's Amended Notice of Civil Action at 2.

- 22 -

49.     After receiving the Amended Notice of Civil Action, Elevate closed its Rio Rancho facility.   See Complaint ¶ 71, at 12.

50.     On January 12, 2021, the Sept. 16 Citation was dismissed without prejudice. See Complaint ¶ 45, at 8.

51.     On January 25, 2021, the NMDOH held a hearing on the Elevate's Notice of Civil Action.  See Complaint ¶ 68, at 11.

52.     At the January 25 hearing, a NMDOH expert testified that, under oath, that he was not aware of any study, peer reviewed or otherwise, that suggests trampoline facilities are at any higher risk of COVID-19 transmission than any of the businesses or activities described in the PHO definition of "close contact business" which includes gyms, group fitness classes, personal training services, massage parlors, barbershops, hair salons, tattoo parlors, nail salons, spas, esthetician clinics, tanning salons, guided balloon tours, bowling alleys, and ice skating rinks -- all of which are allowed to operate.  See Complaint ¶ 73, at 12.

53.     As of the Complaint's filing, on February 4, 2021, the NMDOH has not issued a recommendation.  See Complaint ¶ 77, at 13.

54.     Elevate's closure has created significant financial distress for Elevate and caused many of its employees to lose their jobs.  See Complaint ¶ 76, at 13.

**5.    Cool Spring's Violations of the Public Health Orders.**

55.     On June 3, 2020, after the June 1 PHO permitted gyms and "similar exercise facilities" to open and operate at fifty percent of maximum occupancy, Cool Springz emailed Daniel Schlegel, the small business liaison for Governor Grisham's office, to confirm that Cool Springz could open.  See Complaint ¶ 78, at 13.

56.    On June 3, 2020, Schlegel responded, stating that Cool Springz could not open. See Complaint ¶ 79, at 13.

57.    On June 4, June 5, and June 9, 2020,  Cool Springz followed up, and requested: (i) to see documentation supporting Schlegel's determination that  Cool Springz could not open and the State's refusal to acknowledge Cool Springz as a gym or "similar exercise facility"; (ii) further information as to how Elevate had secured the ability to open; (iii) the criteria used and documentation supporting the State's position that Cool Springz is not allowed to open.  See Complaint ¶ 80, at 13.

58.    On June 4, Cool Springz received a response stating that New Mexico was looking into the report that Elevate was open, but no response regarding its request for the criteria, documentation, or information upon which Cool Springz was not allowed to open was provided.  See Complaint ¶ 81, at 13.

59.    On June 11, 2020, Cool Springz contacted Schlegel by email and asked him for the criteria used and documentation supporting the State's position.  See Complaint ¶ 81, at 14.

60.    Schlegel responded, asking Cool Springz if it would like to discuss the situation with someone in the "legal department," Cool Springz responded, saying "yes" it would like to speak to someone in the legal department, and no further response was forthcoming from Schlegel or anyone else employed by the State.  See Complaint ¶ 82, at 14.

61.    On June 27, 2020, Cool Springz emailed Schlegel repeating their prior requests for information and documentation and noting that Elevate, Stone Age Gym, and Pure Barre were all open, as was Empire Board Games, but Schlegel did not respond.  See Complaint ¶ 83, at 14.

62.     On June 30, 2020, and again on July 2, 2020, Cool Springz asked Schlegel by email for the contact information for someone in the "legal department," but there was no response to either email.  See Complaint ¶ 84, at 14.

63.     On August 9, 2020, Cool Springz contacted Schlegel by email  regarding "fitness classes" which were permitted, under the then current PHO, and asking for: (i) documentation supporting the State's position that Cool Springz could not open; and (ii) contact information for anyone that Cool Springz could discuss the matter with further.  See Complaint ¶ 85, at 14.

64.     Cool Springz received an auto-response from Schlegel informing it that he would be out of the office until August 17, 2020, and Cool Springz never received a response to its August 9, 2020, email.  See Complaint ¶ 85, at 14.

65.     In September, 2020, Cool Springz reconfigured its business location to emphasize strength training and cardio conditioning.  See Complaint ¶ 86, at 14.

66.     Cool Springz closed those parts of its facility that were "high touch" areas, including its rock climbing walls and laser tag.  See Complaint ¶ 86, at 14.

67.     Cool Springz trained its staff in new procedures designed to comply with the State's COVID Safe Practices requirements.  See Complaint ¶ 86, at 14.

68.     Cool Springz re-opened on September 23, 2020.  See Complaint ¶ 87, at 14.

69.     On September 24, 2020, a Bernalillo County, New Mexico Sheriff's deputy visited Cool Springz, responding to a report that the business was open.  See Complaint ¶ 88, at 14.

70.     After touring the facility, the deputy stated that he believed that Cool Springz was operating within the PHO's requirements and would be allowed to continue its business

operations.  See Complaint ¶ 88, at 14.

71.     On October 1, 2020, Michael Pittman from the Bernalillo County Environmental Health Department visited Cool Springz, toured the facility, and spoke with the owner about the protocols and COVID Safe Practices that Cool Springz had put in place.  See Complaint ¶ 89, at 14.

72.     Pittman agreed that Cool Springz was operating within the then current PHO's scope and would be allowed to continue its business operations.  See Complaint ¶ 89, at 14.

73.     On October 5, 2020, the DPS issued a notice to Cool Springz, stating that Cool Springz "is operating in violation of Executive Order 2020-004."  See Notice at 1, filed February 4, 2021 (Doc. 1-2)(" Cool Springz First Violation Notice").

74.     The Cool Springz First Violation Notice, which is signed by a DPS official and the manager of Cool Springz, states:

> I, manager or owner of the below named business, acknowledge receipt of this notice of a First Violation of Executive Order 2020-004, New Mexico Department of Health Public Orders.  I understand that additional violations are subject to citation and fines as described below.  Today you will be provided a copy of this notice and a cease and desist order.

Cool Springz First Violation Notice at 1 (emphasis in the original).

75.     The Cool Springz First Violation Notice states the second violation will result in a petty misdemeanor and is punishable by a fine of up to $100.  See Cool Springz First Violation Notice  at 1.

76.     The Cool Springz First Violation Notice states the third violation, and each following violation, is punishable by a civil administrative penalty of up to $100.  See Cool Springz First Violation Notice  at 1.

77.     On October 5, 2020, DPS also issued a cease-and-desist letter to Cool Springz, stating that Cool Springz is in violation of the April 6 PHO, and stating that Cool Springz is "hereby ordered to immediately **cease and desist** from All Recreational Activities."  Cool Springz First Violation Notice at 2 (emphasis in the original).

**6.      Jungle Jam's Pandemic Activity.**

78.     On  August 27,  2019, Jungle Jam received a Small Business Administration ("SBA") loan.  Complaint ¶ 96, at 16.

79.     Around that time, Jungle Jam signed a commercial lease and began to remodel 25,000 square feet for use as a trampoline facility.  See Complaint ¶ 97, at 16.

80.     In January 2020, Jungle Jam began interviewing potential employees, had made its final selections, and was finalizing its account with a payroll services when the COVID-19 pandemic began to become a concern.  See Complaint ¶ 98, at 16.

81.     Jungle Jam was prepared to offer thirty-five people employment at its new trampoline facility, when Governor Grisham announced the first statewide lockdown.  See Complaint ¶ 99, at 16.

82.     Jungle Jam decided at that point to take a "wait and see" approach to opening its business.  Complaint ¶ 100, at 16.

83.     Jungle Jam received a certificate of occupancy for its business on April 22, 2020, but was not allowed to open at that time because it did not meet the definition of an "essential business" under the then operative April 11 PHO.  Complaint ¶ 101, at 16.

84.     Because it was unable to open, and had not hired any employees, Jungle Jam was ineligible for any of the federal relief programs that applied to other businesses.  See Complaint ¶ 102, at 16.

85.     Jungle Jam's SBA loan is currently deferred, although interest has accrued since September 2020, and continues to accrue.  See Complaint ¶ 103, at 16.

86.     Since the first lockdown PHO, Jungle Jam has contacted the NMDOH numerous times to see what can be done so that it could open for business.  See Complaint ¶ 104, at 17.

87.     To date, the NMDOH has taken the position that Jungle Jam is a "close-contact recreational facility" and is not allowed to open.  Complaint ¶ 104, at 17.

88.     The NMDOH has told Jungle Jam that, even if it can follow NMDOH's COVID Safe Practices requirements, it cannot open.  See Complaint ¶ 105, at 17.

89.     When the NMDOH permitted gyms to open, Jungle Jam called the NMDOH and was told that it could not open.  See Complaint ¶ 106, at 17.

90.     When the parks and playgrounds in the City of Albuquerque were allowed to reopen, Jungle Jam again called the NMDOH and was again told that it could not open.  See Complaint ¶ 107, at 17.

91.     During the more than nine months that Jungle Jam has not been allowed to open its business, it has incurred rent to its landlord in hundreds of thousands of dollars, interest on its SBA loan, which continues to accrue, and other expenses.  See Complaint ¶ 108, at 17.

**7.     Duke City's Pandemic Activity.**

92.     Duke City has been in operation since 2015 and leases approximately 8,000 square feet in the Cottonwood Mall in Albuquerque.  See Complaint ¶ 109, at 17.

93.     Before the State ordered lockdown, Duke City had seventeen employees.  See Complaint ¶ 110, at 17.

94.     Duke City closed in response to the first lockdown order from the State in March 2020.  See Complaint ¶ 111, at 17.

95.     As a result of the lockdown, Duke City's 2020 revenue declined by at least 85% from prior years.  See Complaint ¶ 111, at 17.

96.     As of the Complaint's filing, Duke City has no employees and has had no business income or revenue.  See Complaint ¶ 112, at 17.

**PROCEDURAL BACKGROUND**

1.     On February 4, 2021, the Plaintiffs filed the Complaint.  See Complaint at 1.  In the Complaint, the Plaintiffs allege claims for: (i) violation of the Plaintiffs' "right to substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution," Complaint ¶ 138, at 22; (ii) denial of the Plaintiffs "right to operate their respective businesses" and, therefore, "their constitutional rights to procedural due process," Complaint ¶ 155, at 24; and (iii) denial of the Plaintiffs' "right to equal protection under the Fifth and Fourteenth Amendments to the United States Constitution."   Complaint ¶ 156, at 24.   The Plaintiffs request "both preliminary and permanent injunctive relief to prohibit Defendants from enforcing all PHOs that rely on the unconstitutionally overbroad and vague authority granted under Section 24-1-3E, NMSA 1978" Complaint ¶ 165, at 26.  The Plaintiffs insist that the NMDOH's PHOs, "Section 24-1-3E, NMSA 1978," and "NMAC 7.1.30" are void both on their face and as applied to the Plaintiffs.  Complaint ¶¶ A-C, at 27.   The Plaintiffs also contend that they "are entitled to an award their costs and reasonable attorney's fees incurred in this action."  Complaint ¶ F, at 27.

1.     **The Motion.**

2.     On February 4, 2021, the Plaintiffs filed the Motion, which requests that the Court grant a TRO and a preliminary injunction.  See Motion at 1.

3.    The Plaintiffs aver that

1) there is a substantial likelihood Plaintiffs will prevail on the merits of their claims; 2) Plaintiffs will suffer irreparable injury unless a TRO and preliminary injunction are granted; 3) the balance of equities tips in Plaintiffs' favor; and 4) issuance of a TRO and preliminary injunction is in the public interest.

Complaint at 1-2.

4.    The Plaintiffs argue that Defendants' ban on in-person instruction at public schools

in certain counties in New Mexico violates the Fourteenth Amendment's Due Process and Equal

Protection Clauses.  See Motion at 9.

**3.    The Hearing.**

5.    The Court held a hearing on February 5, 2021.  See Transcript of Hearing.

6.    The Court invited the Plaintiffs to speak in support of their request for a TRO.  See

Tr. at 3:15-18 (Court).

7.    The Plaintiffs argued that, absent a TRO "immediate and irreparable injury, loss,

or damage will result . . . ."  Tr. at 3:23-4:1 (Artuso).

8.    Regarding Elevate, the Plaintiffs maintained that "within the next 30 days" it "will

have to seriously consider either permanently closing or possibly filing for bankruptcy protection."

Tr. at 5:3-7 (Artuso).  The Plaintiffs argued that Jungle Jam, Cool Springz, and Duke City Jump

would have to take similar measures within one to two months, sixty to ninety days, and six

months, respectively.  See Tr. at 5:8-24 (Artuso).  The Plaintiffs noted that "we're not asking the

Court to hold that the statute upon which the PHOs are based is unconstitutional at this

point. . . . We're simply asking that the Court prohibit the Defendants from enforcing the closure

of the Plaintiffs' businesses."  Tr. at 6:16-23 (Artuso).  The Plaintiffs argue that "there is no

evidence that trampolines are more likely to transmit COVID-19 than any other close contact

businesses." Tr. at 7:11-14 (Artuso). The Plaintiffs noted that the PHOs do not mention specifically trampolines or trampoline gyms. See Tr. at 8:16-18 (Artuso). They emphasized that they "have been ordered to close for almost a year now" and the PHO "definitions are a moving target and change almost every two weeks." Tr. at 8:20-25 (Artuso). The Plaintiffs argued that a trampoline facility is like a gym, because

> What do people do at a gym? Well, they run, they build strength, they stretch, they do yoga. Essentially, the elevate their heart rates, build their strengths and flexibility, improve their balance and coordination, and get a workout. All of these things happen at the plaintiffs' businesses, too. We respectfully submit . . . that they are either undefined under the public health orders and are, therefore, entitled to operate at 25% capacity, or they are a gym, and are also entitled to operate at 25% capacity.

