**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ETP RIO RANCHO PARK, LLC; FAC-ABQ,
LLC; JUNGLE JAM, LLC and DUKE CITY
JUMP, LLC,

        Plaintiffs,

vs.                                                                     No. CIV 21-0092 JB/KK

MICHELLE LUJAN GRISHAM; TRACIE C.
COLLINS and TIM Q. JOHNSON,

        Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

    **THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Plaintiffs'

Verified Complaint for Violation of Constitutional Rights to Due Process and Equal Protection

and Request for Preliminary and Permanent Injunctive Relief, filed February 11, 2021 (Doc.

13)("MTD").   The primary issues are: (i) whether the Court can consider facts outside the

Plaintiffs' Complaint, other than facts about which the Court can take judicial notice; (ii) whether

Plaintiffs ETP Rio Rancho Park, LLC ("Elevate Trampoline"), FAC-ABQ, LLC ("Cool Springz"),

Jungle Jam, LLC ("Jungle Jam"), and Duke City Jump, LLC's ("Duke City")(collectively, "the

Plaintiffs") claims are moot; (iii) whether the Court must continue to abstain from hearing Elevate

Trampoline's claims under the abstention doctrine articulated in <u>Younger v. Harris</u>, 401 U.S. 37

(1971); (iv) whether the New Mexico Department of Health ("NMDOH") Public Health Orders

("PHOs") are rationally related to Governor Michelle Lujan Grisham, New Mexico Department

of Health Secretary-Designate Tracie C. Collins, and New Mexico Department of Public Safety

Acting Secretary Tim Q. Johnson's legitimate State interest in stopping the spread of COVID-19;

(v) whether the PHOs violate the Plaintiffs' substantive due process rights; (vi) whether either

Section 3(E) of the New Mexico Public Health Act, N.M.S.A. § 24-1-3(E), or the PHOs is void for vagueness; (vii) whether the Defendants violated the Plaintiffs' procedural due process rights; and (viii) whether the Defendants violated the Plaintiffs' equal protection rights.  The Court concludes that: (i) the Court may not consider facts outside the Complaint, other than facts about which the Court may take judicial notice; (ii) the Plaintiffs' claims are not moot, because the State of Public Health Emergency declared by Defendant Governor Michelle Lujan Grisham is ongoing; (iii) Elevate Trampoline's claims do not require abstention under <u>Younger</u>, because the state proceeding against Elevate Trampoline is no longer ongoing; (iv) the PHOs are rationally related to the legitimate state interest of slowing COVID-19's spread; (v) the PHOs do not violate substantive due process, because they neither involve a fundamental right nor shock the judicial conscience; (vi) neither N.M.S.A. § 24-1-3(E) nor the PHOs is void for vagueness; (vii) the Defendants have not violated the Plaintiffs' procedural due process rights, because summary administrative action is justified in emergency situations to protect public health and safety, and the February 24 PHO is quasi-legislative; and (viii) the Defendants have not violated the Plaintiffs' equal protection rights, because the Plaintiffs are not members of a suspect class, the Defendants have shown no animus towards the Plaintiffs, and the PHOs satisfy rational basis review.  The Court, therefore, grants the Defendants' MTD.

## **FACTUAL BACKGROUND**

The Defendants filed a MTD under rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>See</u> MTD at 1.  The Court may consider the "sufficiency of the allegations within the four corners of the complaint after taking those allegations as true" when evaluating a motion to dismiss under rule 12(b)(6).  <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).  The Court also may consider: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v. Makor</u>

Issues & Rights, Ltd., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the Plaintiffs' claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court could consider notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned). See also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."). The Court takes its facts from the Plaintiffs' Complaint. See Verified Complaint for Violation of Constitutional Rights to Due Process and Equal Protection and Request for Preliminary and Permanent Injunctive Relief, filed February 4, 2021 (Doc. 1-1)("Complaint"). The Court provides these facts for background. It does not adopt them for the truth, and it recognizes that the Complaint reflects largely the Plaintiffs' version of events.

The Plaintiffs operate trampoline facilities in the State of New Mexico. See Complaint ¶ 1, at 1. Elevate Trampoline operates a trampoline facility in Rio Rancho, New Mexico. See Complaint ¶¶ 1, 13, at 1, 13. "Elevate Trampoline is an Arizona limited liability company registered with the New Mexico Secretary of State and authorized to conduct business in New Mexico." Complaint ¶ 1, at 1. "Cool Springz is a New Mexico limited liability company registered with the New Mexico Secretary of State and in good standing." Complaint ¶ 2, at 2. "Cool Springz operates a trampoline facility in Albuquerque, New Mexico." Complaint ¶¶ 2, 14,

at 2, 3.  "Jungle Jam is a New Mexico limited liability company registered with the New Mexico Secretary of State and in good standing."  Complaint ¶ 3, at 2.  Jungle Jam built a trampoline facility located at 9227 Coors Boulevard, NW in Albuquerque.  See Complaint ¶ 3, at 2.  On August 27, 2019, Jungle Jam received a Small Business Administration ("SBA") loan.  Complaint ¶ 96, at 16.  Around that time, Jungle Jam signed a commercial lease and began to remodel 25,000 square feet of the building for use as a trampoline facility.  See Complaint ¶ 97, at 16.  Duke City is a New Mexico limited liability company registered with the New Mexico Secretary of State and in good standing.  See Complaint ¶ 4, at 2.  Duke City has been in operation since 2015 and leases approximately 8,000 square feet in the Cottonwood Mall in Albuquerque.  See Complaint ¶ 109, at 17.  Before the COVID-19 pandemic, Duke City had seventeen employees.  See Complaint ¶ 110, at 17.

On March 11, 2020 the State of New Mexico identified the first cases of Novel Coronavirus ("COVID-19") in the state.  See N.M. Exec. Order 2020-004 at 2 (March 11, 2020), available at http://www.governor.state.nm.us/about-the-governor/executive-orders/ ("March 2020 Executive Order"); N.M. Exec. Order No. 2021-030 at 1 (June 25, 2021), available at http://www.governor.state.nm.us/about-the-governor/executive-orders/ ("June 2021 Executive Order").[1]  At that time, infections were identified in thirty-nine states and 100,000 people had been infected globally.  See June Executive Order at 1.  On March 11, 2020, Governor Grisham

_____

[1]The Court takes judicial notice of New Mexico State Executive Orders Nos. 2020-004 and 2021-030 to provide context to the current state of the Public Health Emergency.  See Fed. R. Evid. 201.  See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 703 n.22 (10th Cir. 2009)(noting that a Court may take judicial notice of sources "not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned.").  This executive order is noticeable because it is generally known throughout the State of New Mexico and there is no dispute to the Executive Order's authenticity.

declared a public health emergency under the Public Health Emergency Response Act, N.M.S.A. §§ 12-10A-1 to -19 (the "PHERA"), and invoked the All Hazards Emergency Management Act, N.M.S.A. §§ 12-10-1 to -10, by directing all cabinets, departments, and agencies to comply with the declarations, directives, and the New Mexico Department of Health's ("NMDOH") further instructions.[2]  See Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited July 12, 2021)("Emergency Declaration").  After Governor Grisham declared a public health emergency, on March 16, 2020, then-NMDOH Secretary Kathyleen M. Kunkel entered a series of PHOs encouraging New Mexicans to stay in their homes as much as possible and requiring New Mexicans to exercise precautions when entering public spaces as well as restricting mass gatherings and business operations.[3]  See, e.g., Kathyleen M. Kunkel, Public Health Emergency Order Limiting Mass

_____

[2]The Court takes judicial notice of Governor Grisham's press release to provide context of the legal background for the State of New Mexico's later PHOs and Executive Orders.  See Fed. R. Evid. 201.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)(noting that, at the 12(b)(6) stage, a district court may consider facts of which it may take judicial notice); Hawaii v. Trump, 859 F.3d 741, 773 n.14 (9th Cir.)(taking judicial notice of President Trump's tweets), vacated on other grounds,  138 S. Ct. 377 (2017); Christa McAuliffe Intermediate Sch. v. de Blasio, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019)(taking judicial notice of Mayor Bill de Blasio's tweets in a § 1983 action); Lane v. Page, 649 F. Supp. 2d 1256, 1301 (D.N.M. 2009)(Browning, J.)(concluding that a "press release . . . fall[s] within the scope of judicial notice").

[3]The Court takes judicial notice of these PHOs, because they provide context for understanding previous and subsequent Public Health Orders.  See Fed. R. Evid. 201.  The Complaint incorporates the PHO by reference. See Complaint ¶ 25, at 5.  As the Court has previously held:

> The Court concludes that it may consider each of Secretary Kunkel's Public Health Orders for three reasons.  First, the Complaint attaches and incorporates by

Gatherings and Implementing Other Restrictions Due to COVID-19, New Mexico Department of

Health (March 16, 2020), www.governor.state.nm.us%2Fwp-

content%2Fuploads%2F2020%2F03%2FAMENDED-PUBLIC-HEALTH-ORDER.pdf.

In January, 2020, Jungle Jam was interviewing potential employees and was finalizing

its account with a payroll services when the COVID-19 pandemic began to become a concern.

---

reference the April 6 Order and the April 11 Order.  See Complaint at 7-22.  The
Court may thus consider the April 6 Order and the April 11 Order.  See Tellabs,
Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. . . .  Third, the Court may take
judicial notice of each of Secretary Kunkel's Public Health Orders, including those
Public Health Orders that Secretary Kunkel issued after the April 11 Order.  District
courts may take judicial notice of "a fact that is not subject to reasonable dispute
because it: (1) is generally known within the trial court's territorial jurisdiction; or
(2) can be accurately and readily determined from sources whose accuracy cannot
reasonably be questioned."  Fed. R. Evid. 201(b).  The Public Health Orders are
noticeable, because they are generally known with the District of New Mexico,
readily determined from the New Mexico Department of Health, and there is no
dispute that the Public Health Orders accurately reflect New Mexico's COVID-19-
related restrictions and guidelines.  The Court may also take judicial notice, for the
MTD's purposes, that the coronavirus is highly contagious and potentially fatal,
because this information is generally known within the District of New Mexico and
can be "accurately and readily determined from sources whose accuracy cannot
reasonably be questioned."  Fed. R. Evid. 201(b).  Courts presiding over similar
cases have taken judicial notice of Public Health Orders and scientific consensus
regarding the coronavirus.  See, e.g., Givens v. Newsom, No. 20-CV-00852
JAM\CKD, 459 F. Supp. 3d 1302, 1308–09 (E.D. Cal. May 8, 2020)(Mendez,
J.)(taking judicial notice of Public Health Orders from other states and
municipalities); McGhee v. City of Flagstaff, No. CV-20-08081-PCT-GMS, 2020
WL 2309881, at *3 (D. Ariz. May 8, 2020)(Murray Snow, C.J.)(taking judicial
notice of COVID-19's public health risks); Basank v. Decker, No. 20 CIV. 2518
(AT), 449 F. Supp. 3d 205, 210–12 (S.D.N.Y. March 26, 2020)(Torres, J.)(same).

Legacy Church, Inc. v. Kunkel, 472 F. Supp. 3d 926, 1066-67 (D.N.M. 2020)(Browning, J.), aff'd
Legacy Church, Inc. v. Collins, 853 F. App'x 316 (10th Cir. 2021)(unpublished).  Similarly, here,
the Court takes judicial notice of all relevant PHOs.  The Court may consider the previous Public
Health Orders, because they are central to the Plaintiffs' claims and the parties do not dispute the
Public Health Orders' authenticity.  See Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th
Cir. 2002).

See Complaint ¶ 98, at 16.  Jungle Jam was prepared to offer thirty-five people employment at its new trampoline facility when Governor Grisham announced the first statewide lockdown.  See Complaint ¶ 99, at 16.  Jungle Jam decided to take a "wait and see" approach to opening its business.  Complaint ¶ 100, at 16.  Duke City closed in response to the first lockdown order from the State in March, 2020.  See Complaint ¶ 111, at 17.  Since March 19, 2020, the NMDOH has issued fifty-one PHOs.  See Public Health Orders, New Mexico Department of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited September 28, 2021).

On April 6, 2020, after declaring a public health emergency, Secretary Kunkel ordered:

> All businesses, except those entities identified as "essential businesses", are hereby directed to reduce the in-person workforce at each business or business location by 100%.  "Essential businesses" may remain open provided it minimize their operations and staff to the greatest extent possible.  Further, all essential businesses shall adhere to social distancing protocol and maintain at least six-foot social distancing from other individuals, avoid person-to-person contact, and direct employees to wash their hands frequently.  All essential businesses shall ensure that all surfaces are cleaned routinely.[4]

Public Health Order at 5-6, New Mexico Department of Health (April 6, 2020), https://cv.nmhealth.org/public-health-orders-and-executive-orders/ ("April 6 PHO").  The April 6 PHO defines "Essential Business" as any business or non-profit entity falling within one or more of the following categories:

    a.     Health care operations including hospitals, walk-in-care health facilities, veterinary and livestock services necessary to assist in an emergency or to avoid an emergency (such as vaccinations), pharmacies, medical wholesale and distribution, home health care workers or aides for the elderly, emergency dental facilities, nursing homes, residential health care facilities, research facilities, congregate care facilities, intermediate care facilities for

---

[4]The Court takes judicial notice of this PHO because it provides substantive context for what restrictions were in place at various times when the events in the Complaint were taking place.

those with intellectual or developmental disabilities, supportive living homes, home health care providers, and medical supplies and equipment manufacturers and providers;

b.      Homeless shelters, food banks, and other services providing care to indigent or needy populations;

c.      Childcare facilities necessary to provide services to those workers employed by essential businesses and essential non-profit entities;

d.      Grocery stores, supermarkets, food banks, farmers' markets and vendors who sell food, convenience stores, and other businesses that generate the majority of their revenue from the sale of canned food, dry goods, fresh fruits and vegetables, pet food, feed, and other animal supply stores, fresh meats, fish, and poultry, and any other household consumer products;

e.      Farms, ranches, and other food cultivation, processing, or packaging operations;

f.      All facilities routinely used by law enforcement personnel, first responders, firefighters, emergency management personnel, and dispatch operators;

g.      Infrastructure operations including, but not limited to, public works construction, commercial and residential construction and maintenance, airport operations, public transportation, airlines, taxis, private transportation providers, transportation network companies, water, gas, electrical, oil drilling, oil refining, natural resources extraction or mining operations, nuclear material research and enrichment, those attendant to the repair and construction of roads and highways, gas stations, solid waste collection and removal, trash and recycling collection, processing and disposal, sewer, data and internet providers, data centers, technology support operations, and telecommunications systems;

h.      Manufacturing operations involved in food processing, manufacturing agents, chemicals, fertilizer, pharmaceuticals, sanitary products, household paper products, microelectronics/semi-conductor, primary metals manufacturers, electrical equipment, appliance, and component manufacturers, and transportation equipment manufacturers;

i.      Services necessary to maintain the safety and sanitation of residences or essential businesses including security services, towing services, custodial services, plumbers, electricians, and other skilled trades;

j.      Media services including television, radio, and newspaper operations;

k.      Automobile repair facilities, bike repair facilities, and retailers who generate the majority of their revenue from the sale of automobile or bike

repair products;

l.    New and used automobile dealers may sell cars through internet or other audiovisual means but it may not allow customers in showrooms;

m.    Hardware stores;

n.    Laundromats and dry cleaner services;

o.    Utilities, including their contractors, suppliers, and supportive operations, engaged in power generation, fuel supply and transmission, water and wastewater supply;

p.    Funeral homes, crematoriums, and cemeteries;

q.    Banks, credit unions, insurance providers, payroll services, brokerage services, and investment management firms;

r.    Real estate services including brokers, title companies, and related services;

s.    Businesses providing mailing and shipping services, including post office boxes;

t.    Laboratories and defense and national security-related operations supporting the United States government, a contractor to the United States government, or any federal entity;

u.    Restaurants, but only for delivery or carry out and local breweries or distillers but only for carry out;

v.    Professional services, such as legal or accounting services, but only where necessary to assist in compliance with legally mandated activities; and

w.    Logistics, and also businesses that store, transport, or deliver groceries, food, materials, goods or services directly to residences, retailers, government institutions, or essential businesses. Businesses falling under this category are not permitted to provide curbside pickup services to the general public for online or telephonic orders.