Tr. at 9:20-10:6 (Artuso).

9.     The Defendants responded, and first explained that Elevated is currently engaged in administrative proceedings with the NMDOH. See Tr. at 12:1-3 (Agajanian). They also noted that Elevated has "stayed open almost entirely throughout this pandemic despite the closure order" and "were recently fined substantially because . . . they are subject to a $5,000 a day fine." Tr. at 12:1-8 (Agajanian). The Defendants argued that Elevate's financial stress results "in large part" from the large fine they face "for refusing to obey the orders." Tr. at 12:9-12 (Agajanian). The Defendants continued that Elevate are precluded from "bringing claims to this Court right now under the Younger abstention doctrine." Tr. at 12:13-15 (Agajanian)(citing Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619 (1986); Samuels v. Mackell, 401 U.S. 66 (1971)).

10.     The Defendants explained that "there is due process . . . . And that is that the Secretary is allowed to close any public place for the protection of public health." Tr. at 15:4-6 (Agajanian). The Defendants distinguished Chronis v. State ex rel. Rodriguez, 1983-NMSC-081,

100 N.M. 342 from the current case, because "that case involved a liquor license" and there "is no separate . . . protected property interest to run a business." Tr. at 15:14-17 (Agajanian). The Defendants stated that Grisham v. Reeb, 2020 WL 6538329 (Nov. 5, 2020), upheld the PHERA's constitutionality. Tr. at 15:14-17 (Agajanian). The Defendants also noted that, if the Plaintiffs "would like us to add the word trampoline to close contact recreational facilities" definition in the PHO. Tr. at 16:1-7 (Agajanian). The Defendants described Elevate's website as stating, "we are the coolest extreme recreation park in New Mexico," and argued that this supports their categorization as a close contact recreational facility. Tr. at 16:15-24 (Agajanian)(citing Talleywhacker, Inc. v. Cooper, 465 F. Supp. 3d 523 (E.D.N.C. 2020). The Defendants explained that Xponential Fitness v. Arizona, No. CV-20-01310-PHX-DJH, 2020 WL 3971908 (D. Ariz. July 14, 2020)(Humetewa, J.) held that there is no property right to operate a business. The Defendants quoted a relevant Tenth Circuit case, which states:

> Legislative choices involve line-drawing, and the fact that such line-drawing may result in some inequity is not determinative. *See Heller v. Doe,* 509 U.S. 312, 321, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993). Accordingly, an enactment may be over-inclusive and/or under-inclusive yet still have a rational basis. The fact that the classification could be improved or is ill-advised is not enough to invalidate it; the political process is responsible for remedying perceived problems.

Kitchen v. Herbert, 755 F.3d 1193, 1237 (10th Cir. 2014)(Kelly, J., concurring in part and dissenting in part.

11. The Defendants argued that rational basis applies here, because the Plaintiffs have not demonstrated that the Defendants have violated their fundamental rights. See Tr. at 18:9013 (Agajanian). The Defendants averred that "the right to practice in one's chosen profession is not fundamental." Tr. at 18:18-20 (Agajanian)(citing Guttman v. Khalsa, 669 F.3d 1101 (10th Cir. 2012)). The Defendants continued that keeping trampoline facilities closed is rationally related to the state's interest in combating COVID-19's spread. See Tr. at 19:3-8 (Agajanian). The

Defendants argued that the Plaintiffs are not being treated differently than similarly situated businesses, because all trampoline facilities are required to be closed.  See Tr. at 19:22-20:7 (Agajanian).

12.    The Defendants argue that allowing trampoline facilities to reopen would create a slippery slope:

> If the plaintiffs argue that trampoline gyms are close enough to another business to be basically indistinguishable under the public health order, such that they should be allowed to be open at a 25 percent capacity, then the next thing we have are -- . . . miniature golf businesses: Why can't we open? Indoor skydiving places saying: Why can't we open? All these other businesses saying -- movie theaters could say, in these trampoline parks people are breathing heavily.  And in a movie theater everybody is a going to sit quietly.  Why can't we open?  And that's exactly the point of that Tenth Circuit case, Your Honor, that I was reading earlier, which is at some point legislative lines need to be drawn.  And in this case that happened.

Tr. at 20:9-25 (Agajanian).

13.    The Defendants concluded that the Court should deny the TRO.  See Tr. at 21:1 (Agajanian).

14.    The Plaintiffs responded that Elevate has not been fined, but is engaged currently in administrative proceedings with the NMDOH.  See Tr. at 21:21-22:4 (Artuso).  The Plaintiffs also argued that the Supreme Court held in Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496 (1982) that a plaintiff need not exhaust his or her administrative remedies to bring suit under 42 U.S.C. § 1983.  Tr. at 22:1-6 (Artuso).

**4.    The Defendant's Response to Plaintiffs' Application for Ex Parte TRO.**

15.    The Defendants file the Response to Plaintiffs' Application for Ex Parte TRO on February 8, 2021.  See Response to Plaintiffs' Application for Ex Parte TRO at 1, filed February 8, 2021 (Doc. 8)("Response").  The Defendants asked the Court to "deny Plaintiffs' request for an *ex parte* TRO or defer ruling on it until Defendants can file a meaningful response to the

Application."  Response at 3.

## LAW REGARDING ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has construed Eleventh Amendment immunity to prohibit federal courts from entertaining suits against States that their own citizens or citizens of another State without their consent.  See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990).  State agencies and State officials likewise enjoy immunity as "an arm of the state."  Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977).

Exceptions to a State's Eleventh Amendment immunity are few.  See, e.g., Ex Parte Young, 209 U.S. at 159-60 ("If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.").  A State may, however, voluntarily waive its immunity.  See Edelman v. Jordan, 415 U.S. 651, 673 (1974).  Congress may also abrogate Eleventh Amendment immunity pursuant to Section 5 of the Fourteenth Amendment to the Constitution of the United States, where the statute explicitly manifests Congress' intent to do so.  See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).  Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983.  See Quern v. Jordan, 440 U.S. 332, 340 (1979).  Consequently, Eleventh Amendment immunity extends to defendants under that statute, and claims against the

state pursuant to § 1983 in the federal courts are barred as a matter of law.

Although not properly characterized as an exception to a State's Eleventh Amendment immunity, the doctrine that the Supreme Court announced in Ex Parte Young, 209 U.S. at 128, allows for suits against state officials under certain circumstances. See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state."). In Ex Parte Young, the Supreme Court held that the Eleventh Amendment bar generally does not apply in federal court to state officials defending against suit which seeks only prospective relief from violations of federal law. See Ex Parte Young, 209 U.S. at 28. The Ex Parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests. See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609.

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction. See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974); Chavez v. Kincaid, 15 F. Supp. 2d at 1119. A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is a federal question if the case arises under the Constitution, laws, or treaties of the United States. See 28 U.S.C. § 1331. Whether a case arises under a federal law is determined

by the "wellpleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)). This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)). The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26. The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986). See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("*Merrell Dow* is the controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law). District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.

In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'"

Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)).  If the resolution turns on a substantial question of federal law, the federal question must also be "contested."  Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005).  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  542 U.S. at 313.  Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts.  542 U.S. at 313.  See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

## LAW REGARDING YOUNGER ABSTENTION

Under the abstention doctrine that the Supreme Court articulated in Younger, 401 U.S. 37, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief.  Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)).  Younger abstention is not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court.  The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority

- 37 -

of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."  Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996)).  This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs."  J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  When all of the elements mandating abstention clearly exist in the record, courts may and should address application of the Younger abstention doctrine sua sponte.  See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court sua sponte"); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

"Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims."  Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted).  See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger

- 38 -

criteria,' there is no discretion for the district court to exercise.").  When the <u>Younger</u> abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation.  <u>Deakins v. Monaghan</u>, 484 U.S. 198, 202 (1988).  For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under <u>Younger</u>, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action.  <u>See</u> <u>Myers v. Garff</u>, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended).  <u>See also</u> <u>Younger</u>, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the state court proceeding.  In <u>Wideman v. Colorado</u>, 242 F. App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights.  <u>See</u> 242 F. App'x at 613.  The parent had requested a federal district court to issue an order regarding his parental rights and rights to child support payments, and to award the parent monetary damages recompensing him for his past child support payments.  <u>See</u> 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court

seeking money damages from the state court officials adjudicating his state custody case. 242 F. App'x at 613. The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger. See Wideman v. Colorado, 242 F. App'x at 614. The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing. 242 F. App'x at 614. Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues. 242 F. App'x at 614. Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the Colorado state proceedings." 242 F. App'x at 614. Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

## LAW REGARDING 42 U.S.C. § 1983 CLAIMS

§ 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. § 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998))). § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To

- 40 -

state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation

of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color

of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused
> (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M.

2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-

0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

　　　The Supreme Court clarified that, in alleging a § 1983 action against a government agent

in his or her individual capacity, "a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal,

556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See

Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens*[1] and

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S.

397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-

employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of

N.Y., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional

---

[1]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388
(1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth
Amendment of the Constitution of the United States "by a federal agent acting under color of his
authority gives rise to a cause of action for damages consequent upon his unconstitutional
conduct."  403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal
officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See
Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions
are the "federal analog" to § 1983 actions).

or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously

enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed. See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371). The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'" Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING 42 U.S.C. § 1988

§ 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys to litigate civil rights violations." Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.). Section 1988(b) provides: "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). "[T]here are two elements in deciding whether to award attorney's fees. First, the party seeking fees must qualify as a 'prevailing party.' Second, the fee itself must be 'reasonable.'" Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir. 1997)(quoting 42 U.S.C. § 1988(b)).

For the purpose of determining attorney's fees, a court may determine that plaintiffs are

"prevailing parties . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. at 433 (internal quotation marks omitted)(citation omitted).  In Farrar v. Hobby, 506 U.S. 103 (1992), the Supreme Court later elaborated on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.  The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.  Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement.  Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff.  Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party.  In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111 (citations omitted)(internal quotation marks omitted)(alterations omitted).  The Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across the statutory threshold." Hensley v. Eckerhart, 461 U.S. at 433.  See Copar Pumice Co., Inc. v. Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart).  The district court must then determine what fee is "reasonable." Hensley v. Eckerhart, 461 U.S. at 433; Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1210 (D.N.M. 2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

"To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate." Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S. at 888; Hensley v. Eckerhart, 461 U.S. at 433).  This lodestar figure "provides an

objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433.  While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims."  Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214.  The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates claimed.  See Hensley v. Eckerhart, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award accordingly.  See Hensley v. Eckerhart, 461 U.S. at 434. See also Ysasi v. Brown, 2015 WL 403930, at *14 (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

A district court may also adjust the lodestar to reflect a plaintiff's overall success level. See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36).  "In making such adjustments, however, Hensley requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success."  Jane L. v. Bangerter, 61 F.3d at 1511.  The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar.  Jane L. v. Bangerter, 61 F.3d at 1511.  "There is no precise rule or formula" for making such determinations.  Hensley v. Eckerhart, 461 U.S. at 436.  In Hensley v. Eckerhart, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis.  Such a lawsuit

cannot be viewed as a series of discrete claims.  Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

461 U.S. at 435.

Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim.  See Hensley v. Eckerhart, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); Jane L. v. Bangerter, 61 F.3d at 1512.  Claims are related when they are either based on "a common core of facts" or based on "related legal theories." Hensley v. Eckerhart, 461 U.S. at 435.  In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award.  See Jane L. v. Bangerter, 61 F.3d at 1512.  The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts."  Jane L. v. Bangerter, 61 F.3d at 1512 (internal quotation marks omitted)(quoting Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)).  The Tenth Circuit has also recognized that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee."  Jane L. v. Bangerter, 61 F.3d at 1512 (quoting Hensley v. Eckerhart, 461 U.S. at 435).

**LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER**

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F.

Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court and the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a TRO under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v.

Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor. Diné, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States and its officers and agencies are exempt from this requirement. See Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable."). See also

Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security,''' and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215 (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and preliminary injunctions.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017), the Court issued a preliminary injunction requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("UDV").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See 286 F. Supp. 3d at 1264.  UDV theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated.  See 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See 286 F. Supp. 3d at 1264.  The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from

suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies" including "cupping and shaking girls' breasts" were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the damage of the TRO; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional rights who attended prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98.  The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the defendants faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

## LAW REGARDING PRELMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the

injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))). The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282. "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963) ). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" Schrier v. Univ. of Colo., 427

F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro II")).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975).  "The meaning of this category is self-evident."  Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With

respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]"  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available).  Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  "The Clause 'creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly.'"  Teigen v. Renfrow, 511 F.3d 1072, 1083 (10th Cir. 2007)(unpublished)(quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

- 53 -

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class.  See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012).  The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons." SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279).  In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action." SECSYS, LLC v. Vigil, 666 F.3d at 685.