April 6 PHO at 3-5. The April 6 PHO further orders:

(1)    All Mass Gatherings are hereby prohibited under the powers and authority set forth in the New Mexico Public Health Act, and all regulations promulgated pursuant thereto.

(2)    All businesses, except those entities identified as "essential businesses", are hereby directed to reduce the in-person workforce at each business or business location by 100%. "Essential businesses" may remain open

provided it minimize their operations and staff to the greatest extent possible. Further, all essential businesses shall adhere to social distancing protocol and maintain at least six-foot social distancing from other individuals, avoid person-to-person contact, and direct employees to wash their hands frequently. All essential businesses shall ensure that all surfaces are cleaned routinely.

(3)     This Order requires the closure of physical office spaces, retail spaces, or other public spaces of a business and does not otherwise restrict the conduct of business operations through telecommuting or otherwise working from home in which an employee only interacts with clients or customers remotely. This prohibition does not apply to necessary operations of essential businesses.

(4)     The maximum number of customers allowed in a "retail space" at any given time shall be equal to 20% of the maximum occupancy of the retail space, as determined by the relevant fire marshal or fire department. If customers are waiting outside of a "retail space", they must do so in compliance with social distancing protocols including the requirement that it maintain a distance of at least six-feet from other individuals, avoid person-to-person contact.

April 6 PHO at 5-6.

Jungle Jam received a certificate of occupancy for its business on April 22, 2020, but was not allowed to open at that time, because it did not meet the definition of an "essential business" under the then operative April 11 PHO. Complaint ¶ 101, at 16. Because it was unable to open, and had not hired any employees, Jungle Jam was ineligible for any of the federal relief programs that applied to other businesses. See Complaint ¶ 102, at 16. Jungle Jam's SBA loan was deferred at the time of the Complaint's filing, although interest has accrued since September, 2020. See Complaint ¶ 103, at 16.

Following the April 6 PHO, NMDOH issued several other PHOs amending the April 6 PHO.[5] See Public Health Orders and Executive Orders, New Mexico Department of Health,

_____

[5]The Court takes judicial notice of these PHOs, because they provide context for understanding previous and subsequent PHOs.

https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited September 7, 2021)(issuing PHOs on April 11, April 30, May 5, May 15, May 27, 2020).  On June 1, 2020, NMDOH issued another PHO.[6]  See PHO at 1, filed February 4, 2021 (Doc. 1-5)("June 1 PHO"). The June 1 PHO kept in place several previous PHOs and amended others, including the April 6 PHO.  See June 1 PHO at 1.  The June 1 PHO includes definitions for "close contact businesses," "recreational facilities," "bars," "COVID-Safe Practices ('CSPs')," "places of lodging," and "retail space":

(6)     "Close-contact business" includes barbershops, hair salons, tattoo parlors, nail salons, spas, massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, gyms, and personal training services for up to two trainees.

(7)     "Recreational facilities" include indoor movie theaters, museums, bowling alleys, miniature golf, arcades, amusement parks, concert venues, event venues, performance venues, go-kart courses, adult entertainment venues, and other places of indoor recreation or indoor entertainment.

        . . . .

(8)     "COVID-Safe Practices" ("CSPs") are those directives, guidelines, and recommendations for businesses and other public operations that are set out and memorialized in the document titled "All Together New Mexico: COVID-Safe Practices for Individuals and Employers".  That document may be obtained at the following link https://cv.mnhealth.org/covid- safe-practices/.

(9)     "Places of lodging" means all hotels, motels, RV parks, co-located short-term condominium rentals with a central check-in desk, and short-term vacation rentals.

(10)    "Retail space" means any essential business that sells goods or services directly to consumers or end-users such as grocery stores or hardware stores and includes the essential businesses identified in the categories above: l(d), 1(1), l(m), l(p), and l(s).

_____

[6]The Court takes judicial notice of this PHO, because it provides substantive context for what restrictions were in place at various times when the events in the Complaint were taking place.

June 1 PHO at 6.  The June 1 PHO also orders:

(3)    "Essential businesses" may open but must operate in accordance with the pertinent "COVID-Safe Practices (CSPs)" section(s) of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers" and also any identified occupancy restrictions.

(4)    "Recreational facilities" must remain closed.

(5)    Any business that is not identified as an "essential business" or a "recreational facility" may open provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.

(6)    Businesses identified as a "retail space" may operate provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.  Any business opening pursuant to this provision must comply with the pertinent CSP's set out in the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers".

(7)    Indoor shopping malls are permitted to operate provided that the total number of persons within the mall at any given time does not exceed 25% of the maximum occupancy of the premises, as determined by the relevant fire marshal or fire department. Further, loitering within the indoor shopping mall is not permitted and food courts must remain closed.

(8)    Gyms and similar exercise facilities may operate at up to 50% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department, but may not conduct group fitness classes.

(9)    Public swimming pools may open but such facilities are limited to lane-swimming and lessons with up to two students only. Play and splash areas shall be closed. Public swimming pools may not exceed 50% of their maximum occupancy.

(10)    If customers are waiting outside of a business, the business must take reasonable measures to ensure that customers maintain a distance of at least six-feet from other individuals and avoid person-to-person contact.

(11)    Bars are not permitted to operate other than for take-out and delivery if otherwise permitted under their applicable licenses.

(12)    "Places of lodging" shall not operate at more than 50% percent of maximum occupancy. Health care workers who are engaged in the provision of care

to New Mexico residents or individuals utilizing lodging facilities for extended stays, as temporary housing, or for purposes of a quarantine or isolation period shall not be counted for purposes of determining maximum occupancy. All places of lodging should comply with the "COVID-Safe Practices (CSPs) for Hotels, Resorts, & Lodging" section of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers". In the case of vacation rentals, occupancy shall be determined based upon the number properties managed by a property manager.

June 1 PHO at 6-7.

On June 3, 2020, after the June 1 PHO permitted gyms and "similar exercise facilities" to open and operate at fifty percent of maximum occupancy, Tamara Portnoy, owner of Cool Springz, emailed Daniel Schlegel, the small business liaison for Governor Grisham's office, to confirm whether Cool Springz could open. See Complaint ¶ 78, at 13. On June 3, 2020, Schlegel responded, stating that Cool Springz could not open. See Complaint ¶ 79, at 13.

On June 4, June 5, and June 9, 2020, Ms. Portnoy followed up, and requested: (i) to see documentation supporting Schlegel's determination that Cool Springz could not open, and the State's refusal to acknowledge Cool Springz as a gym or "similar exercise facility"; (ii) further information about how Elevate Trampoline had secured the ability to open; and (iii) the criteria used and documentation supporting the State's position that Cool Springz could not open. See Complaint ¶ 80, at 13. On June 4, 2020, Ms. Portnoy received a response stating that New Mexico was looking into the report that Elevate Trampoline was open, but he did not receive a response regarding the request for the criteria, documentation, or information upon which Cool Springz was not allowed to open. See Complaint ¶ 81, at 13.

On June 5, 2020, the New Mexico Department of Public Safety ("DPS") issued a notice to Elevate Trampoline, stating that Elevate Trampoline "is operating in violation of Executive

Order 2020-004." Complaint ¶ 17, at 4.  On June 5, 2020, DPS also issued a cease-and-desist letter to Elevate Trampoline, stating that Elevate Trampoline is in violation of the April 6 PHO and stating that Elevate Trampoline is "hereby ordered to immediately cease and desist from open public operation."  Complaint ¶ 18, at 4.  On June 11, 2020, Ms. Portnoy contacted Mr. Schlegel by email, and asked him for the criteria used and documentation supporting the State's position.  See Complaint ¶ 81, at 13.  Mr. Schlegel replied and asked Ms. Portnoy if she would like to discuss the situation with someone in the "legal department," and Ms. Portnoy responded, indicating that she would like to speak to someone in the legal department, but Portnoy did not receive a response.  See Complaint ¶ 82, at 14.

On June 27, 2020, Ms. Portnoy again emailed Mr. Schlegel, repeating her prior requests for information and documentation, and noting that Elevate Trampoline, Stone Age Gym, and Pure Barre were all open, as was Empire Board Games, but Mr. Schlegel did not respond.  See Complaint ¶ 83, at 14.  On June 30, 2020, and again on July 2, 2020, Ms. Portnoy asked Mr. Schlegel by email for the contact information for someone in the "legal department," but there was no response to either email.  Complaint ¶ 84, at 14.  On August 9, 2020, Ms. Portnoy contacted Mr. Schlegel by email regarding "fitness classes," which were permitted under the then current PHO, and asking for: (i) documentation supporting the State's position that Cool Springz could not open; and (ii) contact information for anyone with whom Ms. Portnoy could further discuss the matter.  See Complaint ¶ 85, at 14.  Ms. Portnoy received an auto-response from Mr. Schlegel informing her that he would be out of the office until August 17, 2020, and Ms. Portnoy never received a response to her August 9, 2020, email.  See Complaint ¶ 85, at 14.

On September 3, 2020, the NMDOH issued another PHO.[7] See Public Health Order, New Mexico Department of Health (September 3, 2020) available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ ("Sept. 3 PHO"). The Sept. 3 PHO adds to and amends the "essential business," definition but does not extend that definition to include "close-contact recreational facilities," instead defining them as:

> (3)   "Close-contact recreational facilities" include indoor movie theaters, indoor museums with interactive displays or exhibits and other similar venues, bowling alleys, miniature golf, arcades, amusement parks, aquariums, casinos, concert venues, professional sports venues, event venues, bars, dance clubs, performance venues, go-kart courses, automobile racetracks, adult entertainment venues, and other places of recreation or entertainment. For purposes of this section, a "bar" is defined as any business that generated more than half of its revenue from the sale of alcohol during the preceding fiscal year.
>
> (4)   "Outdoor recreational facilities" include outdoor golf courses, public swimming pools, outdoor tennis courts, summer youth programs, youth livestock shows, horseracing tracks, botanical gardens, outdoor zoos, and New Mexico state parks.

Sept. 3 PHO at 6-8. The Sept. 3 PHO further orders:

> (2)   "Essential businesses" may open but must comply with the pertinent "COVID-Safe Practices (CSPs)" . . . . "Essential businesses" identified as a "retail space" may not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department. Further, an "essential business" identified as a "retail space" may not allow a person who is without a mask or multilayer cloth face covering to enter the premises except where that person i[s] in possession of a written exemption from a healthcare provider.
>
> (3)   "Close contact businesses" may operate at up to 25% of the maximin occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.
>
> (4)   "Close-contact recreational facilities" must remain closed

---

[7]The Court takes judicial notice of this PHO, because it provides substantive context for what restrictions were in place at various times when the events in the Complaint were taking place.

(5)     "Food and drink establishments" may provide dine-in service, but it may not exceed more than 25% occupancy of the maximum occupancy in any enclosed space on the premises, as determined by the relevant fire marshal or fire department. . . .

    . . . .

(9)     Any business that is not identified as an "essential business", "close contact business", "food and drink establishment", "house of worship", "close-contact recreational facility", "outdoor recreational facility", or "place of lodging" may open provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.

(10)    Any entity, including businesses and houses of worship, operating pursuant to this public health order must comply with the pertinent "COVID-Safe Practices (CSPs)" section(s) of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers" and also any identified occupancy restrictions.

    . . . .

Sept. 3 PHO at 5-7.

On September 16, 2020, a New Mexico State Police Officer issued a citation to an Elevate Trampoline employee in Rio Rancho, because "the business was open and operating for the public in violation of the public health order issued on 8/28/2020[;] recreational facilities were required to remain closed."  Complaint ¶ 40, at 7.  On September 18, 2020, the NMDOH issued another PHO.[8]  See Public Health Order, New Mexico Department of Health (September 18, 2020) available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ ("Sept. 18 PHO").  The Sept. 18 PHO updated the definition for "close contact business" to include "barbershops, hair salons, gyms, group fitness classes, tattoo parlors, nail salons, spas,

_____

[8]The Court takes judicial notice of this PHO because it provides substantive context for what restrictions were in place at various times when the events in the Complaint were taking place.

massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, bowling alleys, ice skating rinks, and personal training services." Sept. 18 PHO ¶ 2, at 5. The Sept. 18 PHO provided that "[c]lose-contact businesses may operate at up to 25% of the maximum capacity on the business's premises, as determined by the relevant fire marshal or fire department." Sept. 18 PHO at 6. Cool Springz re-opened on September 23, 2020. See Complaint ¶ 87, at 14. In preparation, Cool Springz reconfigured its business location to emphasize strength training and cardio conditioning. See Complaint ¶ 86, at 14. Cool Springz closed those parts of its facility that were "high touch" areas and trained its staff in new procedures to comply with the State's COVID Safe Practices requirements. Complaint ¶ 86, at 14.

On September 24, 2020, a Bernalillo County, New Mexico, Sheriff's deputy visited Cool Springz, responding to a report that the business was open. See Complaint ¶ 88, at 14. After touring the facility, the deputy stated that he believed that Cool Springz was operating within the PHO's requirements and that the State would allow it to remain open. See Complaint ¶ 88, at 14. On October 1, 2020, Michael Pittman from the Bernalillo County Environmental Health Department visited Cool Springz, toured the facility, and spoke with Portnoy about the protocols and COVID Safe Practices that Cool Springz had put in place. See Complaint ¶ 89, at 15. Pittman agreed that Cool Springz was operating within the then-current PHO's scope and would be allowed to continue its business operations. See Complaint ¶ 89, at 14. On October 5, 2020, the DPS issued a notice of violation to Cool Springz. See Complaint ¶ 90, at 15. On October 5, 2020, DPS also issued a cease-and-desist letter to Cool Springz, stating that Cool Springz was in violation of the April 6 PHO. See Complaint ¶ 91, at 15.