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  At least in the Tenth Circuit, however, under some circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it.  See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999).  The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citations omitted).  The failure to prevent discrimination before it occurs is not actionable.  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.7.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty,

or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"   Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).   The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S.

at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)]. See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)]. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly

must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." <u>Teigen v. Renfrow</u>, 511 F.3d 1072, 1079 (10th Cir. 2007). <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577. <u>See</u> <u>Farthing v. City of Shawnee</u>, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985)(citing <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." <u>Mathews v. Eldridge</u>, 424 U.S. at 334. The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.

> This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote omitted).

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  See
A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431,
at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngeres, the
Court concluded that the New Mexico Department of Health violated due process when it afforded
a woman with developmental disabilities no process before depriving her of medical care,
conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no
process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court has also
concluded that a tenured city employee was not denied due process when the city fired him,
because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d
1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily
guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215
(denying due process claims where a state employee "got her opportunity to be heard at a complex
grievance hearing, with an attorney and with an opportunity to question witnesses, and make
opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque,
375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of
Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its
inspectors, may close a restaurant to protect the health of patrons and workers without first
providing a hearing to the restaurant owner.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive
any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.
In general, state actors may be held liable under § 1983 only for their own affirmative acts that
violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma,

519 F.3d at 1251 (citing <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. at 197).

"[N]othing in the language of the Due Process Clause itself requires the State to protect the life,

liberty and property of its citizens against invasion by private actors."  <u>DeShaney v. Winnebago</u>

<u>Cty. Dep't of Soc. Servs.</u>, 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal

level of safety and security.  <u>See</u> <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. at

195.

### 1.      **Exceptions to the General Rule.**

There are, however, two exceptions to this general rule.  The first exception -- the special-

relationship doctrine -- arises when the state has a custodial relationship with the victim, which

triggers an affirmative duty to provide protection to that individual.  <u>See</u> <u>Christiansen v. City of</u>

<u>Tulsa</u>, 332 F.3d 1270, 1280 (10th Cir. 2003); <u>Graham v. Indep. Sch. Dist. No. 1-89</u>, 22 F.3d 991,

994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a

state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to

create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  <u>Robbins v.</u>

<u>Oklahoma</u>, 519 F.3d at 1251 (quoting <u>Currier v. Doran</u>, 242 F.3d at 923).  "If either the special-

relationship or danger-creation exception applies, the conduct of the state actor must go beyond

negligence to the point of 'shocking the conscience.'"  <u>Glover v. Gartman</u>, 899 F. Supp. 2d 1115,

1135 (D.N.M. 2012)(Browning, J.)(citing <u>Johnson ex rel. Estate of Cano v. Holmes</u>, 455 F.3d

1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.      **Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an

individual cannot trigger liability under the due process clause is the special-relationship doctrine.

A plaintiff must show that he or she was involuntarily committed to state custody to establish a

duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.    **Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."  Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227

(D.N.M. 2013)(Browning, J.)(citing <u>Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.</u>, 511

F.3d 1114, 1126 (10th Cir. 2008)).

 In determining whether the danger-creation exception applies, the Tenth Circuit has

focused on the deliberateness of the conduct in relation to the caused harm.  <u>See</u> <u>Christiansen v.</u>

<u>City of Tulsa</u>, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk

of the conduct and act "with an intent to place a person unreasonably at risk." <u>Medina v. City &</u>

<u>Cty. of Denver</u>, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present

where the defendant "is aware of a known or obvious risk" creating a high probability that serious

harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable

disregard of the consequences."  <u>Medina v. City & Cty. of Denver</u>, 960 F.2d at 1496 (citations

omitted).

   **4.**  **<u>Conduct that Shocks the Conscience</u>.**

 A government actor's official conduct intended to injure in a way that cannot reasonably

be justified by any government interest most likely shocks the conscience.  <u>See</u> <u>Cty. of Sacramento</u>

<u>v. Lewis</u>, 523 U.S. at 849("[C]onduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking

level.").  "[A] plaintiff must do more than show that the government actor intentionally or

recklessly caused injury to the plaintiff by abusing or misusing government power." <u>Camuglia v.</u>

<u>City of Albuquerque</u>, 448 F.3d at 1222 (internal quotation marks omitted)(quoting <u>Moore v.</u>

<u>Guthrie</u>, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of

outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."

<u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting

<u>Uhlrig v. Harder</u>, 64 F.3d at 574).

Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d

at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[2] the plaintiffs' son. 716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1074-75.

## LAW REGARDING A STATUTE BEING VOID FOR VAGUENESS

"Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580

---

[2]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles." 716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

(1998)(quotation marks omitted).   "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment."   United States v. Williams, 553 U.S. 285, 304 (2008).  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."   Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56–57 (1999)).  See United States v. Williams, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement."); Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987)("A statute violates due process if it is so vague that a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated."). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." United States v. Williams, 553 U.S. at 306. The Supreme Court of the United States has noted that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."   United States v. Williams, 553 U.S. at 304 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).

"A federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court."   United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988)(citation omitted). In evaluating the constitutional validity of state statutes, the Supreme Court has stated that "every presumption is to be indulged in favor of the validity of a statute [ .]" Mugler v. Kansas, 123 U.S. 623, 661 (1887). The Supreme Court of New Mexico, in discussing

the presumption of constitutional validity that attaches to acts of the New Mexico legislature, has

stated:

> A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language. See State v. Fleming, 2006-NMCA-149, 149 P.3d 113; Ortiz v. Taxation & Revenue Dep't, 1998-NMCA-027, 954 P.2d 109.  In construing a regulation or statute, "this Court has a duty to affirm the legislation's validity and constitutionality if reasonably possible."  Old Abe Co. v. N.M. Mining Comm'n, 1995-NMCA-134, 908 P.2d 776, 789–90.  A statute is only unconstitutional "if it is so vague that persons of common intelligence must guess at its meaning and would differ in its application."  City of Albuquerque v. Sanchez, 1992-NMCA-038, 832 P.2d 412, 418.   However, "absolute or mathematical certainty is not required in the framing of a statute."  State ex rel. Bliss v. Dority, 1950-NMSC-066, 225 P.2d 1007, 1017.

Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 16, 212 P.3d 361, 366-67.  In

some cases, however, the Supreme Court has noted that it could not remedy a constitutionally

imprecise state statute.   See Hynes v. Mayor & Council of Oradell, 425 U.S. 610, 622

(1976)("Even assuming that a more explicit limiting interpretation of the ordinance could remedy

the flaws we have pointed out—a matter on which we intimate no view—we are without power to

remedy the defects by giving the ordinance constitutionally precise content.").

In determining whether a federal statute is unconstitutionally vague, the Supreme Court

has also noted that a strong presumption of validity attaches to Congress' enactments and has

consistently construed a challenged statute narrowly rather than condemn it as unconstitutionally

vague. See Skilling v. United States, No. 08–1394, 2010 U.S. LEXIS 5259, at *91 (June 24, 2010)

("It has long been our practice, however, before striking a federal statute as impermissibly vague,

to consider whether the prescription is amenable to a limiting construction."); United States v.

Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)(stressing, in response to a vagueness challenge,

"[t]he strong presumptive validity that attaches to an Act of Congress"). In Skilling v. United

States, the Supreme Court looked to Congress' intent in passing the honest-services doctrine, and

- 66 -

limited the construction of the honest-services doctrine to reach bribes and kickbacks, as Congress intended, stating:

> [T]here is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes only the bribe-and-kickback core of the pre-*McNally* case law.

Skilling v. United States, 2010 U.S. LEXIS 5259, at * *96–97.

In Grayned v. City of Rockford, 408 U.S. 104 (1972), the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." 408 U.S. at 110 (internal quotations omitted). For example, in Minority TV Project Inc. v. FCC, No. C–06–02699, 2007 U.S. Dist. LEXIS 95498 (N.D. Cal. Dec. 21, 2007), the Honorable Elizabeth D. Laporte, United States District Judge for the Northern District of California, found it premature to dismiss a facial challenge of void for vagueness until the plaintiffs introduced evidence of the Federal Communication Commission's ("FCC") enforcement decisions applying the statute in question— a prohibition against certain paid promotional advertisements. See 2007 U.S. Dist. LEXIS 95498, at * *37–38. When the plaintiffs submitted evidence of the FCC's enforcement, Judge Laporte found the statute was not unconstitutionally vague, explaining:

> Assuming that the Court may "perhaps to some degree" consider the FCC's interpretation of the statute in evaluating whether the statute is vague, see Grayned v. City of Rockford, 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do, arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute. If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge. Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" California Teachers Ass'n, 271 F.3d at

1151(quoting Hill v. Colorado, 530 U.S. 703, 733 (2000)(rejecting vagueness challenge)(quotation marks omitted)). As in *Grayned,* the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits." 408 U.S. at 110 (quoting Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969)).

Minority TV Project Inc. v. FCC, 649 F.Supp.2d 1025, 1047 (N .D.Cal.2009). The Supreme Court in Grayned v. City of Rockford noted: "Condemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110. The Supreme Court rejected a facial vagueness challenge to an ordinance that implicated First Amendment rights and prohibited certain demonstrations "adjacent" to schools that "disturb[ ] or tend[ ] to disturb the peace or good order of such school session or class thereof," finding that it was "clear what the ordinance as a whole prohibits," even though the statute at issue did not specify the prohibited quantum of disturbance. 408 U.S. at 109-11 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.").

Numerous statutes have withstood facial vagueness challenges even though they contained arguably ambiguous language. See Hill v. Colorado, 530 U.S. at 732 (rejecting vagueness challenge to ordinance making it a crime to "approach" another person, without that person's "consent," to engage in "oral protest, education, or counseling" within specified distance of health-care facility); Boos v. Barry, 485 U.S. 312, 332 (1988)(rejecting vagueness challenge to ordinance interpreted as regulating conduct near foreign embassies "when the police reasonably believe that a threat to the security or peace of the embassy is present"); Cameron v. Johnson, 390 U.S. 611, 616 (1968)(rejecting vagueness challenge to ordinance prohibiting protests that "unreasonably interfere" with access to public buildings); Kovacs v. Cooper, 336 U.S. 77, 79 (1949)(rejecting vagueness challenge to sound ordinance forbidding "loud and raucous" sound amplification).

**ANALYSIS**

The Court is sympathetic to the trampoline facility owners, their employees, and other businesses who are struggling financially and face great hardship during this time.  Nonetheless, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement." S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1614 (2020)(Roberts, C.J., concurring). The Defendants' classification of trampoline facilities has a rational basis, and they have provided post-deprivation administrative remedies that likely satisfy procedural due process. See Big Tyme Investments, L.L.C. v. Edwards, No. 20-30526, 2021 WL 118628, at *9 (5th Cir. Jan. 13, 2021)(explaining that the State's decision to close bars while allowing restaurants to remain open survived rational basis review).  Although the Plaintiffs face real challenges, see Motion at 10, that does not mean they have a remedy under the Constitution.  Consequently, the Court denies the TRO.