On October 8, 2020, NMDOH issued Elevate Trampoline a "Notice of Contemplated

Action for Assessment of Civil Administrative Monetary Penalties Pursuant to PHERA for Violation of Public Health Order."  Complaint ¶ 65, at 11.  Elevate Trampoline's Notice of Civil Action states that EPT Rio Rancho LLC, doing business as Elevate Trampoline, had operated in violation of the Public Health Order for at least three business days.  See Complaint ¶ 65-66, at 11.  Elevate Trampoline's Notice of Civil Action states that the NMDOH will, "therefore, assess a combined civil administrative penalty of $15,000" based on an administrative penalty of $5,000.00 per day.  Complaint ¶ 66-67, at 11.

On January 5, 2021, the NMDOH issued an Amended Notice of Contemplated Action to Elevate Trampoline.  See Complaint ¶ 69, at 11.  The Amended Notice of Civil Action states that the NMDOH is assessing a "combined civil administrative penalty of seven-hundred-and-fifteen-thousand dollars ($715,000.00)."  Complaint ¶ 70, at 11.  After receiving the Amended Notice of Civil Action, Elevate Trampoline closed its Rio Rancho facility.  See Complaint ¶ 71, at 12.  On January 12, 2021, the NMDOH dismissed Elevate Trampoline's Sept. 16 Citation without prejudice.  See Complaint ¶ 45, at 8.  On January 25, 2021, the NMDOH held a hearing on the Elevate Trampoline's Notice of Civil Action.  See Complaint ¶ 68, at 11.  As of the Complaint's filing, on February 4, 2021, the NMDOH had not issued a recommendation.  See Complaint ¶ 77, at 13.

On February 24, 2021, Secretary Collins issued another PHO.[9]  See Tracie Collins, Public Health Emergency Order Clarifying that Current Guidance Documents, Advisories, and Emergency Public Health Orders Remain in Effect; and Amending Prior Public Health Emergency Orders to Impose County by County Restrictions due to COVID-19 at 1,

---

[9]The Court takes judicial notice of this PHO, because it provides substantive context for the claims before the Court.

NMDOH    (Feb. 24, 2021),    available at https://cv.nmhealth.org/public-health-orders-and-executive-orders)("Feb. 24 PHO").  The Feb. 24 PHO defines recreational facilities as:

> any publicly or privately owned facility typically or actually used for recreational activities capable of bringing persons within close proximity of one another, including, but not limited to: aquariums, amusement parks, arcades, basketball courts, baseball fields, bowling alleys, botanical gardens, family entertainment centers, football fields, go- kart courses, golf courses, guided raft and balloon tours, ice-skating rinks, museums with interactive displays or exhibits, miniature golf courses, ski areas, soccer fields, swimming pools, tennis courts, ***trampoline parks***, youth programs, and zoos.

Feb. 24 PHO at 5 (emphasis added).  The Feb. 24 PHO includes specifically "trampoline parks" in its recreational facility definition.  Feb. 24 PHO at 5.  The Feb. 24 PHO also provides four categories of Counties in New Mexico, which dictate their "reopening level."  Feb. 24 PHO at 6.  The Feb. 24 PHO defines these categories as follows:

> a.    Turquoise Level -- Counties seeking to operate at this level must have satisfied the metrics required to operate at Green Level for the two most recent 14-day reporting periods.
>
> b.    Green Level -- Counties seeking to operate at this level must satisfy <u>both</u> of the following metrics:
>
> > a.    A new COVID-19 case incidence rate of no greater than 8 cases per 100,000 inhabitants during the most recent 14-day period; <u>AND</u>
> >
> > b.    An average percent of positive COVID-19 test results over the most recent 14-day period less than or equal to 5%.
>
> c.    Yellow Level -- Counties seeking to operate at this level must meet <u>either</u> of the following metrics:
>
> > 1.    A new COVID-19 case incidence rate of no greater than 8 cases per 100,000 inhabitants during the most recent 14-day period; <u>OR</u>
> >
> > 2.    An average percent of positive COVID-19 test results over the most recent 14-day period less than or equal to 5%.
>
> d.    Red Level -- All other counties shall operate at the Red Level.

Feb. 24 PHO at 6-7 (emphasis in original).

In a turquoise level county, recreational facilities "may operate at up to 50% of the maximum occupancy of any enclosed space on the premises . . . . Further, 'recreational facilities' may operate up to 75% capacity of any outdoor space on the premises." Feb. 24 PHO at 7 (no citation for quotation). In a green level county, recreational facilities "may operate at up to 25% of the maximum occupancy of any enclosed space on the premises . . . . Further, 'recreational facilities' may operate up to 50% capacity of any outdoor space on the premises." Feb. 24 PHO at 9 (no citation for quotation). In a yellow level county, recreational facilities "may operate up to 33% capacity of any outdoor space on the premises but shall not permit patrons to enter any indoor portion of the facility except for the limited purpose of using the restroom or momentarily exiting/entering." Feb. 24 PHO at 10. In a red level county, recreational facilities "may operate up to 33% capacity of any outdoor space on the premises but shall not permit patrons to enter any indoor portion of the facility except for the limited purpose of using the restroom or momentarily exiting/entering." Feb. 24 PHO at 12.

On June 30, 2021, the NMDOH replaced the color-coded system -- implemented to provide guidance for individual counties -- with generalized guidance based on CDC guidelines. See Tracie Collins, Public Health Emergency Order Clarifying that Current Guidance Documents, Advisories, and Emergency Public Health Orders Remain in Effect; and Amending Prior Public Health Emergency Orders to Impose County-by-County Restrictions Due to COVID-19 at 2-3 (June 30, 2021)("June 30 PHO"), available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/. In all counties in New Mexico, including Bernalillo County, businesses were ordered that:

(1)     . . . Businesses, establishments, houses of worship, and other non-profit entities shall also follow the latest official guidance from the CDC regarding mask-wearing and social distancing, provided that nothing in this Order shall be construed as prohibiting any entity from imposing more stringent requirements.

(2)     Any business, establishment, or non-profit (other than those which are a healthcare operation, utility, or indigent care services) which members of the public regularly visit must report to the Department of Health when there is an occurrence of four (4) or more rapid responses within a fourteen (14) day period.  For purposes of this directive, rapid responses will be counted on a rolling basis.  Businesses, establishments, or non-profits with four or more rapid responses shall not be required to cease operations.  However, the rapid responses must be reported to the Department of Health so that the public may be made aware  of the positive cases.

(3)     All businesses, establishments, and non-profit entities must adhere to the pertinent COVID-Safe Practices.

June 30 PHO at 2.  The June 30 PHO further amends the previous Public Health Orders,

directing as follows that:

(1)     Unless a healthcare provider instructs otherwise, all individuals shall wear a mask or multilayer cloth face covering in public settings except when: eating or drinking; exercising outdoors alone or with members of the same household; attending a small, outdoor gathering of fully vaccinated individuals. Notwithstanding the foregoing, fully vaccinated individuals are not required to wear a mask unless otherwise recommended by the latest official guidance from the Centers for Disease Control and Prevention ("CDC").  Further, fully vaccinated individuals shall not be required to socially distance from other individuals unless otherwise recommended by the latest official guidance from the CDC, in which case they must follow that guidance. Businesses, establishments, houses of worship, and other non-profit entities shall also follow the latest official guidance from the CDC regarding mask-wearing and social distancing, provided that nothing in this Order shall be construed as prohibiting any entity from imposing more stringent requirements.
          . . .

(2)     Any business, establishment, or non-profit (other than those which are a healthcare operation, utility, or indigent care services) which members of the public regularly visit must report to the Department of Health when there is an occurrence of four (4) or more rapid responses within a fourteen (14) day period.  For purposes of this directive, rapid

responses will be counted on a rolling basis.  Businesses, establishments, or non-profits with four or more rapid responses shall not be required to cease operations.  However, the rapid responses must be reported to the Department of Health so that the public may be made aware  of the positive cases.

(3)   All businesses, establishments, and non-profit entities must adhere to the pertinent COVID-Safe Practices.

June 30 PHO at 2.  Current CDC guidance does not mandate occupancy restrictions or business closures but suggests monitoring staff for COVID-19 symptoms, permitting travel only as required for business, and social distancing among staff.[10]  See Centers for Disease Control and Prevention, General Business Frequently Asked Questions,  (May 24, 2021), available at https://cv.nmhealth.org/public-health-orders-and-executive-orders.

Since June, 2021, the NMDOH issued several additional Public Health Orders relaxing or clarifying restrictions in previous orders.  See Public Health Orders and Executive Orders, New Mexico Department of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last accessed September 28, 2021).  Governor Michelle Lujan Grisham renewed the declaration of a Public Health Emergency through October 15, 2021 on September 15, 2021.  See N.M. Exec. Order No. 2021-054 at 2, (September 15, 2021), available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/.  On September 15, 2021, NMDOH issued the most recent PHO.[11]  See Tracie Collins, Public Health Emergency Order Clarifying that Current Guidance Documents, Advisories, and Emergency Public Health Orders Remain in Effect; and Amending Prior Public Health Emergency Orders

---

[10]The Court takes judicial notice of the CDC's current guidance because it provides substantive context for the restrictions currently affecting the Plaintiffs.

[11]The Court takes judicial notice of this PHO because it provides substantive context for the claims before the court.

to Impose Certain Public Health Measures, New Mexico Department of Health at 1 (September 15, 2021)("September 15 PHO"), available at https://cv.nmhealth.org/public-health-orders-and-executive-orders.  The September 15 PHO states:

1.  All current guidance documents and advisories issued by the Department of Health remain in effect.

2.  The following Public Health Emergency Orders remain in effect through the current Public Health Emergency and any subsequent renewals of that Public Health Emergency or until they are amended or rescinded:

    A.  December 15, 2020 Amended Public Health Emergency     Order Implementing Additional Contact Tracing Information Requirements for All Laboratories and Submitters Submitting Notifiable Condition COVID-19 Test Results to the New Mexico Epidemiology and Response Division;

    B.  January 8, 2021 Emergency Order Implementing Administration and Reporting Requirements for All COVID-19 Vaccine Providers;

    C.  April 5, 2021 Amended Public Health Emergency Order Temporarily Limiting Long-Term Care Facilities Visitation Due to COVID-19;

    D.  February 26, 2021 Public Health Emergency Order Implementing Administration Requirements for All COVID-19 Vaccine Providers and Requiring Accurate Information be Provided by Individuals Registering to Receive the COVID-19 Vaccine;

    E.  September 15, 2021 Amended Public Health Emergency Order Requiring All School Workers Comply with Certain Health Requirements and Requiring Congregate Care Facility Workers, Hospital Workers, and Employees of the Office of the Governor Be Fully Vaccinated.

September 15 PHO at 1-2.

## PROCEDURAL BACKGROUND

On February 4, 2021, the Plaintiffs filed the Complaint.  See Complaint at 1.  In the Complaint, the Plaintiffs allege that: (i) the Defendants violated the Plaintiffs' "right to substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution," Complaint ¶ 138, at 22; (ii) the Defendants denied the Plaintiffs "right to operate their respective businesses" and, therefore, "their . . . constitutional rights to procedural due process," Complaint ¶ 155, at 24; and (iii) the Defendants denied the Plaintiffs' "right to equal protection under the Fifth and Fourteenth Amendments to the United States Constitution" by "treat[ing] them differently than other, similarly situated businesses."  Complaint ¶¶ 156-157, at 24.  The Plaintiffs request "both preliminary and permanent injunctive relief to prohibit Defendants from enforcing all PHOs that rely on the unconstitutionally overbroad and vague authority granted under Section 24-1-3E, NMSA 1978."  Complaint ¶ 165, at 26.  The Plaintiffs insist that the NMDOH's PHOs, "Section 24-1-3E, NMSA 1978," and "NMAC 7.1.30" are void both on their face and as applied to the Plaintiffs.  Complaint ¶¶ A-C, at 27.  The Plaintiffs also contend that they "are entitled to an award [of] their costs and reasonable attorney's fees incurred in this action."  Complaint ¶ F, at 27.

### 1.    The Memorandum Opinion and Order Denying the TRO.

On February 8, 2021, the Court filed a Memorandum Opinion and Order denying the Temporary Restraining Order ("TRO").  See ETP Rio Rancho Park, LLC v. Grisham, 517 F. Supp. 3d 1177 (D.N.M. 2021)(Browning, J.)("ETP Rio Rancho").  The Court concluded that: (i) the Plaintiffs' substantive due process claims were unlikely to succeed on the merits, because the Defendants' policies are rationally related to a legitimate state interest; (ii) the Plaintiffs' vagueness and over-broadness claims were unlikely to succeed on the merits, because the Supreme Court has held consistently that the phrase "public health" does not provide an undefined

- 24 -

or unrestricted grant of authority; (iii) the Plaintiffs' procedural due claims were unlikely to succeed on the merits, because the Defendants likely provided adequate post-deprivation process; (iv) the Plaintiffs' equal protection claims were unlikely to succeed on the merits, because the Defendants' policies are rationally related to a legitimate state interest; (v) the Court would likely need to abstain from this case with respect to Elevate Trampoline under Younger v. Harris, 401 U.S. 37 (1971), because ongoing state administrative proceedings involved important state interests and provided an adequate forum for Elevate Trampoline's claims; and (vi) the Plaintiffs were not entitled to a TRO, because their claims are unlikely to succeed on the merits.  See ETP Rio Rancho, 517 F. Supp. 3d at 1186.

With respect to the Plaintiffs' substantive due process claims, the Court held that "the Defendants neither have likely infringed on the Plaintiffs' fundamental rights, nor likely deprived the Plaintiffs of life, liberty, or property in a manner so arbitrary that the actions shock the conscience." ETP Rio Rancho, 517 F. Supp. 3d at 1228.   The Court concluded that the Defendants' classification of trampoline facilities has "a rational basis, and they have provided post-deprivation administrative remedies that likely satisfy procedural due process."  ETP Rio Rancho, 517 F. Supp. 3d at 1227 (citing Big Tyme Investments, L.L.C. v. Edwards, 985 F.3d 456, 460 (5th Cir. 2021)(explaining that the State's decision to close bars while allowing restaurants to remain open survives rational basis review)).

### 2.      The Memorandum Opinion and Order Denying the Preliminary Injunction.

On February 26, 2021, the Court filed a Memorandum Opinion and Order denying the Preliminary Injunction ("PI").  See ETP Rio Rancho Park, LLC v. Grisham, No. CIV 21-0092 JB/KK, 2021 U.S. Dist. LEXIS 36354 (D.N.M. Feb. 26, 2021)(Browning, J.)("ETP Rio Rancho II").  In the opinion about the PI, the Court concluded that: (i) the Plaintiffs' substantive due

process claims were unlikely to succeed on the merits, because the Defendants' policies are rationally related to a legitimate state interest; (ii) the Plaintiffs' vagueness and over-broadness claims were unlikely to succeed on the merits, because the Supreme Court has held consistently that the phrase "public health" does not provide an undefined or unrestricted grant of authority; (iii) the Plaintiffs' procedural due claims were unlikely to succeed on the merits, because the Defendants likely provided adequate post-deprivation process; (iv) the Plaintiffs' equal protection claims were unlikely to succeed on the merits, because the Defendants' policies are rationally related to a legitimate state interest; (v) the Court will likely need to abstain from this case with respect to Elevate Trampoline under Younger v. Harris, 401 U.S. 37 (1971), because ongoing state administrative proceedings involve important state interests and provide an adequate forum for Elevate Trampoline's claims; and (vi) the Plaintiffs were not entitled to a PI, because the Court will not grant a generally disfavored extraordinary remedy where the Plaintiffs do not demonstrate a likelihood of success on the merits, that the balance of harms favors the Plaintiffs, or that the PI would not be adverse to the public interest.  See ETP Rio Rancho II, 2021 U.S. Dist. LEXIS 36354 at *1-3.