I.     **THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS ARE LIKELY TO FAIL, BECAUSE THE DEFENDANTS PROBABLY HAVE NEITHER VIOLATED THE PLAINTIFFS' FUNDAMENTAL RIGHTS, NOR ENGAGED IN CONDUCT THAT SHOCKS THE JUDICIAL CONSCIENCE.**

The Plaintiffs have not demonstrated that they are likely to succeed on the merits regarding their substantive due process claims, because the Defendants neither have likely infringed on the Plaintiffs' fundamental rights, nor likely deprived the Plaintiffs of life, liberty, or property in a manner so arbitrary that the actions shock the conscience.  See Complaint ¶ 121-138, at 20-22. There are two types of substantive due process claims: (i) where the plaintiff alleges that the government has infringed upon a fundamental right, see Washington v. Glucksberg, 521 U.S. 702, 721-22 (1997)("Glucksberg"); and (ii) where the plaintiff alleges that a government action has deprived arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial

conscience, see Rochin v. California, 342 U.S. 165, 172 (1952)(concluding that a sheriff's application of stomach pumping to force an arrestee to vomit shocked the conscience). The Tenth Circuit "appl[ies] the fundamental rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*." Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018)(emphasis in original), cert. denied, 139 S. Ct. 1347 (2019). But see Seegmiller v. LaVerkin City, 528 F.3d 762, 768 (10th Cir. 2008)(Tymkovich, C.J.)(explaining that "there is no hard-and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards"). But see also Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624, 636 (10th Cir. 2018)(Tymkovich, C.J., concurring)(noting that "though our circuit has sometimes repeated Seegmiller's 'both tests work' dicta, we do not follow it. Instead, we follow a simple binary approach" which applies the fundamental rights test to legislative actions and the shocks the conscience test to executive actions).[3]   Here, the Plaintiffs do not challenge "the tortious

---

[3] The Court agrees with the Honorable Timothy M. Tymkovich, United States Circuit Judge for the Tenth Circuit's recent clarification regarding the substantive due process tests:

Looking to the history of Due Process Clause jurisprudence, as well as to the Supreme Court's stated policy concerns in this area, we propose dividing substantive due process into (1) cases challenging legislative action, (2) cases challenging executive action, and (3) cases challenging judicial action (though those distinctions themselves will require line drawing). In those challenging legislative action, plaintiffs must show the law impermissibly or irrationally burdens a fundamental right. In cases challenging executive action, plaintiffs must show they were deprived of a liberty or property interest in such an egregious fashion that the conduct shocks the conscience of federal judges. The shocks-the-conscience formulation is not to be an empty phrase, though. In each context, courts should specify the factors that make a case conscience shocking. In fact, we argue that this is what the more specific tests have already done. What has been unclear until now is that many of the cases creating more specific tests for substantive due process violations are simply manifestations of the shocks-the-conscience approach. Finally, in cases challenging judicial action, a state court

conduct of an individual agency officer," nor do they challenge a purely "legislative action . . . ."
Abdi v. Wray, 942 F.3d 1019, 1027 (10th Cir. 2019).  See Am. Compl. ¶ 10, at 3.  Although the
NMDOH -- a State executive agency -- issues the Dec. 30 PHO, the fundamental rights approach
applies here, because the Dec. 30 PHO is "akin to a legislative action."  Abdi v. Wray, 942 F.3d
at 1027.  See Dec. 30 PHO at 1  An "executive action" in the substantive due process analysis
context is typically a "specific act of a governmental officer."  Cty. of Sacramento v. Lewis, 523
U.S. 833, 846 (1998).  By contrast, here, the Dec. 30 PHO is "akin to a . . . legislative action
because, as with an act of a lawmaking body, the" NMDOH "here is attempting, through policy,
to achieve a stated government purpose."  Abdi v. Wray, 942 F.3d at 1027-28.  Further, the
fundamental rights approach applies where "a government entity's implementation of its official
policy is alleged to have caused a substantive due process violation."  Abdi v. Wray, 942 F.3d
1019, 1028 n.1 (10th Cir. 2019)(citing Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x at 630).
The Court, therefore, will analyze the Dec. 30 PHO under the "legislative action" fundamental
rights framework for substantive due process claims.  See Glucksberg, 521 U.S. at 721-22.
Accordingly, because the Defendants' Dec. 30 PHO is rationally related to a legitimate state
interest, the Plaintiffs' substantive due process claims cannot succeed on the merits.  See City of
New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

---

decision will violate substantive due process only if it is an "arbitrary or capricious"
abuse of power.

Hon. Timothy M. Tymkovich, Joshua Dos Santos, Joshua J. Craddock, A Workable Substantive
Due Process, 95 Notre Dame L. Rev. 1961, 1964 (2020).  See Chavez v. Martinez, 538 U.S. 760,
787 (2003)(Stevens, J., concurring)(describing the fundamental rights approach and the shocks
the conscience approach as separate tests).  See also Peter J. Rubin, Square Pegs and Round
Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights, 103 Colum. L.
Rev. 833, 845 (2003)(noting that United States v. Salerno, 481 U.S. 739, 746 (1987)
"distinguished fundamental rights analysis from shocks-the-conscience analysis").

A.    THE DEC. 30 PHO DOES NOT VIOLATE THE PLAINTIFFS'
SUBSTANTIVE DUE PROCESS RIGHTS, BECAUSE THE DEFENDANTS
HAVE NOT INFRINGED UPON THE PLAINTIFFS' FUNDAMENTAL
RIGHTS.

The fundamental rights approach proceeds in three steps.  See Abdi v. Wray, 942 F.3d at

1028.  First, the Court must evaluate whether a fundamental right is at issue either: (i) "because

the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the

right claimed to have been infringed by the government is one that is objectively among those

'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty'

such that it is 'fundamental.'"  Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at

720-21).  Second, the Court determines whether the right at issue "has been infringed through

either total prohibition or 'direct and substantial' interference."  Abdi v. Wray, 942 F.3d at 1028

(quoting Zablocki v. Redhail, 434 U.S. 374, 387 (1978)).  Third, if the right is fundamental, the

Court must determine whether the government action at issue satisfies strict scrutiny.  Abdi v.

Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the

law . . . is narrowly tailored to achieve a compelling governmental purpose").  If the right is not

fundamental, however, the Court applies rational basis review.  See Reno v. Flores, 507 U.S. 292,

305 (1993)(explaining that strict scrutiny is required "only when fundamental rights are

involved").  The Court concludes that (i) it will not recognize a new fundamental right to operate

a trampoline facility in this case; (ii) because "the Plaintiffs' respective liberty interest[] to run

their businesses free from . . . government interference" is not a fundamental right, the Court will

apply rational basis review.  Complaint ¶ 137, at 22.

First, the rights that the Plaintiffs allege that the Defendants violate -- their rights to run a

business free from State interference -- are not fundamental.  See Complaint ¶ 137, at 22.  "The

Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it

as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned." Nebbia v. New York, 291 U.S. 502, 527-28 (1934). Accord Powers v. Harris, 379 F.3d 1208, 1221 n.16 (10th Cir. 2004)(same).

The Court will not recognize a new fundamental right to operate a trampoline facility, because: (i) the Plaintiffs have not demonstrated the historical importance of operating trampoline facilities; (ii) the Plaintiffs have not demonstrated that a temporary pause on operating trampoline facilities will make it impossible for the Plaintiffs to access other fundamental liberties; (iii) the Plaintiffs have not sufficiently defined the contours of their proposed right, and (iv) the Supreme Court has made plain that no general right to operate a business exists. See Nebbia v. New York, 291 U.S. at 527-28.   Here, the Plaintiffs insist upon a general right to run their businesses free from . . . government interference . . . ." Complaint ¶ 137, at 22. Under Glucksberg, however, the Plaintiffs must provide a "careful description of the asserted fundamental liberty interest." 521 U.S. at 721. The Plaintiffs' vague and conclusory allegations do not satisfy Glucksberg's "careful description" requirement, because they do not explain how the Dec. 30 PHO deprives the Plaintiffs of a fundamental right and do not address how trampoline facility operation is "deeply rooted in Nation's history and tradition." Glucksberg, 521 U.S. at 720-21.

### B.  THE DEFENDANTS' ACTIONS DO NOT SHOCK THE JUDICIAL CONSCIENCE, BECAUSE THEIR CONDUCT -- LIMITING IN-PERSON INTERACTIONS IN AN EFFORT TO MITIGATE THE PANDEMIC'S SPREAD -- IS NEITHER EGREGIOUS NOR OUTRAGEOUS.

Even if the shocks-the-conscience standard applies here, the Defendants actions do not violate the Plaintiffs' substantive due process rights, because they do not shock the Court's conscience. See Rochin v. California, 342 U.S. at 172; Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2. "Executive action that shocks the conscience requires much more than negligence." Doe v. Woodard, 912 F.3d at 1300.  Rather, "[c]onduct that shocks the judicial

conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice."  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013).  "The behavior complained of must be egregious and outrageous."  Hernandez v. Ridley, 734 F.3d at 1261 (citing Breithaupt v. Abram, 352 U.S. 432, 435 (1957)).  The Tenth Circuit, for example, recently held that a social worker's behavior was conscience-shocking where the social worker removed a child from his mother's home to place him in his father's home and: (i) withheld information about the father's criminal history, including his conviction for attempted sexual assault against a minor in his care; (ii) withheld concerns about his father "for fear of being fired"; and (iii) was aware of, and failed to "investigate evidence of potential abuse," including the child's report that his father "had hit him with a wooden mop and school official's reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father . . . ."  T.D. v. Patton, 868 F.3d 1209, 1230 (10th Cir. 2017).  Ultimately, the child "suffered severe physical and sexual abuse at the hands of his father," and the Tenth Circuit concluded that the social worker had violated the child's substantive due process rights "by knowingly placing" the child "in a position of danger and knowingly increasing" his "vulnerability to danger."  T.D. v. Patton, 868 F.3d at 1212.  By contrast, the Court has held that school officials' conduct did not shock the conscience, where the plaintiffs alleged that the defendants did not take action to protect students at the school from being kicked and punched in the testicles on at least three occasions.  See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.

The Defendants' action in issuing the Dec. 30 PHO is not "egregious and outrageous." Hernandez v. Ridley, 734 F.3d a 1261.  See Dec. 30 PHO at 1-9.  First, limiting in-person interactions where possible, mitigates COVID-19'S spread.  See How COVID-19 Spreads, Centers for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-

ncov/prevent-getting-sick/how-COVID-spreads.html.  As discussed below, see Analysis § III-IV,

infra,  the Defendants have a strong interest in stopping the spread of COVID-19, and have chosen

to close close-contact recreational facilities to achieve this goal.  See Doe v. Woodard, 912 F.3d

at 1300; Dec. 30 PHO at 8.  Further, a temporary pause on trampoline facility operation is not

comparable to knowingly permitting a child to suffer severe, long-term physical and sexual abuse,

as in T.D. v. Patton.  See T.D. v. Patton, 868 F.3d at 1212.   The Defendants' actions -- taken to

prevent further spread of a deadly virus -- therefore, do not rise to the level of conscience shocking.

See Herrin v. Reeves, No. CIV 20-263 MPM\RP, 2020 WL 5748090, at *9 (N.D. Miss. Sept. 25,

2020)(Mills, J.)("[T]his court finds the notion that restrictions designed to save human lives are

'conscious shocking' to be absurd and not worthy of serious discussion.")(no citation for

quotation).  Accordingly, "the Court's conscience is not shocked."  Schaefer v. Las Cruces Pub.

Sch. Dist., 716 F. Supp. 2d at 1075.

**C.    THE DEC. 30 PHO IS RATIONALLY RELATED TO THE DEFENDANTS' LEGITIMATE STATE INTEREST IN STOPPING COVID-19'S SPREAD.**

Because the Dec. 30 PHO affects neither a suspect class nor a fundamental right, the Court

will evaluate the policy under rational basis review to determine whether the Dec. 30 PHO is

"rationally related to a legitimate state interest."  City of New Orleans v. Dukes, 427 U.S. at 303.

The Court concludes that the Dec. 30 PHO satisfies rational basis review.  See City of New Orleans

v. Dukes, 427 U.S. at 303.  A State policy "need not be in every respect logically consistent with

its aims to be constitutional.  It is enough that there is an evil at hand for correction, and that it

might be thought that the particular legislative measure was a rational way to correct it."

Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 487-88 (1955).  Moreover, "[u]nder

this test," the Defendants' "action 'is not subject to courtroom fact-finding and may be based on

rational speculation unsupported by evidence or empirical data.'"   League of Indep. Fitness

Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125, 128 (6th Cir. 2020)(quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993))).  Moreover, the Defendants need not "actually articulate at any time the purpose or rationale supporting" their classification of trampoline facilities as a close contact recreational facility.  Nordlinger v. Hahn, 505 U.S. 1, 11 (1992).  The classification survives rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  FCC v. Beach Commc'ns, Inc., 508 U.S. at 313.

The Defendants have a legitimate interest in "the protection and preservation of human life . . . ."  Cruzan v. Dir. Missouri Dep't of Health, 497 U.S. 261 (1990).  See Legacy II, 2020 WL 3963764, at *113.  As of February 6, 2021, 176,793 people have tested positive for COVID-19 and 3,378 people have died of the virus in New Mexico.  See COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Feb. 21, 2021).  In addition, 12,381 people have been hospitalized, and 396 people are hospitalized currently because of COVID-19.  See COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Feb. 21, 2021).  According to the CDC, "the more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread."  How COVID-19 Spreads, Centers for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html.  "And at least until vaccines are readily available, the situation may get worse in many parts of the United States," including New Mexico.  Roman Catholic Diocese of Brooklyn v. Cuomo, No. 20A87, 2020 WL 6948354, at *8 (U.S. Nov. 25, 2020)(Kavanaugh, J., concurring).  Presently, vaccines are available only to certain high-risk groups in New Mexico.  See NMDOH, General Vaccine Information,

https://cv.nmhealth.org/covid-vaccine/ (last visited February 8, 2021).    Further, the Court sees rational reasons why the Defendants might wish to prohibit the Plaintiffs from operating during the pandemic, while allowing gyms, for example, to remain open.  See Complaint ¶ 157, at 24 (complaining that the "Plaintiffs have been treated differently than other, similarly situated businesses, to include bowling alleys and gyms").  Bouncing on a large trampoline, in comparison to standing on solid ground in a gym, could make it more difficult for the Plaintiffs' customers to adhere precisely to social distancing requirements.  When a person bounces on a trampoline, he or she lacks total control of where he or she lands.  By contrast, a person walking or running on solid ground, aside from a possible trip or fall, has greater control over where his or her steps take her.  There could be a greater risk, therefore, that trampoline facility customers could bounce inadvertently next to or into another customer, creating a "close inter[action]" that, according to the CDC, increases the risk of COVID-19 spread.  Further, bouncing could dislodge a trampoline facility customer's mask.  Masks, worn properly, limit COVID-19's spread.  A trampoline facility, however, which involves at least one hour of bouncing for each customer, likely creates a higher risk than exists in a typical gym that a person's mask will fall down or off entirely.  See Elevate Park, Pricing, https://elevateriorancho.com/pricing/ (last visited Feb. 6, 2021)(listing trampoline facility prices as "2 hour jump, 90 minute jump," and "1 hour jump").  The Defendants' Dec. 30 PHO, therefore, rationally relates to its legitimate purpose of protecting the health and lives of its citizens by preventing the spread of COVID-19.[4]