### 3.        The Defendants' Motion to Dismiss for Failure to State a Claim.

On February 11, 2021, the Defendants filed the MTD.  See MTD at 1.  The Defendants seek dismissal pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to "state a claim upon which relief can be granted."  MTD at 1.  The Defendants identify six arguments supporting a dismissal for failure to state a claim: (i) the Court must abstain from addressing Elevate Trampoline's claims, because a federal court should not interfere with State administrative proceedings; (ii) the Plaintiffs' objections to previous, now expired, PHO restrictions are moot, because the issue is no longer live and thus sovereign immunity protects the Defendant;

(iii) N.M.S.A. § 24-1-3-E, which gives the Secretary of Health the authority to promulgate PHOs, is not overbroad or vague, because it provides a comprehensible normative standard; (iv) the PHOs themselves are not overbroad or vague; and (v) the Plaintiffs are not entitled to any procedural due process rights, and if they were, they received sufficient due process.  See MTD at 11-22.

The Defendants also assert that, of the Plaintiffs, only Elevate Trampoline has standing to challenge the administrative procedures resulting from a PHO violation.  See MTD at 22.  The Defendants reason that Elevate Trampoline has standing to challenge the administrative procedures because they have received a fine and elected to proceed to hearing, whereas the remaining Plaintiffs have not disobeyed the PHO.  See MTD at 22-23.  The Defendants also contend that, even if the remaining Plaintiffs have standing, the Court should abstain from addressing ongoing state claims and that the current process provides adequate due process.  See MTD at 24.  The Defendants also assert that the PHOs' restrictions on "close-contact" recreational facilities do not discriminate against a suspect class, do not infringe on a fundamental right, and do not deprive a person of life, liberty, or property in a way that "shocks the judicial conscience." MTD at 25-26.  The Defendants thus argue that their actions should be subject to rational basis review and, further, that the PHOs' restrictions are rationally related to the "compelling government interest" of preventing further COVID-19 infections.  MTD at 27-28.

### 4.     The Plaintiffs' Response to Defendants' MTD.

The Plaintiffs filed a Response in Opposition to the Defendants' Motion to Dismiss on March 10, 2021.  See Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss Plaintiffs' Verified Complaint, filed March 10, 2021 (Doc. 21-1)("Response").  In the Response, the Plaintiffs contend that there are sufficient factual allegations that, if viewed in the light most favorable to the Plaintiffs, support the contentions that: (i) the Plaintiffs were denied due process,

because both N.M.S.A § 24-1-3E and the PHOs are unconstitutionally vague and overbroad; (ii) the PHOs violate the Plaintiffs' due process rights by not providing a pre-deprivation notice or hearing, and not providing a means by which the Plaintiffs can appeal the restrictions applicable to the classification of business under the PHOs; and (iii) that the PHOs violate the Plaintiffs' rights to equal protection.  Response at 2.

The Plaintiffs assert that the prior PHOs are not moot, because voluntary cessation of illegal conduct does not negate a court's ability to hear a case.  See Response at 14.  The Plaintiffs rely on Justice Neil Gorsuch's concurrence in Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct 63, 71-72 (2020)(Gorsuch, J., concurring), which states that a change in COVID restrictions in that case did not negate the case for judicial intervention.  See Response at 14.  The Plaintiffs also imply that, because previous PHOs do not identify trampoline gyms, but later PHOs identify them as recreation facilities subject to those restrictions, the controversy in question remains "live."  See Response at 14-16.

The Plaintiffs also address the claim for denial of substantive due process.  See Response at 18.  The Response attempts to distinguish the Court's previous analysis, which concluded that the Constitution does not grant unfettered privilege to engage in business.  See Response at 19. The Plaintiffs assert that the Court's analysis relies on "a duly passed statute and properly adopted regulations," whereas the Plaintiffs are faced with "an order that will result in their extermination." Response at 19.  The Response also makes a new allegation: that the Governor's Executive Order 2020-04 requires minimization of physical and economic harms when considering COVID-19 restrictions.  See Response at 20.  The Plaintiffs point to the duration of the restrictions placed upon trampolining facilities as determinative.  See Response at 21.  The Plaintiffs note that the Court's determination that a temporary restriction on operating trampoline facilities does not

restrict a fundamental liberty is no longer current, because the shutdown continues.  See Response at 21.  The Plaintiffs assess that the continuing restrictions are less than temporary, or at least lead to permanent damages, especially in light of other similar businesses facing lesser restrictions.  See Response at 22-23.  Finally, the Plaintiffs contend that the notion of "public health" is a vague phrase without objective criteria, see Response at 24, and that the PHOs enforced by the State of New Mexico have in fact harmed public health through third-order effects such as depression and substance abuse, see Response at 25-27.

The Plaintiffs next address their claim for denial of procedural due process.  See Response at 29.  The Plaintiffs argue that they were provided no pre-deprivation hearing or process to appeal how they were categorized under the various PHOs.  See Response at 29.  The Plaintiffs further argue that this lack of appeals process, when combined with a broad interpretation of liberty, leads to the conclusion that there has been a fundamental lack of due process for businesses that the PHOs affect.  See Response at 30.  The Plaintiffs contend that the PHOs are administrative, rather than legislative or quasi- legislative, actions and that judicial review is appropriate to determine if the PHOs are proper.  See Response at 31.  The Plaintiffs also present a new argument, not argued in the pleadings, that the entitlement from the State of New Mexico to operate a business, conferred in exchange for the Plaintiffs paying taxes and fees, constitutes a benefit, and thus an interest that the Fifth Amendment protects.  See Response at 32.

The Plaintiffs argue that the Younger abstention doctrine does not apply to Trampoline Park's claims.  Under Younger, a plaintiff may not request a federal district court to interfere before a state court judgment is final.  See Younger, 401 U.S. at 43-45; Martinez v. Martinez, No. CIV 09–0281 JB/LFG, 2013 WL 3270448, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).  The Plaintiffs argue that Elevate Trampoline lacked adequate opportunity to raise its federal claims in

the State administrative proceedings.  See Response at 33.

The Plaintiffs next address their equal protection claims.  See Response at 35.  The Plaintiffs state that trampoline businesses remain closed while other similar businesses, such as climbing gyms, are allowed to open.  See Response at 35.  The Plaintiffs allege "arbitrary discrimination" by the State, because, while these similar businesses could operate, the Plaintiffs could not.  Response at 36.  The Plaintiffs continue, contending that there is no rational basis for keeping trampoline facilities closed.  See Response at 38.  The Plaintiffs further contend that rational basis requires factual foundation, and, in the present case, the Plaintiffs assert that there is insufficient factual evidence to prove the rationality of the State's COVID actions.  See Response at 38.  The Plaintiffs further allege that, despite being the strictest in the nation, New Mexico's PHOs have not resulted in better objective public health results.  See Response at 41-42.  Finally, the Plaintiffs discuss that the Defendants will not consider the damages of the PHOs, and will not present information to verify the efficacy and extent of economic damage, to determine if the restrictions are rational.  See Response at 44.

**5.      The Defendants' Reply to the Plaintiffs' Response to Defendants' Motion to Dismiss for Failure to State a Claim.**

On April 7, 2021, the Defendants filed a Reply in Support of the Defendants' Motion to Dismiss.  See Reply in Support of Motion to Dismiss Plaintiffs' Verified Complaint, filed April 7, 2021 (Doc. 25)("Reply").  As a preliminary matter, the Defendants object to the Plaintiffs' use of material outside of the complaint to support their arguments, noting that "the district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  Reply at 2 (quoting Anderson Living Tr. V. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1210 (D.N.M. 2014)(Browning, J.)).  The Defendants assert that the judicially noticeable facts exception does not apply in this case, and that the Court may not

consider evidence such as the testimony, attached exhibits, or factual assertions made by Plaintiffs in their Response without converting the Defendants' motion into one of summary judgment.  See Reply at 2.

The Defendants contend that the PHO's previous iterations are moot, and thus any argument should hinge on language in the current PHO, which was current at the time Defendants filed their Reply.  See Reply at 3 (citing N.M. Department of Health, Public Health Order at 5 (Mar. 12, 2021), https://cv.nmhealth.org/wpcontent/uploads/2021/03/GovernorsOffice @state.nm_.us_20210312_150653.pdf ("March 12 PHO")).  The Defendants quote from the March 21 PHO to show its inclusion of "'trampoline parks'" as a named recreational facility. Reply at 3 (quoting March 12 PHO).  The Defendants argue that the voluntary cessation doctrine does not apply, because Defendants "have no intention of removing 'trampoline parks' from the definition of 'recreational facilities,' nor do they have any intention [of] reimposing the same provisions from prior PHOs of which Plaintiffs complain."  Reply at 4.  The Defendants quote Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096 (10th Cir. 2010), for the proposition that "the mere possibility that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy," Reply at 4 (quoting Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d at 1117), and suggest that "claims of discontinuance by public officials are more apt to be trusted than like claims by private defendants," Reply at 4 (quoting id. at 1116 n.15).

The Defendants additionally state that § 24-1-3(E) of the Public Health Act, one of the statutory bases for the Secretary of the Department of Health's authority to promulgate PHOs, is not unconstitutionally vague.  See Reply at 5.  The Defendants note the Court's previous analysis holding that § 24-1-3(E) is not vague, and contend that § 24-1-3(E) is not the sole authority for

issuing PHOs.  See Reply at 5.  The Defendants assert that the Public Health Emergency Act also provides legal foundation for the PHOs and the Plaintiffs are not challenging the Public Health Emergency Act.  See Reply at 5.

The Defendants proceed by explaining that the Court should apply rational basis review, because the PHOs do not infringe upon a fundamental right or discriminate against a suspect class. See Reply at 6.  The Defendants point to the Court's analysis in the PI MOO that the right to run a business free of interference is not a fundamental right and note that the Plaintiffs do not argue that they are a "suspect class."  See Reply at 6 (citing ETP Rio Rancho Park, LLC v. Grisham, 2021 U.S. Dist. LEXIS 36354 at *116-19).  The Defendants further respond to the Plaintiffs' contention that the Governor's Executive Order mandates minimization of economic harm from the PHOs, averring that the PHOs in fact seek to minimize economic harm by allowing businesses in general to operate even though they may spread COVID-19.  See Reply at 7.  The Defendants dispute the Plaintiffs' contentions that the PHOs are -- or could become -- permanent.  See Reply at 8.

The Defendants next argue that the PHOs are related to a compelling state interest, see Reply at 9, and that the Plaintiffs' arguments about the effectiveness of the Defendants' health measures are irrelevant to rational basis review, see Reply at 10.  The Defendants counter the Plaintiffs' argument that the PHO's restrictions are not grounded in fact -- and thus not "rational" -- by asserting that the COVID-19 pandemic is a worldwide affair that continues to develop, and that published scientific fact shows the virus is both airborne and "highly contagious."  Reply at 11-12.  The Defendants contend that the Court can take judicial notice of established scientific facts to establish a rational basis.  See Reply at 11-12.

The Defendants also react to the Plaintiffs' argument that the PHO's restrictions on their

business is irrational and unequal, given that other businesses face different restrictions.  See Reply at 13.  The Defendants assert that other courts in similar cases have rejected arguments that COVID-19 restrictions violate the equal protection clause.  See Reply at 13.  The Defendants also note that these differing restrictions are the result of the businesses' nature, as opposed to resulting from some animus towards the Plaintiffs.  See Reply at 13.  As an example, the Defendants examine the differing restrictions applied to businesses such as restaurants, climbing gyms, and "'close-contact businesses' (like salons, tattoo parlors, and massage studios)" as examples of how a businesses' nature drives what restrictions are placed upon the business.  Reply at 14-15.

The Defendants state that the Plaintiffs are not entitled to procedural due process, because they do not have a "protected property or liberty interest in operating their businesses free from government regulation."  Reply at 17.  The Defendants distinguish the Plaintiffs' situation from Chronis v. State, 1983-NMSC-081, 100 N.M. 342, 670 P.2d 953, which dealt with the suspension of a business license, whereas the Plaintiffs' licenses have not been suspended or revoked.  See Reply at 17 n. 22 (citing Chronis v. State, 1983-NMSC-081, 100 N.M. 342, 670 P.2d 953).  Further, the Defendants argue that the PHOs are quasi-legislative and therefore do not trigger procedural due process protections for the Plaintiffs.  See Reply at 18.  The Defendants assert that the PHOs generally are applicable across the entire State for all businesses, and therefore that they "'do not give rise to the constitutional procedural due process requirements of individual notice and hearing . . . .'"  See Reply at 18 (quoting Hernandez v. Grisham, No. CIV 20-0942 JB/GBW, 2020 U.S. Dist. LEXIS 238477 at *162 (D.N.M. Dec. 18, 2020)(Browning, J.)).

Finally, the Defendants argue that the Court should abstain from deciding Elevate Trampoline's claims under the Younger abstention doctrine.  See Reply at 19.  The Defendants argue that the Court's prior determination of irreparable harm for the purposes of preliminary

injunctive relief should not qualify the Plaintiffs for an exception to <u>Younger</u> under its "extraordinary circumstances" exception.  Reply at 20 (citing <u>Robles-Ortiz v. Toledo</u>, No. 05-1281 (JAG), 2005 U.S. Dist. LEXIS 37903 at *9 (D.P.R. Sept. 2, 2005).  In addition, the Defendants note that the Plaintiffs can operate their businesses "outdoors in Red and Yellow counties and indoors when their counties reach the Green or Turquoise level," lessening the amount of harm the Plaintiffs will suffer, and that the Court should not permit Elevate Trampoline to allege financial harm under the extraordinary circumstances exception when $700,000.00 of that financial harm is the result of imposition of fines from Elevate Trampoline's PHO violation.  <u>See</u> Reply at 20.

### 6. __The Notice from the New Mexico Department of Health to Elevate Trampoline__.

On April 8, 2021 the State of New Mexico Department of Health issued a Final Decision on an appeal in the matter of <u>Elevate Trampoline v. New Mexico Department of Health</u>.  <u>See</u> Final Decision, filed July 15, 2021 (Doc 28)("Final Decision").  The appeal was a response to the notice of contemplated action that Elevate Trampoline received on October 8, 2020.  <u>See</u> Final Notice at 1; Complaint ¶ 65, at 11.  The Department of Health determined that Elevate Trampoline violated PHOs on five occasions by operating a close contact recreational facility and encouraging mass gatherings.  <u>See</u> Final Notice at 2.  The Department of Health ordered Elevate Trampoline to pay a $12,500.00 civil monetary penalty.  <u>See</u> Final Notice at 2.

### __LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)__

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs'

claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the Plaintiffs' claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the Plaintiffs' favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the Plaintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Iqbal")).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted). See Duncan v. Citibank, No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements necessary to state a RICO claim).