---

[4]The Court need not, and probably should not, decide whether the Defendants have chosen the best path.  See Powers v. Harris, 379 F.3d at 1217 (stating that under the rational basis test, "[s]econd-guessing by a court is not allowed"); FCC v. Beach Commc'ns, Inc., 508 U.S. at 313 ("[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."); New Orleans v. Dukes, 427 U.S. at 303 ("The judiciary may not sit as a

## II.   THE PLAINTIFFS' EVIDENCE DOES NOT SUPPORT THAT N.M.S.A. § 24-1-3E AND THE PHOS ARE UNCONSTITUTIONALLY VAGUE.

The Plaintiffs assert that the twenty-five PHOs the NM Health Department issued since March 19, 2020, pursuant to § 24-1-3E, NMSA 1978, deprive them of their substantive due process rights under the Fifth and Fourteenth Amendments, because § 24-1-3E is unconstitutionally vague and overbroad.  See Complaint ¶¶ 121-138, at 21-22.  Specifically, the Plaintiffs state that § 24-1-3E, NMSA 1978, which permits the NM Health Department Secretary to "close any public place . . . for the protection of public health" is unconstitutionally vague and overbroad, because the statute does not define clearly "'public health' and how it is to be protected," meaning that "persons of common intelligence must necessarily guess at the meaning of the statute, and will differ with respect to its applications."  Complaint ¶ 127, at 21.  Relatedly, the Plaintiffs argue that, because each of the twenty-five PHOs rely on § 24-1-3E's vague enabling language, which, according to the Plaintiffs, is "an unconstitutionally vague statute," then, to "the extent that the PHOs purport to close any public place or forbid gatherings of people . . . they violate substantive due process and are void and without effect."  Complaint ¶ 136, at 22.  Because the Plaintiffs' evidence does not convince the Court that the term "public health" in § 24-1-3E, NMSA 1978, is overbroad or vague, the Court concludes that the Plaintiffs' vagueness claims, as they relate to § 24-1-3E's constitutionality, and the twenty-five PHOs enacted pursuant to § 24-1-3E, NMSA 1978,  will likely not succeed on the merits.

### A.   BECAUSE THE PHRASE "PUBLIC HEALTH" DOES NOT GRANT AN UNDEFINED AND UNRESTRICTED GRANT OF AUTHORITY TO NM HEALTH DEPARTMENT OFFICIALS, THE TERM NEITHER RENDERS § 24-1-3E, NMSA 1978, NOR THE PHOS, VOID FOR VAGUENESS.

super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .").

The Plaintiffs state that N.M.S.A. § 24-1-3E, which permits the NM Health Department Secretary to "close any public place . . . for the protection of public health," is unconstitutionally vague and overbroad, because the statute does not define clearly "'public health' and how it is to be protected," meaning that, "persons of common intelligence must necessarily guess at the meaning of the statute, and will differ with respect to its applications."  Complaint ¶ 127, at 21 (quoting N.M.S.A. § 24-1-3E).  As proof that the term "public health" is unconstitutionally vague, the Plaintiffs reference that the "Defendants themselves have demonstrated that they are, at best, 'guessing' by issuing twenty-five (25) PHOs that seek to regulate or otherwise restrict Plaintiffs' respective business since March 19, 2020.'" Complaint ¶ 128, at 21.  The Plaintiffs further explain that § 24-1-3E, NMSA 1978, is unconstitutionally vague, because it (i) "provides no standard by which the NMDOH is to determine whether a particular event or circumstance threatens the 'public health'"; (ii) "is so vague that it invited arbitrary enforcement";," (iii) "is void for vagueness and unconstitutional on its face";," and (iv) "is also unconstitutionally overbroad in that the undefined, and unrestricted grant of authority for the 'protection of the public health,' sweeps many lawful activities within it scope."  ,"Complaint ¶¶ 130-133, at 21 (quoting § 24-1-3E, NMSA 1978).  As support for the latter premise -- that § 24-1-3E, NMSA 1978, allows for "undefined, and unrestricted grant of authority for the 'protection of the public health,'" Complaint ¶¶ 130-133, at 21 (quoting § 24-1-3E, NMSA 1978), the Plaintiffs theorize that, given the term's overbreadth, NM Health Department officials, in the name of mitigating the danger of concussions, merely could cite medical studies to "prohibit public gatherings, and close stadiums and areas, for purposes of playing football, soccer, or hockey."  Complaint ¶ 133, at 21 (citing § 24-1-3E, NMSA 1978).  Similarly, the Plaintiffs theorize that, in the name of "the public health," Complaint ¶ 133, at 21 (quoting § 24-1-3E, NMSA 1978), and for the purpose of protecting a "a negative

psychological impact arising from playing video games," NM Health Department officials "could close any store that sells, lends, or rents such games, claiming that their action is necessary for the 'protection of the public health.'"   Complaint ¶ 133, at 21 (citing § 24-1-3E, NMSA 1978). Furthermore, because the Plaintiffs argue that § 24-1-3E, NMSA 1978, is an "unconstitutionally vague statute," the PHOs "issued in reliance on this statute" deprive "the Plaintiffs and other citizens of [] New Mexico of their Constitutional right to substantive due process under the Fifth and Fourteenth Amendments."  Complaint ¶ 137, at 22.  The vagueness, according to the Plaintiffs, is evident, given that the PHOs "chang[e] the definitions, restrictions, obligations and requirements on New Mexico businesses on an almost bi-weekly basis."   Complaint ¶ 134, at 22.   Equally problematic, according to the Plaintiffs, is that the PHOs "have all been promulgated, modified, and amended without any public participation or comment."  Complaint ¶ 135, at 22.  Accordingly, the Plaintiffs argue that, as applied, the PHOs "violate the Plaintiffs' respective liberty interests to run their businesses free from unconstitutional government inference and Plaintiffs' respective rights to substantive due process."  Complaint ¶ 137, at 22.

> Section 24-1-3(E), NMSA 1978, grants the NM Health Department Secretary "authority" to "close any public place and forbid gatherings of people when necessary for the protection of the public health."  Each PHO, in turn, contains the following statement, which reference § 24-1-3E, NMSA 1978, as offering authority for the NM Health Department to close public places and forbid gatherings of people.

> WHEREAS, the New Mexico Department of Health possesses legal authority pursuant to the Public Health Act, NMSA 1978, Sections 24-1-1 to -40, the Public Health Emergency Response Act, NMSA 1978, Sections 12-10A-1 to -10, the Department of Health Act, NMSA 1978, Sections 9-7-1 to -18, and inherent constitutional police powers of the New Mexico state government, to preserve and promote public health and safety, to adopt isolation and quarantine, and to close public places and forbid gatherings of people when deemed necessary by the Department for the protection of public health.

April 6, 2020 PHO, at 2.

- 80 -

In a March 23, 2020, Open Letter issued to the Honorable Cliff R. Pirtle, State Senator of the State of New Mexico, Assistant Attorney General Sally Malave offered an Attorney General Advisory Opinion "regarding a governor's authority to close or otherwise regulate the activities of private businesses, including private clubs, engaged in the sale of food and alcoholic beverages for consumption on the premises during a public health or other emergency." Re: Opinion Request - - Governor's Authority during a Public Health or Other Emergency ("Opinion Request"), 2020 WL 1551772, at *1-2 (N.M.A.G. Mar. 23, 2020).

Based on the Attorney General Office's "examination of the relevant constitutional, statutory and case law authorities, as well as the information available to us at this time," the Attorney General's Office determined that

> the Governor has broad authority to declare a public health emergency by executive order. In turn, the executive order properly triggers the authority of the Secretary of Health to order the closure of public places, including privately owned businesses generally open to the public, and forbid large gatherings.

Opinion Request, 2020 WL 1551772, at *1-2. The Assistant Attorney General subsequently advanced three arguments in support of the Governor's broad authority to regulate private business activities during a public health or other emergency under N.M.S.A. § 24-1-3E. See Opinion Request, 2020 WL 1551772, at *1-2. First, the Assistant Attorney General outlined the "several rules of statutory construction," which" guide the analysis of the Governor's authority under N.M.S.A. § 24-1-3E.

> As a preliminary matter, there are several rules of statutory construction that guide our analysis. First, in construing a statute, our goal is to give primary effect to the legislative intent, which intent is evidenced primarily through the statute's language. _See Souther v. Ancae Heating and Air Conditioning_, 2002-NMSC-0078, 132 N.M. 608, 611. Second, under the plain meaning rule, we give statutory language its ordinary meaning unless the Legislature indicates a different meaning is necessary. _See Cooper v. Chevron_, 2002-NMSC-020, 132 N.M. 382, 388. Finally, we read statutes regarding the same subject matter together as harmoniously as possible in a way that facilitates their operation and achievement

- 81 -

of their goals.  *See* *Jicarilla Apache Nation v. Rodarte*, 2004-NMSC-035, 136 N.M. 630, 634-5.

Opinion Request, 2020 WL 1551772, at *1.  Second, the Assistant Attorney General analyzed "the relevant statutes that authorize the governor to declare a state of public health emergency and the executive's response to said emergency."  Opinion Request, 2020 WL 1551772, at *1.

> The New Mexico Constitution vests the governor with the supreme power of the state and directs the governor to take care that the laws be faithfully executed.  N.M. Const., art. V, § 4. Notwithstanding, as head of the executive branch, the governor's powers are limited to those granted by the constitution or statute.  *See* N.M. Const, art. III, § 1; State v. Fifth Judicial Dist. Court, 1932-NMSC-023, 36 N.M. 151.  *See also* State ex rel. Sego v. Kirkpatrick, 86 N.M. 359, 362 (1974)(stating that "[t]he power of veto, like all powers constitutionally conferred upon a government officer or agency, is not absolute and may not be exercised without any restraint or limitation whatsoever") (emphasis in original).  Thus, while the governor may issue orders to executive agencies in an effort to better execute existing law, the governor's executive order will be invalid if it is outside the governor's constitutional or statutory authority.

Opinion Request, 2020 WL 1551772, at *1.  Relatedly, the Assistant Attorney General assessed N.M.S.A. § 24-1-3E, in light of the Public Health Emergency Response Act, which provides a grant of authority to the governor to declare a state of public health emergency "upon the occurrence of a public health emergency." Opinion Request, 2020 WL 1551772, at *2 (citing § 12-10A-5(A), NMSA 1978).  According to the Assistant Attorney General, the Public Health Emergency Response Act,

> requires the governor to consult with the secretary of health prior to making such a declaration.  § 12-10A-5(A), NMSA 1978.  And, upon making the declaration, the Act allows the governor to confer upon the secretaries of health, public safety, and homeland security and emergency management the authority to coordinate a response to the public health emergency. The Act also mandates that the governor's declaration of a state of public health emergency be by an executive order that specifies:
>
> > (1)      the nature of the emergency;

        (2)      the areas of the state affected by the emergency;

        (3)      its causation;

        (4)      its expected duration, if less than thirty days;

        (5)      the public health officials needed to assist in coordinating a response to the emergency; and

        (6)      any other provisions necessary to implement the order.

Opinion Request, 2020 WL 1551772, at *2 (quoting  § 12-10A-5(B), NMSA 1978).

Furthermore, as the Assistant Attorney General explained,

With an executive order in place, then, the Public Health Act authorizes the Department of Health to, among other things:

(C)    investigate, control and abate the causes of disease, especially epidemics, sources of mortality and other conditions of public health;

(D)    establish, maintain and enforce isolation and quarantine;

(E)    close any public place and forbid gatherings of people when necessary for the protection of the public health; and

(F)    respond to public health emergencies and assist communities in recovery.

Opinion Request, 2020 WL 1551772, at *2 (quoting § 24-1-3, NMSA 1978)(emphasis added).

Finally, although the Assistant Attorney General admitted that the Public Health Act does not

define "public place,"

based on New Mexico statutory definitions and common usage, we find that a "public place" is a place generally open or accessible to the public and may include both publicly owned and privately owned spaces. *See e.g.* https://definitions.uslegal.com/p/public-place/ (public place is generally an indoor or outdoor area, whether privately or publicly owned, to which the public have access by right or by invitation, expressed or implied, whether by payment of money or not, but not a place when used exclusively by one or more individuals for a private gathering or other personal purpose). As such, private businesses, including private clubs would be subject to an executive order that closes any public place and forbids gatherings of people when necessary for the protection of the public health.