To survive a motion to dismiss, a Plaintiffs' complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a Plaintiffs' pleadings "so liberally that it becomes his advocate." Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to

be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted)).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125.  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished) states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the Plaintiffs' complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x at 85.[12]  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the Plaintiffs' claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may

---

[12]Carter v. Daniels is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Donahue v. Kansas Bd. of Educ., 827 F. App'x 846, 853 (10th Cir. 2020)(unpublished); Burke v. New Mexico, 696 F. App'x 325, 329 (10th Cir. 2017)(unpublished); Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007)(unpublished); Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005)(unpublished); and Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished), and all other unpublished cases cited herein have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the Plaintiffs' claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005).  The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the Plaintiffs' allegations in the complaint, because the plaintiff cited the statements only to attack the Defendants' reliability and truthfulness.  See 2013 WL 312881, at

*50-51.

The Court also previously has ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the Defendants' alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the Plaintiffs'] claims").

On the other hand, in a securities class action, and as an exception to the general rule, the Court has found that a Defendants' operating certification, to which the plaintiffs refer in their complaint, and which is central to whether the plaintiffs adequately allege a loss, falls within an exception to the general rule, and the Court may consider the operating certification when ruling on the Defendants' motion to dismiss without converting the motion into one for summary judgment.  See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the Plaintiffs' claim" and whose authenticity the parties did not challenge); Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because

they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING YOUNGER ABSTENTION

Under the abstention doctrine that the Supreme Court of the United States articulates in Younger v. Harris, 401 U.S. 37 (1971)("Younger"), "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)). The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' rather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996)). This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

The Supreme Court of the United States of America limits narrowly the applicability of Younger abstention: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include . . . 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 73 (2013)("Sprint")(quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491

U.S. 350, 368 (1989)).  The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases."  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020).  See Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(noting that Sprint "significantly limited the reach of Younger to only" three situations, and that Sprint "also discounted reliance on the three factors outlined" in Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 433-434 (1982)("Middlesex"); MacIntyre v. JP Morgan Chase Bank, No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that Sprint significantly cabined the breadth of Younger abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n Sprint, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied Younger abstention using substantially the same analysis as in [Amanatullah v. Colo. Bd. Of Med. Examiners, 187 F.3d 1160 (10th Cir. 1999)][.]"); Conry v. Barker, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).

        In Sprint, the Supreme Court clarified that "[t]he three Middlesex conditions . . . were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking Younger."  Sprint, 571 U.S. at 81 (emphasis in original).  In Hunter v. Hirsig, 660 F. App'x 711 (10th Cir. 2016)(unpublished)("Hunter"), the Tenth Circuit continued to use similar factors to determine whether Younger abstention is non-discretionary and "must be invoked absent extraordinary circumstances."  Hunter, 660 F. App'x at 714-15.  "Younger and its progeny require federal courts to abstain from exercising jurisdiction if (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state proceeding provides an adequate forum to hear the plaintiff's federal claims, and (3) the state proceeding involves important state interests."  Hunter,

660 F. App'x at 714 (citing Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d at 1163).

The Tenth Circuit applies the three Sprint categories within its analysis of the first prong -- whether there are "ongoing state administrative proceedings." Hunter, 660 F. App'x at 715. It explained that "[t]he first condition -- ongoing state administrative proceedings -- involves two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference," where the three Sprint categories define "type." Hunter, 660 F. App'x at 715 (emphasis in the original). See Hunter, 660 F. App'x. at 716 ("As for the *type* of proceeding, the Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to criminal prosecutions.'")(emphasis in the original)(quoting Sprint, 134 S. Ct. at 588).

Once a court determines that the case is appropriate for Younger abstention, a court must then analyze the second and third elements: (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432)); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001). When all three elements mandating abstention clearly exist in the record, courts may and should address Younger abstention doctrine's analysis sua sponte. See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)("Abstention may be raised by the court sua sponte."); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

Younger abstention is not discretionary once its criteria are met. See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise."). When the Younger abstention elements are met, a district court should dismiss the

claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation. Deakins v. Monaghan, 484 U.S. 198, 202 (1988). For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action. See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended). See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a State court can address a plaintiff's cause of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the State court proceeding. In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007)(unpublished), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights. See 242 F. App'x at 613. The parent had requested a federal district court to issue an order regarding his parental rights and right to child support payments, and to award the parent monetary damages compensating him for his past child support payments. See 242 F. App'x at 611. Additionally, the parent alleged that the Colorado State trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the State court officials adjudicating his State custody case. 242 F. App'x at 613. The Tenth Circuit ruled that the district court was right to abstain from

hearing the parent's case under Younger.  See Wideman v. Colorado, 242 F. App'x at 614.  The

Tenth Circuit explained that the parent's "complaints assert claims that involve matters still

pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.

Further, the dispute implicated "important state interests," because the parent's complaints covered

domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had

"an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the

Colorado state proceedings." 242 F. App'x at 614.  Thus, where the Younger abstention criteria

are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit

must abstain from adjudicating the entire case while state proceedings are ongoing. 242 F. App'x

at 614.

According to the Tenth Circuit, ordinarily, a state proceeding is no longer "ongoing" when

"the time for appeal has run."  Hunter, 660 F. App'x at 715 (citing Bear v. Patton, 451 F.3d 639,

642 (10th Cir. 2006)("[I]f a lower state court issues a judgment and the losing party allows the

time for appeal to expire, then the state proceedings have ended.")).  "[R]egardless of when [a state

court's] judgment became final, . . .  a necessary concomitant of Younger is that a party in [the

federal plaintiff's] posture must exhaust his state appellate remedies before seeking relief in the

[federal] District Court . . . ."  Hunter, 660 F. App'x at 715 (quoting Huffman v. Pursue, Ltd., 420

U.S. 592, 608 (1975)).

## LAW REGARDING MOOTNESS

Article III, Section 2 of the Constitution of the United States limits the federal courts'

jurisdiction to actual cases and controversies.  See U.S. Const. art. III § 2.  "Federal courts are

without authority to decide questions that cannot affect the rights of litigants in the case before

them."  Ford v. Sully, 773 F. Supp. 1457, 1464 (D. Kan. 1991)(O'Connor, C.J.)(citing North

Carolina v. Rice, 404 U.S. 244, 246 (1971).  See Johansen v. City of Bartlesville, 862 F.2d 1423, 1426 (10th Cir. 1988); Johnson v. Riveland, 855 F.2d 1477, 1480 (10th Cir. 1988).  "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  Arizonians for Official English v. Ariz., 520 U.S. 43, 67 (1997).  See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1121 (10th Cir. 2010).  Accordingly, if a case is moot or becomes moot during any stage of the case, the court does not have jurisdiction to hear the case.  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)(citing Powell v. McCormack, 395 U.S. 486, 496 (1969)).

"Before deciding that there is no jurisdiction, the district court must look at the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and the laws of the United States."  Bell v. Hood, 327 U.S. 678, 682 (1946).  Jurisdiction is not dependent on whether the plaintiff will succeed in his cause of action; jurisdiction is determined before the cause of action's details, both in law and fact, are considered.  See Bell v. Hood, 327 U.S. at 682.  The Tenth Circuit recognized a distinction between mootness and standing in Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239 (10th Cir. 2011):

> Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction.  See e.g., Building & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies.");  See Matthew I. Hall, The Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 571 (2009)(citing footnote 3 in Liner v. Jafco, Inc., 375 U.S. 301 (1964), as the first occasion in which the Supreme Court expressly derived its lack of jurisdiction to review moot cases from Article III).  But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189–92 (2000).  Indeed, the Supreme Court has historically recognized what are often called "exceptions" to

the general rule against consideration of moot cases, as where a Plaintiffs' status is "capable of repetition yet evading review," S. Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515 (1911), or where a defendant has ceased the challenged action but it is likely the defendant will "return to his old ways" -- the latter often referred to as the voluntary cessation exception, United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953); See also, e.g., City of Erie v. Pap's A.M., 529 U.S. 277 (2000). These exceptions do not extend to the standing inquiry, demonstrating the contours of Article III as it distinctly pertains to mootness. Friends of the Earth, Inc., 528 U.S. at 191 . . . .

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1242–43.

A claim may become moot if "(i) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Cty. of L.A. v. Davis, 440 U.S. 625, 631 (1979). The burden of establishing mootness is a heavy one. See Cty. of L.A. v. Davis, 440 U.S. at 631. Courts are permitted to take into account the relative likelihood of the events which a party asserts keep the dispute from becoming moot. See Golden v. Zwickler, 394 U.S. 103, 109 (1969)("We think that under all the circumstances of the case the fact that it was most unlikely that the Congressman would again be a candidate for Congress precluded a finding that there was 'sufficient immediacy and reality' here."). A case can become moot based on intervening events, such as settling the case, see U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 25 (1994)("Where mootness results from settlement, the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal . . . ."), or becoming a resident of the State whose residency laws one is challenging, see Sosna v. Iowa, 419 U.S. 393, 399 (1975)("If appellant had sued only on her own behalf, both the fact that she now satisfies the one-year residency requirement and the fact that she has obtained a divorce elsewhere would make this case moot and require dismissal."). In comparison, while mootness, a statute of limitations, or some other legal doctrine may eventually bar a suit, one cannot lose standing once one has it.

See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 190-92 ("Furthermore, if mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the Defendants' allegedly unlawful activity is 'capable of repetition, yet evading review,' could not exist.").

The Tenth Circuit recognizes "two exceptions to mootness." N.M. Health Connections v. United States HHS, 946 F.3d 1138, 1159 (10th Cir. 2019). First, "a case or controversy is not moot if the dispute is 'capable of repetition, yet evading review.'" N.M. Health Connections v. United States HHS, 946 F.3d at 1159 (quoting Brown v. Buhman, 822 F.3d 1151, 1166 (10th Cir. 2016)). "This exception 'applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" N.M. Health Connections v. United States HHS, 946 F.3d at 1159 (quoting Brown v. Buhman, 822 F.3d 1151, 1166). "Second, 'voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.'" N.M. Health Connections v. United States HHS, 946 F.3d at 1159 (quoting Brown v. Buhman, 822 F.3d at 1166). The Tenth Circuit explains that "This exception is designed to counteract gamesmanship, such as 'a defendant ceasing illegal action long enough to render a lawsuit moot' before 'resuming the illegal conduct.'" N.M. Health Connections v. United States HHS, 946 F.3d at 1159 (quoting Ind v. Colo. Dep't of Corr., 801 F.3d 1209, 1214 (10th Cir. 2015)). This exception does not apply, however, if it is "'absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" N.M. Health Connections v. United States HHS, 946 F.3d 1159 (quoting Brown, 822 F.3d at 1166). "Government 'self-correction . . . provides a secure foundation for mootness so long as it seems genuine.'" N.M. Health Connections v. United

States HHS, 946 F.3d at 1159 (quoting 13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3533.7 (3rd ed. 2008)).  The Tenth Circuit has held that the "withdrawal or alteration of administrative policies" satisfies concerns regarding voluntary cessation.  N.M. Health Connections v. United States HHS, 946 F.3d at 1160 (quoting Rio Grande Silvery Minnow, 601 F.3d at 1117-18).

The Tenth Circuit notes that it is possible that legislative governmental action may be subject to the evading review exception to mootness:

> Indeed, in this governmental context, "[m]ost cases that deny mootness rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways."  13C Wright, Miller & Cooper, *supra* note 15, § 3533.6, at 311 (emphasis added).  More specifically, when a legislature repeals or amends a statute after it is judicially challenged, we have concluded that the voluntary-cessation exception has no application "where there is no evidence in the record to indicate that the legislature intends to reenact the prior version of the disputed statute."  Camfield v. City of Okla. City, 248 F.3d 1214 (10th Cir. 2001).

Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1117 (10th Cir. 2010).  In Roman Catholic Diocese v. Cuomo, 141 S. Ct. 63 (2020), the Supreme Court of the United States suggests that this legislative deference may not extend to executive branch administrators, at least in the context of public health orders:

> It is clear that this matter is not moot . . . . And injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified as red or orange.  See, e.g., Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). The Governor regularly changes the classification of particular areas without prior notice.  If that occurs again, the reclassification will almost certainly bar individuals in the affected area from attending services before judicial relief can be obtained.

Roman Catholic Diocese v. Cuomo, 141 S. Ct. at 68.

The Court has concluded that a due process claim is not moot where the plaintiff does not receive the precise remedy which he has requested.  See Salazar v. City of Albuquerque, 776 F.Supp.2d 1217, 1235-36 (D.N.M. 2011)(Browning, J.)("Salazar").  In Salazar, a city bus driver

brought a due process claim against the City of Albuquerque after being fired from his job.  See 776 F. Supp. 2d at 1223.  Although the employee was later reinstated, the Court determined that his due process claim was not moot, because he had asked for more than just reinstatement; he had also asked for punitive and back-pay damages.  See Salazar, 776 F. Supp.2d at 1235–36.  The Court also has determined that a claim is not necessarily moot even when a State court has previously dismissed the claim for lack of prosecution and for failure to appear, because there was still time for the plaintiff to seek reconsideration of the decision or an appeal.  See Nieto v. University of New Mexico, 727 F. Supp.2d 1176, 1191 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  Soskin v. Reinertson, 353 F.3d at 1247 (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  "The Clause 'creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly.'"  Teigen v. Renfrow, 511 F.3d at 1083 (quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class.  See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012).  The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons."  SECSYS,

LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279).  In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action."  SECSYS, LLC v. Vigil, 666 F.3d at 685.

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  At least in the Tenth Circuit, however, under some circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it.  See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999).  The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority."  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citations omitted).  The failure to prevent discrimination before it occurs is not actionable.  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.7.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however,

a person must have a protected interest in either life, liberty, or property." <u>Chavez-Rodriguez v.</u> <u>City of Santa Fe</u>, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"   <u>Camuglia v. City of Albuquerque</u>, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571 (quoting <u>National Mutual Ins.</u> <u>Co. v. Tidewater Transfer Co.</u>, 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).   The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d at 1079.  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests

attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that:

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335. A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful post-deprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court has also concluded that a

tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win."). See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d at 1299, aff'd 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 197). "Nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

There are two substantive due process claims: (i) where the plaintiff alleges that the government has infringed upon a fundamental right, see Washington v. Glucksberg, 521 U.S. 702,

721-22 (1997)("Glucksberg"); and (ii) where the plaintiff alleges that a government action has deprived arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial conscience, see Rochin v. California, 342 U.S. 165, 172 (1952)(concluding that a sheriff's application of stomach pumping to force an arrestee to vomit shocked the conscience).  The Tenth Circuit "appl[ies] the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action."  Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018).  But see Seegmiller v. LaVerkin City, 528 F.3d 762, 768 (10th Cir. 2008)(Tymkovich, C.J.)(explaining that "there is no hard-and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards").  But see also Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624, 636 (10th Cir. 2018)(Tymkovich, C.J., concurring)(noting that, "though our circuit has sometimes repeated Seegmiller's 'both tests work' dicta, we do not follow it. Instead, we follow a simple binary approach" which applies the fundamental rights test to legislative actions and the shocks-the-conscience test to executive actions).