Opinion Request, 2020 WL 1551772, at *2

In addition, although, as the Assistant Attorney General conceded, "no New Mexico courts have had the opportunity to interpret § 24-1-3," still, "taken as a whole, the statutory scheme outlined above appears to fall within the State's traditional police powers to regulate certain activity for the protection of public health against the spread of infectious disease." Opinion Request, 2020 WL 1551772, at *2. The Assistant Attorney General argued that this conclusion of broad authority is in line with relevant Supreme Court authority and principles of federalism, as well as recent federal district court decisions regarding the scope of states' broad police powers:

> "The United States Supreme Court has declared that the 'structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Florida v. United States HHS*, 648 F.3d 1235, 1305 (11th Cir. 2011)(alterations in original)(quoting *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006)). Moreover, "[n]umerous Supreme Court decisions have identified the regulation of health matters as a core facet of a state's police powers." *Florida v. United States HHS*, 648 F.3d at 1305 (citing various Supreme Court cases discussing the latitude of States to regulate matters of health). *See also Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954)("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power.").

Opinion Request, 2020 WL 1551772, at *2

In light of the Public Health Emergency Response Act and the Hazard Emergency Management Act, according to the Assistant Attorney General, Governor Michelle Lujan Grisham'' actions, and Public Health Orders are a "reasonable exercise of the police powers vested in the Secretary and Department of Health by the Public Act." Opinion Request, 2020 WL 1551772, at *2.

Considering the Attorney General Office's Advisory Opinion as to the authority granted to the Governor under N.M.S.A. § 24-1-3E, which, in turn, enables NM Health Department's

issuance of the twenty-five PHOs, the Court concludes that the Plaintiffs' evidence does not show that they are likely to succeed on the merits of their vagueness claim against the Defendants. First, the Supreme Court has stated that, "we are condemned to the use of words, we can never expect mathematical certainty from our language." Grayned v. City of Rockford, 408 U.S. at 110. Here, N.M.S.A. § 24-1-3E, puts into language its intention to allow the Governor to "regulate certain activity for the protection of public health against the spread of infectious disease." Opinion Request, 2020 WL 1551772, at *2. The Governor's public health regulatory authority, in turn, falls under the State's traditional police powers pursuant to the Tenth Amendment, which, as the Supreme Court has held "'allow the States great latitude . . . to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" Florida v. United States, HHS, 648 F.3d at 1235 (quoting Gonzales v Oregon, 546 U.S. at 270). The term "public  health" in N.M.S.A. § 24-1-3E, then, must be understood in the context of the purpose of the State's police powers under the Tenth Amendment. Furthermore, although the Plaintiffs state that the term "public health" is "so vague . . . that persons of common intelligence must necessarily guess at the meaning of the statute," Complaint ¶ 127, at 21 -- which the Plaintiffs, in turn, contend is evident based on the Defendants demonstrating "that they are, at best 'guessing'" in the PHOs' issuance, Complaint ¶ 128, at 21 (no citation for quotation" -- the "public health" purpose under N.M.S.A. § 24-1-3E, that enables the PHOs' enactment, makes sense in light of what the Supreme Court previously has allowed States to pursue in furtherance of the public health under the umbrella of States' police powers. Florida v. United States HHS, 648 F.3d at 1305 ("Numerous Supreme Court decisions have identified the regulation of health matters as a core facet of a state's police powers.")(citing Hill v. Colorado, 530 U.S. at 715 ("It is a traditional exercise of the States' 'States' police powers to protect the health and safety of their citizens.'" (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470,

475 (1996)." ()); <u>Barnes v. Glen Theatre, Inc.</u>, 501 U.S. 560, 569, (1991)("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals."); <u>Head v. N.M. Bd. of Exam'rs in Optometry</u>, 374 U.S. 424, 428 (1963)( "[T]he statute here involved is a measure directly addressed to protection of the public health, and the statute thus falls within the most traditional concept of what is compendiously known as the police power."); <u>Barsky v. Bd. of Regents</u>,347 U.S. 442, 449 (1954)("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power."); <u>Jacobson v. Massachusetts</u>, 197 U.S. 11, 25 (1905)("According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.");  <u>Gonzales v. Raich</u>, 545 U.S. 1, 42 (2005)(O'Connor, J., dissenting)("This case exemplifies the role of States as laboratories. The States' core police powers have always included authority to define criminal law and to protect the health, safety, and welfare of their citizens.")).   <u>See also</u> <u>Grayned  v. City  of  Rockford</u>, 408 U.S. at 112 (noting that "[a]lthough the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted."); <u>VIP of Berlin, LLC v. Town of Berlin</u>, 593 F.3d 179, 188 (2d Cir. 2010)("In addition to the plain meaning of the ordinance's wording . . . the ordinance's stated purpose -- preventing the adverse secondary effects associated with the presence of [a sexually-oriented business] --provides additional clarity and guidance.").

In addition, the Plaintiffs' opinions on hypothetical situations in which they think N.M.S.A. § 24-1-3E, might enable NM Health Department officials to enact "undefined" and "unrestricted" regulations for "the protection of the public health," Complaint ¶ 133, at 22,  does not dilute the

plain meaning and intended application of N.M.S.A. § 24-1-3E.  See Hill v. Colorado, 530 U.S. at

733 (stating that "speculation about possible vagueness in hypothetical situations not before the

Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its

intended applications.'")(quoting United States v. Raines, 362 U.S. 17, 23 (1960)); United States

v. Williams, 553 U.S. at 304 (stating that "perfect clarity and precise guidance have never been

required even of regulations that restrict expressive activity."); Cal. Teachers Ass'n v. Bd of

Educ., 271 F.3d 1141, 1151 (9th Cir. 2001)(stating that "uncertainty at a statute's margins will not

warrant facial invalidation if it is clear what the statute proscribes in the vast majority of its

intended applications." (citing Hill v. Colorado, 530 U.S. at 733)).  For example, in a recent case

that involved a set of plaintiffs challenging New York's mandatory vaccination law for children

attending public, private, or parochial schools, the Honorable Allyne R. Ross, United States

District Judge for the Eastern District of New York, held that the mandatory vaccination law did

not interfere or modify the rights of children with disabilities under the Disabilities Education Act.

See V.D. et al. v. State of New York, 403 F. Supp 3d 76 (E.D.N.Y. 2019).  In making the ruling,

Senior Judge Ross outlined the historic discretion that states possess in "regulat[ing} in areas

affecting the health and safety of their citizens."  V.D. et al. v. State of New York, 403 F. Supp.

3d at 86.

> States have historically enjoyed considerable discretion to regulate in areas
> affecting the health and safety of their citizens.  See Medtronic, Inc. v. Lohr, 518
> U.S. 470, 485, (1996).  As such, the Supreme Court has long upheld the rights of
> states to enact compulsory vaccination laws.  See Jacobson v. Commonwealth of
> Massachusetts, 197 U.S. 11, 27 (1905).   "[A] community has the right to protect
> itself against an epidemic of disease which threatens the safety of its members."  See
> Jacobson v. Commonwealth of Massachusetts, 197 U.S. at 27.  In service of this
> goal, a state may impose certain requirements on its constituents without offending
> the Constitution.  See Jacobson v. Commonwealth of Massachusetts, 197 U.S. at
> 27.  "[T]he liberty secured by the Constitution of the United States to every person
> within its jurisdiction does not import an absolute right in each person to be, at all
> times and in all circumstances, wholly freed from restraint.").  See also Prince v.

*Massachusetts*, 321 U.S. 158, 166-67 (1944)("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." (citing People v. Pierson, 176 N.Y. 201, (N.Y. 1903)))."

V.D. et al. v. State of New York, 403 F. Supp. 3d at 86.

Of course, the COVID-19 pandemic is an unprecedented event, and the Court recognizes the Plaintiffs' concerns that, potentially, an event of this nature may allow public officials to take unwarranted and seemingly pervasive governmental measures in "the name of public health" that far exceed previous measures taken for public health reasons under N.M.S.A. § 24-1-3E. Nonetheless, the Court still does not believe that the  Governor's actions here in issuing the 25 PHOs, under the "public health" regulatory power offered in N.M.S.A. § 24-1-3E, are testamentary to the statute being void for vagueness.  Relatedly, then, despite the Plaintiffs' contention that the twenty-five PHOs are void for vagueness because they "chang[e] the definitions, restrictions, obligations, and requirements on New Mexico business on an almost bi-weekly basis," Complaint ¶ 134, at 22, the Court determines that the Governor's issuance of the twenty-five PHOs has been consistent with the language of N.M.S.A. § 24-1-3E, in that the PHOs, when issuing their specific regulations that include limiting the activities of certain private businesses that offer services and are open to the public, all cite preventing the further spread of COVID-19 -- a public health emergency in New Mexico, and around the world -- and validate the restrictions based on the threat that COVID-19 poses to the health, safety, and well-being of New Mexico residents – two objectives that fall under the State's police powers.  Moreover, as the Honorable Judge Daniel D. Domenico, United States District Judge for the District of Colorado, explained, when facing a group of plaintiffs' comparable challenges to the State's issuance of PHO's on vagueness grounds, see Denver Bible Church v. Azar, No. 120CV02362DDDNRN, 2020 WL 6128994, at *14 (D. Colo. Oct. 15, 2020)(Domenico, J.)

The fact that the Executive Orders incorporate other Executive Orders and Public Health Orders by reference may make it difficult to follow the entirety of the State's restrictions, but that is hardly unique in modern law, and it does not render the orders unconstitutionally vague. See United States v. Collins, 461 F. App'x 807, 809 (10th Cir. 2012)(citing Hines v. Baker, 422 F.2d 1002, 1005 (10th Cir. 1970)("[I]ncorporation by reference to other defined offenses is not impermissibly vague.")).   And, as the State Defendants point out, each of their Executive Orders and Public Health Orders clearly states its effective period.   See, e.g., [EO D 2020 138, Doc. 1-15 at 4 ("Executive Order D 2020 039 . . . as amended and extended by . . . this Executive Order, shall expire thirty (30) days from July 16, 2020, unless extended further by Executive Order.") ]; 2d Am. PHO 20-35, supra note 7, § VIII, at 26 ("This Order shall become effective on Thursday, October 8, 2020 and will expire 30 days from October 6, 2020, unless extended, rescinded, superseded, or amended in writing."). This then, is not a basis for finding the Executive Orders unconstitutionally vague, as a person of ordinary intelligence can, with a little effort, discern the effective dates of the various orders.

Denver Bible Church v. Azar, No. 120CV02362DDDNRN, 2020 WL 6128994, at *14.  Equally, the Court agrees with the Northern District of California's reasoning in Minority TV Project Inc. v. FCC, that "arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute" and agrees that "[i]f such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge." 649 F. Supp.2d at 1047.  The Supreme Court of New Mexico, as well, has weighed in on the void-for-vagueness issue, in the context of addressing a group of businesses' action seeking declaratory relief as to the issue whether the NM Health Department Secretary's COVID-19 emergency orders were within the scope of the Secretary's authority under the Public Health Emergency Response Act.  See Grisham v. Reeb, No. S-1-SC-38336, 2020 WL 6538329, at *1-2 (N.M. Nov. 5, 2020).  In Grisham v. Reeb, the plaintiff businesses argued that the emergency orders were not authorized, because "the average person would not likely have understood that violation of public health emergency orders were punishable enforceable under the PHERA."  No. S-1-SC-38336, 2020 WL 6538329, at *11.  The Supreme Court of New Mexico dismissed the argument, however, in ruling that the business restrictions were within the scope of the Secretary's

authority under the Public Health Emergency Response Act, and the Act's civil penalty provision

applied to violations of orders restricting  businesses and gatherings due to the COVID-19

pandemic.  See S-1-SC-38336, 2020 WL 6538329, at *1, *11-13.  When issuing the ruling, the

Supreme Court of New Mexico explained,

> Constitutional notice requirements are satisfied if persons of reasonable intelligence would comprehend the law at issue.  N.M. Mining AssnWater Quality Control Comm'n, 2007-NMCA-084, ¶ 26, 164 P.3d 81 (also holding that "a governmental agency attempting to give notice may assume a hypothetical recipient desirous of actually being informed" (internal quotation marks and citation omitted)).  Similarly, under a void-for-vagueness analysis, courts ask whether persons of average intelligence would have to guess at the meaning of a penal provision and would differ as to its application.  Bokum Res. Corp. v. N.M. Water Quality Control Comm'n, 1979-NMSC-090, ¶ 14, 603 P.2d 285.  Here, we also consider, in the context of a public health emergency, that the Legislature conveyed powers under the PHERA to be used when prompt action is critical. Cf., Colorado State Bd. of Med. Exam'rs, Inquiry Panel v. Dist. Court of Seventh Judicial Dist., in Montrose Cty., 551 P.2d 194, 196 (1976)(holding that suspension of a physician's license, before a hearing was held, was appropriate because there was "adequate support for the Board's conclusion" that emergency circumstances justified an immediate suspension, followed by a hearing); Miller v. Campbell Cty., 945 F.2d 348, 353 (10th Cir. 1991)(holding that "where the state is confronted with an emergency, it may deprive an individual of his or her property without first providing a hearing").  The interest in providing more specific notice of the conduct subject to penalty must be balanced against the interest in conveying sufficiently flexible enforcement authority to the Secretary of Health and others to manage a public health emergency.