**1.    The Fundamental Rights Approach.**

The fundamental rights approach proceeds in three steps.  See Abdi v. Wray, 942 F.3d at 1028.  First, the court must evaluate whether a fundamental right is at issue either: (i) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'"  Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at 720-21).  Second, the court determines whether the right at issue "has been infringed through either total prohibition or 'direct and substantial' interference."  Abdi v. Wray, 942 F.3d at 1028 (quoting

Zablocki v. Redhail, 434 U.S. 374, 387 (1978)).  Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny.  See Abdi v. Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the law . . . is narrowly tailored to achieve a compelling governmental purpose").  If the right is not fundamental, however, the Court applies rational basis review.  See Reno v. Flores, 507 U.S. 292, 305 (1993)(explaining that strict scrutiny is required "only when fundamental rights are involved").

      **2.**       **Shocks-the-Conscience Approach.**

There are two exceptions to the general rule that state actors may be held only for their own affirmative acts that violate a Plaintiff's due process rights and not for third parties' acts.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a Plaintiffs' vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine.

A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

The second exception is the danger-creation exception. The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a Plaintiffs' vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."  Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased Plaintiffs' vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the Defendants' conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly

in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations omitted).

A government actor's official conduct intended to injure in a way that a government interest cannot reasonably justify most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), a corrections officer's widow, sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d

at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052, the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[13] the plaintiffs' son. 716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1074-75. See also Caldwell v. Univ. of N.M. Bd. of Regents, 510 F. Supp. 3d 982, 1058-1060 (D.N.M. 2020)(Browning, J.).

---

[13]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles." 716 F. Supp. 2d 1052, 1059 n.2 (citations omitted)(internal quotation marks omitted).

**ANALYSIS**

The Plaintiffs Elevate Trampoline, Cool Springz, Jungle Jam, and Duke City, bring their claims for violations of the rights to substantive and procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution, and for violation of the right to equal protection under the Fourteenth Amendment.  Complaint ¶ 138, at 22; id. ¶¶ 155-156, at 24; U.S. Const. amends. V, XIV.  The Court is sympathetic to the challenges the COVID-19 pandemic presents to trampoline facility owners and their employees.  See ETP Rio Rancho II, 2021 U.S. Dist. LEXIS 36354 at *110.  The Court also has opined that, although the Plaintiffs face significant challenges, they lack a Constitutional remedy: the "appropriate audience for the Plaintiff's arguments are New Mexico's political branches and not a federal court."  ETP Rio Rancho II, 2021 U.S. Dist. LEXIS 36354 at *111-112.  Even accepting as true all the Plaintiffs' well-pled factual allegations in the Complaint, viewing those allegations in the light most favorable to the non-moving parties, and drawing all reasonable inferences in the Plaintiffs' favor, the Court concludes that the Plaintiffs have not stated a claim upon which relief may be granted.

The Court determines that: (i) the Court will not consider facts outside the Complaint, other than facts about which the Court may take judicial notice; (ii) the Plaintiffs' claims are not moot, because of the pandemic's ongoing nature and Governor Grisham's current PHOs; (iii) the Court need no longer abstain from considering Elevate Trampoline's claims, because the State enforcement proceeding against Elevate Trampoline is no longer ongoing; (iv) the PHOs are rationally related to a legitimate State interest in stopping the spread of COVID-19 and therefore survive rational basis review; (v) the PHOs do not violate substantive due process because there is no fundamental right to operate a business free from regulation, and the Defendants' actions do not shock the judicial conscience; (vi) neither N.M.S.A. § 24-1-3(E) nor the PHOs is

unconstitutionally vague or overbroad; (vii) the Defendants have not violated the Plaintiffs' procedural due process rights because the PHOs are quasi-legislative, and because Elevate Trampoline had sufficient due process given the circumstances; and (viii) the Defendants have not violated the  Plaintiffs' equal protection rights, because the Plaintiffs are not members of a suspect class, the Defendants have shown no animus towards the Plaintiffs, and the Defendants' policies satisfy rational basis review.  Consequently, the Court grants the Defendants' Motion to Dismiss without prejudice.

## I.     THE COURT WILL NOT CONSIDER FACTS OUTSIDE THE COMPLAINT, OTHER THAN FACTS ABOUT WHICH THE COURT MAY TAKE JUDICIAL NOTICE.

The Plaintiffs attached ten exhibits to their Response, but the Court will not consider these in disposing of the MTD.  "When ruling on a Rule 12(b)(6) motion, the district court must examine only the Plaintiffs' complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1210 (D.N.M. 2014)(Browning, J.). See Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010).  The Court typically cannot consider properly the additional facts without converting the MTD to a motion for summary judgment.  See Nard. v. Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(explaining that where "the district court considered facts outside of the complaint . . . , it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)").  There are exceptions to this general rule for judicially noticeable documents and for documents the Complaint incorporates by reference.  See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the Plaintiffs' claim" and whose authenticity the parties did not challenge); Mata v.

Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

Here, the documents to the Plaintiffs' Response are not referenced in the Complaint, are not judicially noticeable, and the Defendants object to their consideration.  See Reply at 2.  The Defendants ask that the Court "disregard any references to matters outside of the Complaint and decide the Motion under a motion to dismiss standard."  Reply at 2.  The Court has previously converted an MTD to a motion for summary judgment where the parties did "not object to the Court's decision to convert the Second MTD to a motion for summary judgment pursuant to rule 12(d)," and it could similarly convert the MTD here.  Hernandez v. Grisham, 508 F. Supp. 3d 893, 917 (D.N.M. 2020)(Browning, J.).  Nonetheless, because the Defendants object to conversion, the Court "will let the Defendants be masters of their own motion and thus will not convert their rule 12(b)(6) motion into one for summary judgment."  Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1226.

## II.   THE PLAINTIFFS' CLAIMS ARE NOT MOOT, BECAUSE THE STATE OF PUBLIC HEALTH EMERGENCY GOVERNOR GRISHAM DECLARED IS ONGOING.

The issues presented in the Plaintiffs' case are still live and their claims are not moot.  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)(citing Powell v. McCormack, 395 U.S. 486, 496 (1969)).  A claim may become moot if "(i) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects

of the alleged violation." Cty. of L.A. v. Davis, 440 U.S. 625, 631 (1979). The "burden of demonstrating mootness 'is a heavy one.'" Cty. of L.A. v. Davis, 440 U.S. at 631 (quoting United States v. W. T. Grant Co., 345 U.S. 629, 632-633 (1953)).

The Plaintiffs' claims are not moot, because the State of Public Health Emergency remains in place, and a new PHO could create new restrictions that again bring the questioned restrictions back into place. See June 30 PHO at 1. The Defendants contend that, because the Plaintiffs' arguments contain multiple allegations from previous PHOs, which are no longer in effect, the Plaintiffs' claims are moot. See Motion to Dismiss at 13. Despite these PHOs expiring, the State of Public Health Emergency and later PHOs remain in effect. See July 26 Executive Order at 1. All cabinets, departments, and agencies still must follow the declarations, directives, and the NMDOH's further instructions. See Emergency Declaration at 1. Conditions that present the threat of "reclassification," or reinstitution of COVID mitigation measures, that may continue or recreate the harm in question are not moot. Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 68 (2020). If the State issues another PHO in response to increased COVID transmission rates or deaths, the State's restrictions could affect the Plaintiffs. The issue in question remains live, because the emergency remains ongoing and the State continues to issue PHOs. Without concluding the trampoline facilities are analogous to religious institutions, or that trampoline facilities are given the same level of constitutional protection, the Court finds Justice Gorsuch's reasoning in his concurring opinion in Roman Cath. Diocese of Brooklyn v. Cuomo persuasive regarding mootness:

> [T]he Governor loosened his restrictions, all while continuing to assert the power to tighten them again anytime as conditions warrant. So if we dismissed this case, nothing would prevent the Governor from reinstating the challenged restrictions tomorrow. And by the time a new challenge might work its way to us, he could just change them again.

141 S. Ct. at 72 (Gorsuch, J., concurring).

The Defendants rely on <u>Spell v. Edwards</u> in their arguments, noting that an appeal from the denial of a preliminary injunction in the United States Court of Appeals for the Fifth Circuit concluded that the issue in that case was moot, because the order had expired.  <u>See</u> Motion to Dismiss at 13 (citing <u>Spell v. Edwards</u>, 962 F.3d 175, 179 (5th Cir. 2020)).  The Fifth Circuit concluded that the restrictions in that case were moot, because the trend in Louisiana was towards reopening.  <u>See</u> <u>Spell v. Edwards</u>, 962 F.3d at 180.  Considering the pandemic's ongoing and dynamic nature,[14] the Court concludes that the Plaintiffs' claims are not moot.

## III. ELEVATE TRAMPOLINE'S CLAIMS DO NOT REQUIRE ABSTENTION UNDER THE <u>YOUNGER</u> DOCTRINE, BECAUSE THE STATE PROCEEDING IS <u>NO LONGER ONGOING</u>.

The Court concludes that it can now exercise jurisdiction over Elevate Trampoline's claims, because there is no longer an ongoing State proceeding involving Elevate Trampoline.  The Court held previously that it would likely have to abstain from hearing Elevate Trampoline's claims under the <u>Younger</u> abstention doctrine.  <u>See</u> <u>ETP Rio Rancho II</u>, 2021 U.S. Dist. LEXIS 36354 at *161-164.  Because Elevate Trampoline's administrative proceedings with the State of New Mexico have concluded, <u>see</u> Final Notice at 1, the Court must re-analyze its previous position.

Under <u>Younger v. Harris</u>, 401 U.S. 37 (1971), "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" --

---

[14]The Court takes judicial notice of the latest Executive Order 2021-054, <u>Renewing the Public Health Emergency Initially Declared in Executive Order 2020-004, Other Powers Invoked in that Order, and All Other Orders and Directives Contained in Executive Orders Tied to the Ongoing Public Health Emergency</u>, (September 15, 2021), available at https://www.governor.state.nm.us/about-the-governor/executive-orders/ (last visited September 27, 2021).

when the state forum provides an adequate avenue for relief.  Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)).  For the Court to abstain under Younger, the Plaintiffs must establish: (i) that the Court would interfere with an ongoing state judicial proceeding; (ii) the involvement of important state interests; and (iii) an adequate opportunity afforded in the State court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  "A case warrants Younger abstention only if each of these three criteria are satisfied."  J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.  The Court will re-analyze each of these elements in-turn.

### A.    ELEVATE TRAMPOLINE IS NO LONGER INVOLVED IN ONGOING STATE ADMINISTRATIVE PROCEEDINGS.

The NMDOH issued a final decision as to Elevate Trampoline on April 8, 2021.  See Final Decision at 2 (dated April 8, 2021), filed July 15, 2021 (Doc. 28).  "[T]he proceedings must be ongoing and they must be the type of proceedings afforded Younger deference."  Hunter v. Hirsig, 660 F. App'x 711, 715 (10th Cir. 2016)(emphasis in the original).  The Court concludes that the "type of proceeding" in which Elevate Trampoline was involved is the type afforded Younger deference.  See ETP Rio Ranch II, 2021 U.S. Dist. LEXIS 36354, at *164.  The Court also concludes that the proceedings against Elevate Trampoline are no longer ongoing, and that the Court need not further abstain from hearing the Plaintiffs' § 1983 claims.  See Final Decision at 2.

Under the Younger abstention doctrine, State administrative proceedings that are ongoing must be afforded deference. See Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 627 (1986)(citing cases and concluding that a district court should have abstained where

there were ongoing proceedings before the Ohio Civil Rights Commission).  See, e.g., Middlesex Cnty Ethics Comm. v. Garden State Bar Assoc., 457 U.S. 423, 432-34 (1982)(holding that federal courts should refrain from enjoining lawyer disciplinary proceedings that the State ethics committees initiated where the proceedings were within the appropriate State Supreme Court's appellate jurisdiction); Hunter, 660 F. App'x at 715-16 (concluding that abstention was proper where there were ongoing proceedings before the Wyoming Department of Insurance).  Because Elevate Trampoline received a final decision on its appeal of the Notice of Contemplated Action that the NMDOH issued, Elevate Trampoline's state proceedings have concluded and are no longer ongoing.  See Hunter, 660 F. App'x at 715 ("Ordinarily, a state proceeding ends when the time for appeal has run.")(citing Bear v. Patton, 451 F.3d 639, 642 (10th Cir. 2006)).  District Courts should stay, rather than dismiss, claims that state hearings cannot redress.  See Columbian Fin. Corp. v. Stork, 811 F.3d 390, 395 (10th Cir. 2016)("Although the Younger abstention doctrine may require a federal court to withhold action on damage claims in certain circumstances, the district court at most should have *stayed* rather than dismissed those claims because they cannot be redressed in the pending state proceedings.")(emphasis in original).  Because the first prong of Younger is not met, abstention under the Younger doctrine is no longer appropriate.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 ("A case warrants Younger abstention only if each of these three criteria are satisfied.")  Accordingly, the Court concludes that it may now address the Plaintiffs' § 1983 claims, because the State proceedings are no longer ongoing.

## IV.   THE PHOS ARE RATIONALLY RELATED TO THE DEFENDANTS' LEGITIMATE STATE INTEREST IN STOPPING COVID-19'S SPREAD.

Because the PHOs affect neither a suspect class nor a fundamental right, the Court will evaluate the policy under rational basis review to determine whether the Feb. 24 PHO is "rationally related to a legitimate state interest."  City of New Orleans v. Dukes, 427 U.S. at 303.  Accord

Hernandez v. Grisham, 508 F. Supp. 3d 893, 989 (D.N.M. 2020)(Browning, J.).  See Powers v. Harris, 379 F.3d 1208, 1215 (10th Cir. 2004)("As a state economic regulation that does not affect a fundamental right and categorizes people on the basis of a non-suspect classification, we determine whether the [Oklahoma Funeral Services Licensing Act] passes constitutional muster, both as a matter of substantive due process and equal protection, by applying rational-basis review.").  The Court concludes that the PHOs satisfy rational basis review, because they have a rational relationship to a legitimate state interest.  See City of New Orleans v. Dukes, 427 U.S. at 303.  A State policy "need not be in every respect logically consistent with its aims to be constitutional.  It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 487-88 (1955).  Moreover, "[u]nder this test," the Defendants' "action 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'"  League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125, 128 (6th Cir. 2020)(unpublished)(quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)).

The Defendants need not "actually articulate at any time the purpose or rationale supporting" their classification of trampoline facilities as a close contact recreational facility.  Nordlinger v. Hahn, 505 U.S. 1, 11 (1992).  The classification survives rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  FCC v. Beach Commc'ns, Inc., 508 U.S. at 313.  Here, the Defendants provide the following explanation for the PHOs' closure of the Plaintiffs' businesses:

> As this Court is aware, "the more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread."  *ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 23409, at *110 (quoting *How COVID-19 Spreads*, Centers for Disease Control and Prevention (Oct. 28, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html).

Given this, it is rational that the State would seek to restrict the operation of locations where members of the public are likely to come within close proximity to one another.  Though Plaintiffs do not appear to dispute this logic as a general matter, they jump to the conclusion that Defendants' closure of their businesses is irrational because they do not have any scientific studies regarding trampoline parks.  *See* App. at 15.  But, as this Court points out, rational basis review "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *ETP Rio Rancho Park*, 2021 U.S. Dist. LEXIS 23409, at \*109-10 . . . .