S-1-SC-38336, 2020 WL 6538329, at *11.  Ultimately, then, the alleged inconsistencies in the

PHOs that the Plaintiffs reference here, demonstrate nothing more than that, if  the PHOs are ever

enforced against the Plaintiffs or anyone else, there may be some uncertainty at the PHOs' margins,

but the Court believes that it is clear what a given PHO means in the "vast majority of its intended

applications."  Hill v. Colorado, 530 U.S. at 733.

Finally, the Supreme Court of the United States and the Supreme Court of New Mexico

instruct that statutes should be interpreted to avoid constitutional difficulties. See Frisby v.

Schultz, 487 U .S. 474, 483 (1988)("To the extent they endorsed a broad reading of the ordinance,

the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties."); Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 16, 212 P.3d at 366-67 ("A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language.").  This principle counsels in favor of the Court's plain language reading of  N.M.S.A. § 24-1-3E, and the twenty-five PHOs, and nothing that the Plaintiffs have presented in their Complaint or TRO Application convinces the Court that it should endorse a broader reading that runs afoul of the Constitution.  "Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort."  Nat'l Endowment for the Arts v. Finley, 524 U.S. at 580 (quotation marks omitted).  Ultimately, then, because the Court does not believe that N.M.S.A. § 24-1-3E, language is facially invalid, nor does it believe the PHOs, which rely on N.M.S.A. § 24-1-3E, are facially invalid, the Court concludes that Plaintiffs are not likely to succeed on the merits of their vagueness claim against the Defendants.

**III.    THE DEFENDANTS PROBABLY HAVE NOT VIOLATED THE PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS, BECAUSE SUMMARY ADMINISTRATIVE ACTION IS JUSTIFIED IN EMERGENCY SITUATIONS TO PROTECT PUBLIC HEALTH AND SAFETY, AND THE DEC. 30 PHO IS QUASI-LEGISLATIVE.**

The Plaintiffs  may have a property interest in operating their businesses under the Due Process Clause.  See Honda Motor Co. v. Oberg, 512 U.S. 415, 432 (1994)(describing a property interest in money damages); Complaint ¶ 108, at 17 (describing some of the Plaintiffs' economic losses as a result of the trampoline facility closure).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "'[d]id the individual possess a protected property [or liberty] interest to which due process

protection was applicable?'"; and (ii) "'[w]as the individual afforded an appropriate level of process?'" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1304 (D.N.M. 2005)(Browning, J.)(same), aff'd, 168 F.3d 1214 (10th Cir. 2006).

"In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly.  Quick action may turn out to be wrongful action, but due process requires only a post-deprivation opportunity to establish the error." Camuglia v. City of Albuquerque, 448 F.3d at 221.  Moreover, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Here, the Defendants closed initially the Plaintiffs' business as a quick response to the rapid spread of the COVID-19 pandemic. The Defendants provide an avenue by which the Plaintiffs can request a hearing, and at least one of the Plaintiffs, Elevate, has had an administrative hearing already. The Plaintiffs maintain that they "should have been permitted to operate during the pendency of the proceeding" and "should either be permitted to remain open during the pendency of an appeal . . . or the state should provide for an expedited hearing and determination of any such appeal."  Complaint ¶¶ 153-54, at 24.  The outbreak of a new and deadly disease, however, "constitutes an imminent danger to public safety is precisely the kind of circumstance where the government must act quickly." Guttman v. Khalsa, 669 F.3d at 1114.  The totality of the circumstances here indicate that the Defendants likely afforded the Plaintiffs adequate process.

## IV.   THE DEFENDANTS LIKELY HAVE NOT VIOLATED THE PLAINTIFFS' EQUAL PROTECTION RIGHTS, BECAUSE THE PLAINTIFFS ARE NOT MEMBERS OF A SUSPECT CLASS, THE DEFENDANTS HAVE SHOWN NO ANIMUS TOWARDS THE PLAINTIFFS, AND THE DEFENDANTS' POLICIES SATISFY RATIONAL BASIS REVIEW.

To establish an equal protection violation, the Plaintiffs first must demonstrate that he or

she is a member of a class of persons who is being treated differently than similarly situated individuals outside the class. See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012)(Gorsuch, J.). Further, if a statute appears facially neutral, the plaintiff must make out a "prima facie case of discriminatory purpose." Washington v. Davis, 426 U.S. at 241. See Wayte v. United States, 470 U.S. 598, 610 (1985)(concluding that, even if a government's policy has a discriminatory effect on vocal non-registrants for the Selected Service, the plaintiffs must show that the government intended that discriminatory effect); Curtis v. Oliver, No. CIV 20-0748 JB\JHR, 2020 WL 4734980, at *63 (D.N.M. Aug. 14, 2020)(Browning, J.)("'[A] discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action.'")(quoting SECSYS, LLC v. Vigil, 666 F.3d at 685). The Plaintiffs must establish a discriminatory purpose in any equal protection challenge involving a facially neutral law. See, e.g., Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 481 (1997)(holding that the plaintiff in a constitutional vote dilution challenge under the equal protection clause must demonstrate that the defendants "acted with a discriminatory purpose"); Romer v. Evans, 517 U.S. 620 (1996)(invalidating a state constitutional amendment impacting sexual minorities, because its "sheer breadth" was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects").

Here, the Plaintiffs do not allege that a discriminatory purpose or animus towards trampoline facilities motivates the Defendants' policies. See Washington v. Davis, 426 U.S. at 241. First, the Defendants' Dec. 30 PHO is facially neutral; it does not require only trampoline facilities to remain closed during the pendency of the pandemic. See Dec. 30 PHO at 1. Under the current order, no "close contact recreational facilities" may operate. Public Health Emergency

Order (dated Dec. 30, 2020), at 8 ("Dec. 30 PHO").  The December 30 PHO defines "close contact recreational facilities" to:

> include indoor movie theaters, indoor museums with interactive displays or exhibits and other similar venues, miniature golf, arcades, amusement parks, aquariums, bowling alleys, casinos, concert venues, indoor ice-skating rinks, professional sports venues, event venues, bars, dance clubs, performance venues, go-kart courses, automobile racetracks, adult entertainment venues, and other places of recreation or entertainment.

Dec. 30 PHO at 5.  Unlike the state constitutional amendment in Romer v. Evans, which solely impacted sexual minorities, the Dec. 30 PHO does not solely impact trampoline facilities.  See Romer v. Evans, 517 U.S. at 632; Dec. 30 PHO at 5.  The Defendants have not "decided to single out trampoline gyms for different treatment."  Motion at 17.  Rather, the Dec. 30 PHO prohibits "close contact recreational facilities" from operating.  Dec. 30 PHO at 8.  True, the Dec. 30 PHO distinguishes between trampoline facilities and, for example, "outdoor recreational facilities," which may operate at 50% capacity in "Green Level" counties.  Dec. 30 PHO at 8.  Regulatory distinctions among categories of businesses, however, are not usually enough to state an equal protection claim.  See Heller v. Doe, 509 U.S. 312, 319-20 (explaining that "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity"); Lawrence v. Polis, No. CIV 20-00862, 2020 WL 7348210, at *11 (D. Colo. Dec. 4, 2020)(Domenico, J.)(noting that "distinctions among different types of businesses in Defendants' public-health orders result in a disparity of treatment between his employer," a restaurant, "and, for example, houses of worship" likely did not violate the Equal Protection Clause).  Nor is there any evidence that the Defendants possess a "bare . . . desire to harm" trampoline facilities.  Moreno, 413 U.S. 528, 534 (1973).  The Plaintiffs have not attempted to make a prima facie showing of discriminatory purpose or animus; therefore, any equal protection claim relating to trampoline facilities necessarily fails.  See Washington v. Davis, 426 U.S. at 241; Dec. 30 PHO at

1; Complaint ¶¶ 156-63, at 6-7.

Moreover, the Equal Protection Clause provides heightened scrutiny to prevent "prejudice against discrete and insular minorities" -- protected or suspect classes.  United States v. Carolene Prod. Co., 304 U.S. 144, 153 n. 4 (1938).  Here, the Plaintiffs appear to argue that they are members of a suspect class; they insist that the Defendants have violated their equal protection rights because "the Defendant's actions are not necessary to serve a compelling government interest with respect to the Plaintiffs' trampoline gyms."  Complaint ¶ 162, at 25.  Trampoline facilities are not members of a suspect class.  See Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210 (10th Cir. 2002).  These businesses do not "claim to suffer disabilities, have a history of unequal treatment, or be politically powerless."  Save Palisade FruitLands v. Todd, 279 F.3d at 1210.  Trampoline facilities, therefore, are not entitled to heightened scrutiny because of a suspect classification.  See Palisade FruitLands v. Todd, 279 F.3d at 1210.  Further, as the Court has explained, the Dec. 30 PHO satisfies rational basis review.  See Analysis § IV, supra.  The Plaintiffs' equal protection claims, therefore, will likely fail.

**V.   THE COURT WILL LIKELY NEED TO ABSTAIN FROM HEARING THE CASE CONCERNING ELEVATE UNDER YOUNGER ABSTENTION.**

A threshold issue that the Court analyzes whether it should refrain from hearing the case concerning Elevate under the Younger abstention doctrine.  Under Younger, a plaintiff may not request a federal district court to interfere before a state court judgment is final.  See Younger, 401 U.S. at 43-45; Martinez v. Martinez, No. CIV 09–0281 JB/LFG, 2013 WL 3270448, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).   The Court concludes that it likely will not exercise jurisdiction over Elevate under Younger abstention, because (i) Elevate admits that there is an ongoing State administrative proceeding; (ii) the State proceeding involves important state interests; and (iii) the State proceeding provides an adequate forum to hear Elevate's federal

claims.  See Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d 1160, 1163 (10th Cir. 1999).

Because the other Plaintiffs are not in state administrative proceedings, the Court likely has

jurisdiction to hear the case as it pertains to them.

"Generally, federal courts must exercise their jurisdiction when available. However,

principles of 'equity, comity, and federalism' motivate a 'longstanding public policy against

federal court interference with state court proceedings.'"  Rocky Mountain Gun Owners v.

Williams, 671 F. App'x 1021, 1024 (10th Cir. 2016)(quoting Steffel v. Thompson, 415 U.S. 452,

460-61, (1974), and citing  Younger, 401 U.S. at 43-45; Sprint Commc'ns, Inc. v. Jacobs, 581 U.S.

69, 73 (2013)("Sprint")).  The framers of the Constitution designed a system in which

> there is sensitivity to the legitimate interests of both State and National
> Governments, and in which the National Government, anxious though it may be to
> vindicate and protect federal rights and federal interests, always endeavors to do so
> in ways that will not unduly interfere with the legitimate activities of the States.

Younger, 401 U.S. at 44.  Federal courts should not interfere with ongoing state court proceedings

"by granting equitable relief such as injunctions of important State proceedings or declaratory

judgments regarding constitutional issues in those proceedings" when the state forum provides an

adequate avenue for relief.  Rienhardt v. Kelly, 164 F.3d at 1302.  A court in the Tenth Circuit

should abstain from entertaining cases which implicate the Younger doctrine, so long as an

adequate opportunity is afforded in the state court proceedings to raise the federal claims.  See J.B.

ex rel. Hart v. Valdez, 186 F.3d at 1291.  This refusal to exercise federal jurisdiction arises from a

desire to "avoid undue interference with states' conduct of their own affairs."  J.B. ex rel. Hart v.

Valdez, 186 F.3d at 1291 (quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d at 711.

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three conditions

must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of

important state interests; and (iii) an adequate opportunity afforded in the state court proceedings

to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78.  See Bellotti v. Baird, 428 U.S. at 143 n.10 (noting that when all of the conditions mandating abstention clearly exist in the record, courts should address application of the Younger abstention doctrine sua sponte); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3.  Before examining the three-factor test, the Court first must address whether this case is one that allows for Younger abstention at all.  The Supreme Court has defined the appropriate set of cases narrowly: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include . . . [i] 'state criminal prosecutions,' [ii] 'civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).

In Sprint, the Supreme Court narrows the application of Younger, see Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(noting that Sprint "significantly limited the reach of Younger to only" three situations), and clarified that "[t]he three Middlesex conditions recited above were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking Younger."  Sprint, 571 U.S. at 81 (emphasis in original).  The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases."  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020).  See Catanach v. Thomson, 718 F. App'x at 598 n.2 (noting that Sprint "significantly limited the reach of Younger to only" three situations and that Sprint "also discounted reliance on the three factors outlined" in Middlesex); MacIntyre v. JP Morgan Chase Bank, No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that

Sprint significantly cabined the breadth of Younger abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n Sprint, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied Younger abstention using substantially the same analysis as in [Amanatullah v. Colo. Bd. of Med. Examiners][.]"); Conry v. Barker, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).  In Hunter v. Hirsig, 660 F. App'x 711, 714-17 (10th Cir. 2016)("Hunter"), the Tenth Circuit continued to use Younger's three-condition framework, and applied the three Sprint categories as a sub-set of its analysis whether there are "ongoing state administrative proceedings."  Hunter, 660 F. App'x at 715.  The Tenth Circuit explained that "[t]he first condition -- ongoing state administrative proceedings -- involves two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference," where "type" is defined by the three Sprint categories.  Hunter, 660 F. App'x 711, 715 (emphasis in the original).  See id. at 716 ("As for the *type* of proceeding, the Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to criminal prosecutions.'")(emphasis in the original)(quoting Sprint, 134 S. Ct. at 588).  The Court concludes that the framework that the Tenth Circuit employs in Hunter, 660 F. App'x at 715, is controlling and will apply it here.