Plaintiffs also take aim at the PHO's classifications, arguing that the restriction on their trampoline parks lacks rationality because it does not also close businesses like bowling alleys, skating rinks, swimming pools, and gyms.  [See Complaint] at 25.  Plaintiffs are mistaken for several reasons.  First, the operative PHO does, in fact, close bowling alleys and skating rinks. . . . Second, while the PHO permit swimming pools to open, this only applies *outdoor* swimming pools. *Id.*  As this Court has previously recognized, "[e]xperts appear to agree that outdoor gatherings are less dangerous than indoor gatherings." *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 U.S. Dist. LEXIS 122542, at \*271 (D.N.M. July 13, 2020) (Browning, J.).  It is therefore rational to distinguish between Plaintiffs' indoor trampoline parks and outdoor pools.

. . . .

Gyms are used for exercise purposes only -- an important feature of maintaining a healthy lifestyle -- as opposed to amusement at trampoline parks (albeit with some physical activity). *Cf. Talleywhacker, Inc.*, 465 F. Supp. 3d 523 ("Moreover, plaintiffs do not factor into account that there are other reasons, as stated in Executive Order No. 141, for allowing restaurants to open with restrictions, based upon their importance to the community as a whole, while not with the same urgency allowing adult entertainment establishments, or components of businesses that provide adult entertainment, to open.").

MTD at 28-32.  The Defendants also "point out their rational basis for implementing their cautious approach to reopening -- including New Mexico's higher than-average population of elderly and individuals with underlying health conditions, as well as their lower-than-average availability of hospital beds."  Reply at 11.  The Court is "obliged to consider every plausible legitimate state interest that might support the" PHOs.  Powers v. Harris, 379 F.3d at 1218.

- 70 -

Having carefully considered both the Defendants' stated reasons for the PHOs and other possible State goals, the Court concludes that the Defendants have a legitimate interest in "the protection and preservation of human life . . . ." Cruzan v. Dir. Missouri Dep't of Health, 497 U.S. 261 (1990). See Legacy II, 2020 WL 3963764, at *113; Hernandez v. Grisham, 508 F. Supp. 3d at 989. The Plaintiffs also admit that the Defendants' interest in limiting COVID-19's spread is legitimate. See Feb. 24 Tr. at 84:2-12 (Court, Artuso)("I do believe the state has a legitimate interest, but I have been extremely disappointed with the lengths at which they are willing to resort, and the trampling of constitutional rights . . . . [T]hey may have overreached to the extreme in trying to protect some."). The Plaintiffs nonetheless argue that, despite the Defendants' legitimate interest, their closure of trampoline facilities does not relate to their interest in limiting COVID-19's spread. See Feb. 24 Tr. at 84:13-20 (Artuso, Court). The Plaintiffs insist that the classification is irrational, because the Defendants have "no study, scientific, peer-reviewed or not, that suggests trampoline gyms present any greater risk than gyms or any of the favored activities in the 'close contact business' category." MTD at 39 (no citation for quotation). The Plaintiffs want rational basis to have more bite and be more rigorous than the applicable case law permits. The State does not have to study each industry a law impacts, but can legislate across a broad, general prohibition. The Defendants have provided the Court with a "reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Commc'ns, Inc., 508 U.S. at 313. There are rational reasons for the Defendants to prohibit the Plaintiffs from operating during the pandemic while allowing gyms, for example, to remain open. See Complaint ¶ 157, at 24 (complaining that the "Plaintiffs have been treated differently than other, similarly situated businesses, to include bowling alleys and gyms"). The strongest reason that the Defendants present in this regard is that, because children visit trampoline facilities more frequently than do

adults, even if the Plaintiffs had the same COVID-19 safety protocol in place as a gymnasium, children are less likely to adhere strictly to social distancing guidelines, and are more likely than adults to "start . . . jumping across each other's trampolines," and, even if "masks are staying on . . . kids are running wild." Feb. 24 Tr. at 94:6-11 (Agajanian).  Moreover, the Defendants explain that gyms are "are used for exercise purposes only -- an important feature of maintaining a healthy lifestyle -- as opposed to amusement at trampoline parks (albeit with some physical activity)." MTD at 32.  The Defendants also have touted the benefits of closing most non-essential face-to-face businesses to help limit COVID's spread.  Feb. 24 Tr. at 94:11-18.  The Defendants' PHOs, therefore, rationally relate to their legitimate purpose of protecting the health and lives of its citizens by preventing COVID-19's spread.[15]

## V.   THE PHOS DO NOT VIOLATE SUBSTANTIVE DUE PROCESS BECAUSE THEY NEITHER INVOLVE A FUNDAMENTAL RIGHT NOR SHOCK THE JUDICIAL CONSCIENCE.

The PHOs challenged by the Plaintiffs do not violate their substantive due process rights, because the Plaintiffs do not have a fundamental right to run their business without government regulation, and therefore the Court applies rational basis review to the government's actions.  The

---

[15]The Court need not and should not, decide whether the Defendants have chosen the best path, or the least restrictive means.  See Powers v. Harris, 379 F.3d at 1217 (stating that, under the rational basis test, "[s]econd-guessing by a court is not allowed"); FCC v. Beach Commc'ns, Inc., 508 U.S. at 313 ("[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."); New Orleans v. Dukes, 427 U.S. at 303 ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .").  "[R]ational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question." Powers v. Harris, 379 F.3d 1208, 1217 (10th Cir. 2004).

Court finds that the Defendants have a rational basis for the PHOs, and that the PHOs do not shock the judicial conscience.

### A.   THE PLAINTIFFS DO NOT HAVE A FUNDAMENTAL RIGHT TO RUN THEIR BUSINESSES WITHOUT GOVERNMENT REGULATION.

The Plaintiffs do not have a fundamental right to run their businesses without government regulation.   The fundamental rights approach proceeds in three steps.   First, the Court must evaluate whether a fundamental right is at issue either: (i) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'" Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at 720-21).   Second, the Court determines whether the right at issue "has been infringed through either total prohibition or 'direct and substantial' interference."   Abdi v. Wray, 942 F.3d at 1028 (quoting Zablocki v. Redhail, 434 U.S. 374, 387 (1978)).   Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny.   Abdi v. Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the law . . . is narrowly tailored to achieve a compelling governmental purpose").   If the right is not fundamental, however, the Court applies rational basis review.   See Reno v. Flores, 507 U.S. 292, 305 (1993)(explaining that strict scrutiny is required "only when fundamental rights are involved").   The Court concludes that: (i) it will not recognize a new fundamental right to operate a trampoline facility; and (ii) because "the Plaintiffs' respective liberty interest[] to run their businesses free from . . . government interference" is not a fundamental right, the Court will apply rational basis review.   Complaint ¶ 137, at 22.

First, the rights that the Plaintiffs allege that the Defendants violate -- their rights to run a business free from State interference -- are not fundamental.   See Complaint ¶ 137, at 22.   The

Plaintiffs admitted as much at the February 24, 2021 hearing when they stated: "Our Complaint . . . is based on a violation of our plaintiffs' right to [ . . .] and while it is not a fundamental right to operate a business free of Government interference . . . I do believe they have a fundamental right to liberty and a fundamental right to property."  Tr. at 82:6-24 (Artuso).  "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned." Nebbia v. New York, 291 U.S. 502, 527-28 (1934).  Accord Powers v. Harris, 379 F.3d 1208, 1221 n.16 (10th Cir. 2004)(same).  The Plaintiffs also argued that they "believe they have a fundamental right to liberty and a fundamental right to property and that they're going to be deprived of that property without due process of law." Tr. at 82:20-24 (Artuso). Property rights, however, are not fundamental for substantive due process purposes, and the Fourteenth Amendment Due Process Clause's protection of "liberty" has been interpreted to incorporate most rights listed in the Bill of Rights to state and local governments.

The Court will not recognize a new fundamental right to operate a trampoline facility, because: (i) the Plaintiffs have not demonstrated the historical importance of operating trampoline facilities; (ii) the Plaintiffs have not demonstrated that a temporary pause on operating trampoline facilities will make it impossible for the Plaintiffs to access other fundamental liberties; (iii) the Plaintiffs have not sufficiently defined the contours of their proposed right, and (iv) the Supreme Court has made plain that no general right to operate a business exists.  See Nebbia v. New York, 291 U.S. at 527-28.    Here, the Plaintiffs insist upon a general right to run their businesses free from . . . government interference . . . ."  Complaint ¶ 137, at 22.  Under Glucksberg, however, the Plaintiffs must provide a "careful description of the asserted fundamental liberty interest."  521 U.S. at 721.  The Plaintiffs' vague and conclusory allegations do not satisfy Glucksberg's "careful

description" requirement, because they do not explain how the Feb. 24 PHO deprives the Plaintiffs of a fundamental right and do not address how trampoline facility operation is "deeply rooted in Nation's history and tradition."  Glucksberg, 521 U.S. at 720-21.

### B.   THE DEFENDANTS' ACTIONS DO NOT SHOCK THE JUDICIAL CONSCIENCE, BECAUSE THEIR CONDUCT -- LIMITING IN-PERSON INTERACTIONS IN AN EFFORT TO MITIGATE THE PANDEMIC'S SPREAD -- IS NEITHER EGREGIOUS NOR OUTRAGEOUS.

Even if the shocks-the-conscience standard applies here, the Defendants actions do not violate the Plaintiffs' substantive due process rights, because they do not shock the Court's conscience.  See Rochin v. California, 342 U.S. at 172; Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.  "Executive action that shocks the conscience requires much more than negligence."  Doe v. Woodard, 912 F.3d at 1300.  Rather, "[c]onduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice."  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013).  "The behavior complained of must be egregious and outrageous."  Hernandez v. Ridley, 734 F.3d at 1261 (citing Breithaupt v. Abram, 352 U.S. 432, 435 (1957)).  The Tenth Circuit, for example, recently held that a social worker's behavior was conscience-shocking where the social worker removed a child from his mother's home to place him in his father's home and: (i) withheld information about the father's criminal history, including his conviction for attempted sexual assault against a minor in his care; (ii) withheld concerns about his father "for fear of being fired"; and (iii) was aware of, and failed to "investigate evidence of potential abuse," including the child's report that his father "had hit him with a wooden mop and school official's reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father . . . ."  T.D. v. Patton, 868 F.3d 1209, 1230 (10th Cir. 2017).  Ultimately, the child "suffered severe physical and sexual abuse at the hands of his father," and the Tenth Circuit

concluded that the social worker had violated the child's substantive due process rights "by knowingly placing" the child "in a position of danger and knowingly increasing" his "vulnerability to danger." T.D. v. Patton, 868 F.3d at 1212.  By contrast, the Court has held that school officials' conduct did not shock the conscience, where the plaintiffs alleged that the defendants did not take action to protect students at the school from being kicked and punched in the testicles on at least three occasions.  See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.

The Defendants' action in issuing the Feb. 24 PHO is not "egregious and outrageous." Hernandez v. Ridley, 734 F.3d a 1261.  See Feb. 24 PHO at 1-9.  First, limiting in-person interactions where possible mitigates COVID-19's spread.  See How COVID-19 Spreads, Centers for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html.  As discussed below, see Analysis § III-IV, infra, the Defendants have a strong interest in stopping the spread of COVID-19, and have chosen to close close-contact recreational facilities to achieve this goal.  See Doe v. Woodard, 912 F.3d at 1300; Feb. 24 PHO at 8.  Further, a temporary pause on trampoline facility operation is not comparable to knowingly permitting a child to suffer severe, long-term physical and sexual abuse, as in T.D. v. Patton.  See T.D. v. Patton, 868 F.3d at 1212.  The Defendants' actions -- taken to prevent further spread of a deadly virus -- therefore, do not rise to the level of conscience shocking. See Herrin v. Reeves, No. CIV 20-263 MPM\RP, 2020 WL 5748090, at *9 (N.D. Miss. Sept. 25, 2020)(Mills, J.)("[T]his court finds the notion that restrictions designed to save human lives are 'conscious shocking' to be absurd and not worthy of serious discussion.")(no citation for quotation).  Accordingly, "the Court's conscience is not shocked." Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1075.

**VI.     NEITHER N.M.S.A. § 24-1-3(E) NOR THE PHOS ARE VOID FOR VAGUENESS.**

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). Where, as here, a civil statute is at issue, "[t]he void-for-vagueness doctrine operates in much reduced force outside of its core area of application, criminal law." Griffin v. Bryant, 30 F. Supp. 3d 1139, 1170 (D.N.M. 2014)(Browning, J.). See Response at 2. The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498-99 (1982).

The Plaintiffs assert that two provisions are "unconstitutionally vague and overbroad": (i) N.M.S.A. § 24-1-3(E); and (ii) generally, all of the PHOs. Response at 2. Section 24-1-3(E) grants the Secretary of Health the power to "close any public place and forbid gatherings of people when necessary for the protection of the public health." Section 24-1-3(E) alone, however, does not prohibit any "constitutionally protected conduct." Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. at 494. Instead, it delegates power to the Secretary of Health. See N.M.S.A. § 24-1-3(E). The purpose of the void-for-vagueness and overbreadth doctrine is to provide "ordinary people . . . 'fair notice' of the conduct a statute proscribes." Sessions v. Dimaya, 138 S. Ct. 1204, 1212 (2018)(quoting Papachristou v. Jacksonville, 405 U.S. 156, 162 (1972)). Because N.M.S.A. § 24-1-3(E) neither applies to ordinary people nor proscribes conduct, the Court concludes that the void-for-vagueness and overbreadth doctrine is inapposite. See Sessions v. Dimaya, 138 S. Ct. at 1212. See also MTD at 14.

Next, the PHOs are not unconstitutionally overbroad or vague, because a person of reasonable intelligence would understand the conduct that the PHOs prohibit.  See Hill v. Colorado, 530 U.S. at 732.  The Plaintiffs contend that the PHOs are unconstitutionally vague, because, "by changing the definitions, restrictions, obligations, and requirements on New Mexico businesses on an almost bi-weekly basis, the PHOs are so vague that persons of common intelligence must necessarily guess as to their meanings . . . ."  Complaint ¶ 134, at 22.  "The fact that the Executive Orders incorporate other Executive Orders and Public Health Orders by reference may make it difficult to follow the entirety of the State's restrictions, but that is hardly unique in modern law, and it does not render the orders unconstitutionally vague."  Denver Bible Church v. Azar, 2020 WL 6128994, at *14 (citing United States v. Collins, 461 F. App'x 807, 809 (10th Cir. 2012)).  Moreover, given that the Court is "evaluating a vagueness challenge to a state law," it "must read the statute as it is interpreted by the state's highest court."  United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988).  The Supreme Court of New Mexico recently discussed N.M.S.A. § 24-1-3(E) and the PHOs, noting favorably that "courts have liberally construed grants of authority to public health agencies."  Grisham v. Romero, 2021-NMSC-009, ¶ 30, 483 P.3d 545, 558.  Further, in Grisham v. Reeb, the plaintiff businesses argued that the emergency orders were not authorized, because "the average person would not likely have understood that violation of public health emergency orders were punishable/enforceable under the PHERA."  2021-NMSC-006, ¶ 38, 480 P.3d 852, 867.  The Supreme Court of New Mexico notes that, "under a void-for-vagueness analysis, courts ask whether persons of average intelligence would have to guess at the meaning of a penal provision and would differ as to its application."  Grisham v. Reeb, 2021-NMSC-006, ¶ 39, 480 P.3d 852, 867 (citing Bokum Res. Corp. v. N.M. Water Quality Control Comm'n, 1979-NMSC-090, ¶ 14, 603 P.2d 285).  The

Supreme Court of New Mexico disagrees with the challengers' vagueness argument, holding that the "PHERA gives adequate notice under the circumstances of a public health emergency, to a reasonably intelligent person desirous of being informed." See Grisham v. Reeb, 2021-NMSC-006, ¶ 40, 480 P.3d 852, 868. The Court agrees; the Plaintiffs provide an example of the PHOs' clarity. The PHOs state that "close contact recreational facilities" must remain closed or operate at limited capacity; the Defendants included "trampoline parks" in their definition of "close contact recreational facilities" after this litigation had begun. See Feb. 24 PHO at 5. To the extent that it was unclear whether the Plaintiffs were a close contact recreational facility, the more recent PHOs remedy any confusion. See Feb. 24 PHO at 5.