### A.    ELEVATE IS INVOLVED IN ONGOING STATE ADMINISTRATIVE PROCEEDINGS.

"[T]he proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference."  Hunter, 660 F. App'x at 715 (emphasis in the original). Here, Elevate is involved in ongoing State proceedings, because the NM Health Department held a hearing on the Elevate's Notice of Civil Action and still has not issued a decision.  See Complaint ¶ 68, at 11; id. ¶¶ 55-77, at 9-13.  Here, although, there are no pending matters in the New Mexico state courts,

Younger abstention is appropriate in ongoing "state administrative proceedings." Ohio Civil

Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 627 (1986)(citing cases and

concluding that a district court should have abstained where there were ongoing proceedings

before the Ohio Civil Rights Commission). See, e.g., Middlesex County Ethics Committee v.

Garden State Bar Assn., 457 U.S. 423, 432-34 (1982)(holding that federal courts should refrain

from enjoining lawyer disciplinary proceedings the state ethics committees initiated if the

proceedings are within the appropriate State Supreme Court's appellate jurisdiction).; Hunter, 660

F. App'x 711, 715-16 (concluding that abstention proper where there were ongoing proceedings

before the Wyoming Department of Insurance).  Because Elevate is in proceedings before the NM

Health Department, and these proceedings have not yet concluded, see Hunter, 660 F. App'x at,

715 ("Ordinarily, a state proceeding ends when the time for appeal has run.")(citing Bear v. Patton,

451 F.3d 639, 642 (10th Cir. 2006)); see also Huffman v. Pursue, Ltd., 420 U.S. 592, 608

(1975)(concluding that a plaintiff "must exhaust his state appellate remedies before seeking relief

in the [federal] District Court"), the Court concludes that the State proceedings are ongoing.

Next, regarding the "type of proceeding," Hunter, 660 F. App'x at 716,  Elevate falls within

the second category that Sprint outlines: "civil enforcement proceedings," Sprint, 571 U.S. at 73.

These proceedings "are akin to criminal prosecutions." Sprint, 571 U.S. at 73 (citing Huffman v.

Pursue, Ltd., 420 U.S. 592 (1975)).  The Supreme Court explained and gave examples:

> Such enforcement actions are characteristically initiated to sanction the federal
> plaintiff, i.e., the party challenging the state action, for some wrongful act.  See,
> e.g., Middlesex, 457 U.S. at 433-34 (state-initiated disciplinary proceedings against
> lawyer for violation of state ethics rules).  In cases of this genre, a state actor is
> routinely a party to the state proceeding and often initiates the action.  See, e.g.,
> Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619
> (1986)(state-initiated administrative proceedings to enforce state civil rights laws);
> Moore v. Sims, 442 U.S. 415, 419-420 (1979)(state-initiated proceeding to gain
> custody of children allegedly abused by their parents); Trainor v. Hernandez, 431
> U.S. 434, 444 (1977)(civil proceeding "brought by the State in its sovereign

capacity" to recover welfare payments defendants had allegedly obtained by fraud); Huffman [v. Pursue, Ltd.], 420 U.S. 598 (1975)(state-initiated proceeding to enforce obscenity laws). Investigations are commonly involved, *80 often culminating in the filing of a formal complaint or charges. See, e.g., [Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc], 477 U.S. at 624 (noting preliminary investigation and complaint); Middlesex, 457 U.S. at 433 (same).

Sprint, 571 U.S. at 79-80. See Brown ex rel. Brown v. Day, 555 F.3d 882, 891 (10th Cir. 2009)("In these cases, the federal plaintiff [seeks] to thwart a state administrative proceeding initiated to punish the federal plaintiff for a bad act.").  Here the NM Health Department, a state actor, see N.M.S.A. §§ 24-1-1, 12-10A-1; 9-7-1 (enumerating the powers of the NM Health Department, including tasking it with the drafting and enforcement of PHOs), initiated proceedings against Elevate on October 8, 2020, see Elevate's Notice of Civil Action at 1; Elevate's Amended Notice of Civil Action, because Elevate allegedly "has operated in violation of the Public Health Order for at least 143 days," and that the NM Health Department is assessing a "combined civil administrative penalty of seven-hundred-and-fifteen-thousand dollars ($715,000.00)."  Elevate's Amended Notice of Civil Action at 2 (citing N.M.S.A. § 12-10A-19).  See, e.g., Middlesex, 457 U.S. at 433-434 (state-initiated disciplinary proceedings against lawyer for violation of state ethics rules).  The NM Health Department proceedings (i) are mandatory if Elevate wishes to dispute the civil penalty, see N.M.S.A. § 12-10A-19 (establishing a civil penalty for violations of PHOs); N.M.A.C. § 7.1.30 (regulating administrative hearings); (ii) "originated with the state's proactive enforcement of its laws," because the NM Health Department is enforcing New Mexico's PHOs; and (iii) are the "wrong which the federal plaintiff seeks to correct via injunctive relief,"  Brown ex rel. Brown v. Day, 555 F.3d at 891-92.  See Hunter, 660 F. App'x 711, 713 (concluding that Younger abstention applies where the Wyoming Department of Insurance brought enforcement action against plaintiff licensed to sell insurance); Amanatullah v. Colo. Bd. of Med. Examiners, 187 F.3d at 1162-63 (affirming the application of Younger where the Colorado Board of Medical

- 100 -

Examiners instituted reciprocal civil enforcement proceedings to revoke a physician's medical license based on a public reprimand by Nevada Board of Medical Examiners).  Accordingly, the Court concludes that the first Younger condition is satisfied.

### B.   THE NMDOH'S ENFORCEMENT OF PHOS INVOLVES IMPORTANT STATE INTERESTS.

The second Younger condition is met, because the Enforcement of PHOs is an important state interest.  See, e.g., Graves v. State of Minn., 272 U.S. 425, 428 (1926)(recognizing that "the State  is primarily the judge of regulations required in the interest of public safety and welfare"); Legacy Church, Inc. v. Kunkel, 472 F. Supp. 3d 926, 1048 (D.N.M. 2020)(Browning, J.)("Legacy Church"); Grisham v. Reeb, No. S-1-SC-38336, --- P.3d ---, 2020 WL 6538329, at *4 (reaffirming that "the New Mexico Legislature possesses the police power, the 'broadest power possessed by governments,' to protect public health and welfare.)(quoting State ex rel. City of Albuquerque v. Lavender, 1961-NMSC-096, ¶ 24, 365 P.2d 652).  In Legacy Church, the Court concluded that a New Mexico Public Health Order aimed at combating the pandemic "furthers a compelling State interest": "When 'faced with a society-threatening epidemic,' state governments, pursuant to their Tenth Amendment police and public health powers, have an interest of the highest order in taking measures to protect the populace."  Legacy Church, 472 F. Supp. 3d at 1048 (quoting In re Abbott, 954 F.3d at 784).   Accord Lawrence v. Polis, Civ. No. 1:20-CV-00862 DDD/SKC, 2020 WL 7348210, at *4 (D. Colo. Dec. 4, 2020)(holding that "local governments have broad powers to act during an emergency to secure public health and safety" despite the recent limits of Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905)); Denver Bible Church v. Azar, Civ. No. 1:20-CV-02362DDD/NRN, 2020 WL 6128994, at *6 (D. Colo. Oct. 15, 2020)(Domenico, J.)("[T]here is no question that the State here has a compelling interest in protecting its citizens from the SARS-CoV-2 virus.")(citing Jacobson v. Massachusetts, 197 U.S. at 25).  The enforcement of PHOs falls

under the state's regulatory authority.  See N.M.S.A. §§ 24-1-1, 12-10A-1; 9-7-1.  The second

Younger condition is therefore met.

### C. THE STATE PROCEEDINGS AFFORD ELEVATE AN ADEQUATE OPPORTUNITY TO RAISE THE FEDERAL ISSUES.

The third Younger condition is also met, because the administrative proceedings are

judicial in nature and provide an adequate forum to hear Elevate's federal claims.  The Public

Health Emergency Response Act ("PHERA"), N.M.S.A. §§ 12-10a-1 to -19, and the relevant

regulations, see N.M.A.C. § 7.1.30, govern public health emergencies, PHOs.  See also Grisham

v. Reeb, No. S-1-SC-38336, --- P.3d. ---, 2020 WL 6538329, at *4-6 (describing the scope of the

PHERA's civil penalty provision in relation to the pandemic).  Under § 12-10A-5, "[a] state of

public health emergency may be declared by the governor upon the occurrence of a public health

emergency. . . . The governor shall authorize the secretary of health, the secretary of public safety

and the director to coordinate a response to the public health emergency."  N.M.S.A. § 12-10A-5.

"The secretary of public safety, the secretary of health, the state director and, where appropriate,

other affected state agencies in consultation with the secretaries and state director, shall promulgate

and implement rules that are reasonable and necessary to implement and effectuate [PHERA]."

N.M.S.A. § 12-10A-17.  Under N.M.S.A. § 12-10a-19, the NM Health Department may "impos[e]

a civil administrative penalty of up to five thousand dollars ($5,000) for each violation of

[PHERA]." N.M.S.A. § 12-10a-19.

The regulations provide Elevate with the right to a notice, a hearing, discovery, witnesses,

representation by counsel, records, a written report, and final decision after the NM Health

Department issues.  See N.M.A.C. § 7.1.30.8(A)-(Y).  See also Grisham v. Reeb, No. S-1-SC-

38336, 2020 WL 6538329, at *9 (noting that "even the general civil enforcement provision

(discussed below) requires an administrative hearing before a fine may be imposed")(N.M.S.A. §§

12-10A-17, -19(A); N.M.A.C § 7.1.30).  These procedures give Elevate a reasonable opportunity to litigate its claims: indeed, at the January 25, 2021, hearing, Elevate cross examined a NM Health Department expert testified that on whether the PHO restrictions of trampoline facilities are appropriate, and Elevate does not allege that this forum is inadequate to raise its claims, Elevate on takes issue with speed of the decision.  <u>See</u> Complaint ¶¶ 73-77, at 12-13.  <u>See also</u> <u>Grisham v. Reeb,</u> No. S-1-SC-38336, 2020 WL 6538329, at *12 (noting that "the Legislature did address the need for due process protections" when civil penalties are assessed "through requiring an administrative hearing before the imposition of any fine under the PHERA").  Accordingly, the state administrative proceedings afford Elevate an adequate opportunity to raise the federal claims.

Because all the <u>Younger</u> conditions are met, the Court likely will have to abstain from hearing Elevate's claims.  <u>See</u> <u>Amanatullah v. Colo. Bd. of Med. Exam'rs</u>, 187 F.3d at 1163 (concluding that if the Younger conditions are met, abstention is non-discretionary).

## VI.   THE PLAINTIFFS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER, BECAUSE THE DEFENDANTS HAVE PROBABLY NOT VIOLATED THEIR RIGHTS UNDER THE SUBSTANTIVE DUE PROCESS, PROCEDURAL DUE PROCESS, AND EQUAL PROTECTION CLAUSES.

Although the Plaintiffs are (i) likely to suffer irreparable injury unless the TRO issues; (ii) the threatened injury does not outweighs whatever damage the proposed injunction may cause; (iii) the injunction, if issued, would be adverse to the public interest; and (iv) there is not a substantial likelihood of success on the merits.  <u>See</u> Fed. R. Civ. P. 65.

First, because the financial injuries the Plaintiffs have already suffered are likely to become irreparable absent an injunction, because they risk permanent closure.  <u>See</u> Tr. at 5:3-24 (Artuso). Second, the threatened injuries -- financial injuries and possible permanent business closure -- do not outweigh possible damage -- increased COVID-19 spread leading to sickness, hospitalizations, and death -- to the Defendants.  Third, for similar reasons, a TRO requiring the Defendants to

reopen trampoline facilities would be adverse to the public interest.  See Legacy Church, Inc. v. Kunkel, No. CV 20-0327 JB\SCY, 2020 WL 3963764 (D.N.M. July 13, 2020)(discussing the COVID-19 pandemic's seriousness).  Finally, for the reasons discussed above, the Plaintiffs' claims are not likely to succeed on the merits.  Moreover, with respect to Elevate, the Court cannot grant a TRO because it must abstain as a result of ongoing state administrative proceedings.

**IT IS ORDERED** that the Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction, filed February 4, 2021 (Doc. 4)("Motion") is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Angelo J. Artuso
Law Office of Angelo J. Artuso
Albuquerque, New Mexico

-- and --

Patrick J. Rogers
Patrick J. Rogers, LLLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Holly Agajanian
   General Counsel for Governor Michelle Lujan Grisham
Kyle P. Duffy
Maria S. Dudley
   Office of the Governor
Santa Fe, New Mexico

    *Attorneys for the Defendants*