The Court's holding on § 24-1-3(e) and the PHOs also comports with the Supreme Court's instruction that statutes should be interpreted to avoid constitutional difficulties. See Frisby v. Schultz, 487 U.S. 474, 483 (1988)("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties."). See also Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 16, 212 P.3d at 366-67 ("A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language."). Moreover, when the Court evaluates the constitutional validity of state statutes, it applies the Supreme Court's instruction "that 'every possible presumption is to be indulged in favor of the validity of a statute.'" Griffin v. Bryant, 30 F. Supp. 3d at 1167 (quoting Mugler v. Kansas, 123 U.S. 623 (1887)). "Facial invalidation," which the Plaintiffs request here, is "strong medicine that has been employed by the Court sparingly and only as a last resort." Nat'l Endowment for the Arts v. Finley, 524 U.S. at 580. An ordinary person could understand the meanings of both the PHOs and § 24-1-3(E); the Court therefore declines to

invalidate these provisions.  See Hill v. Colorado, 530 U.S. at 732.  The Court has had a number of cases involving the PHOs.  See, e.g., Hernandez v. Grisham, 499 F. Supp. 3d 1013 (D.N.M. 2020)(Browning, J.); Legacy Church, Inc. v. Kunkel, 472 F. Supp. 3d 926 (D.N.M. 2020)(Browning, J.).  In its review of these PHOs, the issues generally have not been determining what the PHOs cover, but whether what the PHOs cover is constitutional.  The Court concludes that neither N.M.S.A. § 24-1-3(E) nor the PHOs are void for vagueness.

## VII. THE DEFENDANTS HAVE NOT VIOLATED THE PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS, BECAUSE THE PHOS ARE QUASI-LEGISLATIVE AND BECAUSE ELEVATE TRAMPOLINE HAD SUFFICIENT DUE PROCESS IN ITS ADJUCATIVE PROCESS.

The Plaintiffs insist, in Count II of the Complaint, that the PHOs violate procedural due process because "they are drafted and promulgated without any public comment" and the State's available administrative procedures are too slow.  Complaint ¶¶ 139-155, at 22-24.  Because the PHOs are not adjudicative, but are "quasi-legislative in nature," however, the Plaintiffs are not entitled to additional due process.  Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty., No. 10-CV-01482-LTB-KLM, 2015 WL 1361393, at *6 (D. Colo. March 24, 2015)(Babcock, J.)("Onyx I").  "When the action has a limited focus (only a few people or properties are affected) and is based on grounds that are individually assessed, it may be more adjudicative than legislative and therefore subject to traditional procedural requirements of notice and hearing."  Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty., 838 F.3d 1039, 1046 (10th Cir. 2016)("Onyx II").  By contrast, "governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient."  Halverson v. Skagit Cty., 42 F.3d 1257, 1261 (9th Cir. 1994).

Here, the PHOs affect the entirety of New Mexico, and, accordingly, are not subject to traditional notice and hearing requirements. Even before the NMDOH added trampoline parks to its definition of recreational facilities, see Feb. 24 PHO at 5, and the previous PHOs affected the Plaintiffs differently from other businesses, the PHOs were still generally applicable, see Onyx II, 838 F.3d at 1046. Further, the Tenth Circuit has held that there must be an "element of deliberateness in directing the misconduct toward the plaintiff before the Due Process Clause is implicated." Archuleta v. McShan, 897 F.2d 495, 498 (10th Cir. 1990). Finally, the Defendants made the PHOs available to the public, providing sufficient "general notice . . . by law." Halverson v. Skagit Cty., 42 F.3d at 1261.

The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "'[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?'"; and (ii) "'[w]as the individual afforded an appropriate level of process?'" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)); See Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1304 (D.N.M. 2005)(Browning, J.)(same), aff'd, 168 F.3d 1214 (10th Cir. 2006). Under Mathews v. Eldridge, 424 U.S. at 335, "to determine what process is due, courts must balance: (1) the private interests that will be affected by the official action; (2) the risk of erroneous deprivation; and (3) the burden on the government from additional procedural requirements." Mathews v. Eldridge, 424 U.S. at 335. The grant of an individualized hearing to every business in New Mexico which had to shut down during the pandemic would impose a significant burden on the State, and, "where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445 (1915).

The amount of process that is due is dependent on the circumstances: "In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly.  Quick action may turn out to be wrongful action, but due process requires only a post-deprivation opportunity to establish the error."  Camuglia v. City of Albuquerque, 448 F.3d at 221.  Moreover, "due process is flexible and calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

Here, the Plaintiffs may have a property interest in operating their businesses under the Due Process Clause.  See Honda Motor Co. v. Oberg, 512 U.S. 415, 432 (1994)(describing a property interest in money damages); Complaint ¶ 108, at 17 (describing some of the Plaintiffs' economic losses as a result of the trampoline facility closure).  The Defendants closed the Plaintiffs' business initially as a quick response to the COVID-19 pandemic's rapid spread; the Plaintiffs argue that the State "cannot and should not avoid providing some sort of post-deprivation due process just because it will be a lot of work."  Feb. 24 Tr. at 86:1-11.  Because the PHOs are generally applicable, however, the Plaintiffs are not entitled to post-deprivation process.

Only one Plaintiff was subject to an adjudicative process:  Elevate Trampoline has had an administrative hearing already, and the Plaintiffs aver that Elevate Trampoline received a hearing only because it was fined for violating the PHO.  See Tr. at 88:10-14 (Artuso).  The regulation at issue states that "[a] person may request an administrative hearing before a hearing officer appointed by the secretary or his or her designee, to appeal the proposed imposition of a civil monetary penalty pursuant to the Act at Section 12-10A-19 NMSA 1978."  N.M.A.C. § 7.1.30.8 (A).  The Plaintiffs maintain that they "should have been permitted to operate during the pendency of the proceeding," and "should either be permitted to remain open during the pendency of an appeal . . . or the state should provide for an expedited hearing and determination of any such

appeal."  Complaint ¶¶ 153-54, at 24.  The outbreak of a new and deadly disease, however, "constitutes an imminent danger to public safety is precisely the kind of circumstance where the government must act quickly."  Guttman v. Khalsa, 669 F.3d at 1114.  Given the totality of the circumstances, the Court determines that Elevate Trampoline was afforded adequate due process, and that the PHOs' quasi-legislative nature renders the other Plaintiffs' procedural due process claims unavailing.

## VIII.  THE DEFENDANTS HAVE NOT VIOLATED THE PLAINTIFFS' EQUAL PROTECTION RIGHTS, BECAUSE THE PLAINTIFFS ARE NOT MEMBERS OF A SUSPECT CLASS, THE DEFENDANTS HAVE SHOWN NO ANIMUS TOWARDS THE PLAINTIFFS, AND THE DEFENDANTS' POLICIES SATISFY RATIONAL BASIS REVIEW.

To establish an equal protection violation, the Plaintiffs first must demonstrate that he or she is a member of a class of persons who is being treated differently than similarly situated individuals outside the class.  See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012)(Gorsuch, J.).  Further, if a statute appears facially neutral, the plaintiff must make out a "prima facie case of discriminatory purpose."  Washington v. Davis, 426 U.S. 229, 241 (1976). See Wayte v. United States, 470 U.S. 598, 610 (1985)(concluding that, even if a government's policy has a discriminatory effect on vocal non-registrants for the Selected Service, the plaintiffs must show that the government intended that discriminatory effect); Curtis v. Oliver, No. CIV 20-0748 JB\JHR, 2020 WL 4734980, at *63 (D.N.M. Aug. 14, 2020)(Browning, J.)("'[A] discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action.'")(quoting SECSYS, LLC v. Vigil, 666 F.3d at 685).  The Plaintiffs must establish a discriminatory purpose in any equal protection challenge involving a facially neutral law.  See, e.g., Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 481 (1997)(holding

that the plaintiff in a constitutional vote dilution challenge under the equal protection clause must

demonstrate that the defendants "acted with a discriminatory purpose"); Romer v. Evans, 517 U.S.

620 (1996)(invalidating a state constitutional amendment impacting sexual minorities, because its

"sheer breadth" was "so discontinuous with the reasons offered for it that the amendment seems

inexplicable by anything but animus toward the class it affects").

Here, the Plaintiffs do not allege that a discriminatory purpose or animus towards

trampoline facilities motivates the Defendants' policies.  See Washington v. Davis, 426 U.S. at

241.  First, the Defendants' Feb. 24 PHO is facially neutral; it does not require only trampoline

facilities to remain closed during the pandemic's pendency.  See Feb. 24 PHO at 1.  Under the

PHO issued on December 30, 2020, no "close contact recreational facilities" could operate.  Public

Health Emergency Order (dated Dec. 30, 2020), at 8 ("December 30 PHO").  The December 30

PHO includes in its definition of "close contact recreational facilities"

> indoor movie theaters, indoor museums with interactive displays or exhibits and
> other similar venues, miniature golf, arcades, amusement parks, aquariums,
> bowling alleys, casinos, concert venues, indoor ice-skating rinks, professional
> sports venues, event venues, bars, dance clubs, performance venues, go-kart
> courses, automobile racetracks, adult entertainment venues, and other places of
> recreation or entertainment.

December 30 PHO at 5.  Unlike the state constitutional amendment in Romer v. Evans, which

solely impacted sexual minorities, neither the December 30 PHO nor the Feb. 24 PHO solely

impacted trampoline facilities.  See Romer v. Evans, 517 U.S. at 632; Feb. 24 PHO at 5; December

30 PHO at 5-8.  The Plaintiffs argue that the "Defendants offer no reason, nor can they, as to why

these portions of the Plaintiffs' businesses are closed, when identical businesses are open.  In light

of these facts, there is no doubt that Plaintiffs are being treated differently from identical

businesses, as well as similarly situated businesses like gyms . . . ."  Response at 36.  More

accurately, the Feb. 24 PHO prohibits "close contact recreational facilities" from operating.  Feb.

24 PHO at 8.   It is true that the Feb. 24 PHO distinguishes between trampoline facilities and, for example, "outdoor recreational facilities," which may operate at 50% capacity in "Green Level" counties.  Feb. 24 PHO at 8.  Regulatory distinctions among categories of businesses, however, are not usually enough to state an equal protection claim.  See Heller v. Doe, 509 U.S. 312, 319-20 (explaining that "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity"); Lawrence v. Polis, No. CIV 20-00862, 2020 WL 7348210, at *11 (D. Colo. Dec. 4, 2020)(Domenico, J.)(noting that "distinctions among different types of businesses in Defendants' public-health orders result in a disparity of treatment between his employer," a restaurant, "and, for example, houses of worship" likely did not violate the Equal Protection Clause).   Nor is there any evidence that the Defendants possess a "bare . . . desire to harm" trampoline facilities.  Moreno, 413 U.S. 528, 534 (1973).  The Plaintiffs have not attempted to make a prima facie showing of discriminatory purpose or animus; therefore, any equal protection claim relating to trampoline facilities necessarily fails.  See Washington v. Davis, 426 U.S. at 241; Feb. 24 PHO at 1; Complaint ¶¶ 156-63, at 6-7.

The Plaintiffs insist that they bring a "class of one" claim.  Response at 36 (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)("Olech")).  The Supreme Court has "recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Olech, 528 U.S. at 564.  In Olech, Justice Stephen Breyer notes that the defendant city, in addition to making a "faulty zoning decision," demonstrated "illegitimate animus" towards the plaintiff.  528 U.S. at 565 (Breyer, J., concurring).  "The presence of that added factor . . . is sufficient to minimize any concern about transforming run-of-the-mill" cases of faulty decision-making "into cases of constitutional right."   528 U.S. at 565

(Breyer, J., concurring).  Moreover, "when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a 'rational basis for the difference in treatment.'"  Engquist v. Oregon Dep't of Agr., 553 U.S. 591, 602 (2008)(quoting Olech, 528 U.S. at 564).

Here, the Plaintiffs' class of one argument is unsuccessful for three reasons.  First, the Defendants have not singled out solely the Plaintiffs.  Instead, they are subject to the same requirements to which all other recreational facilities, including aquariums, amusement parks, arcades, basketball courts, baseball fields, bowling alleys, botanical gardens, family entertainment centers, football fields, go- kart courses, golf courses, guided raft and balloon tours, ice-skating rinks, museums with interactive displays or exhibits, miniature golf courses, ski areas, soccer fields, swimming pools, tennis courts, and zoos, are subject.  See Feb. 24 PHO at 5.  Second, there is no evidence that the Defendants hold any animus towards the Plaintiffs.  See Olech, 528 U.S. at 565 (Breyer, J., concurring).  Finally, as discussed above, the Defendants have provided a rational basis for placing trampoline facilities in a separate category from gyms or beauty salons.  See Analysis § IV, supra.  The Court therefore dismisses the Plaintiffs' equal protection claim, Count III of the Complaint.  Because the Court will dismiss Counts I, II, and III, the Court will also necessarily dismiss Count IV, which asks the Court to "prevent Defendants from enforcing all PHOs that rely on the unconstitutionally overbroad and vague authority granted under" N.M.S.A. § 24-1-3(E).  Complaint ¶ 165, at 26.

**IT IS ORDERED** that: (i) the Motion to Dismiss Plaintiffs' Verified Complaint for Violation of Constitutional Rights to Due Process and Equal Protection and Request for Preliminary and Permanent Injunctive Relief, filed February 11, 2021 (Doc. 13), is granted; (ii) the Verified Complaint for Violation of Constitutional Rights to Due Process and Equal Protection

and Request for Preliminary and Permanent Injunctive Relief, filed February 4, 2021 (Doc. 1) is

dismissed; and (iii) the Court will enter Final Judgment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Angelo J. Artuso
Law Office of Angelo J. Artuso
Albuquerque, New Mexico

-- and --

Patrick J. Rogers
Patrick J. Rogers, LLC
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Holly Agajanian
  General Counsel for Governor Michelle Lujan Grisham
Kyle P. Duffy
Maria S. Dudley
  Office of the Governor
Santa Fe, New Mexico

     *Attorneys for the Defendants*